**UNITED STATES of America, Plaintiff,**

v.

**Jeff BOYD, Edgar Cooksey, Andrew Craig, Charles Green, Sammy Knox, Felix Mayes and Noah Robinson, Defendants.**

**No. 89 CR 908.**

United States District Court, N.D. Illinois, E.D.

Sept. 20, 1993.

Barry Elden, U.S. Atty., Chicago, IL, for U.S.

Kenneth Hanson, Chicago, IL, for Jeff Boyd.

Victor Pilolla, Oak Park, IL, for Edgar Cooksey.

Eugene O'Malley, Chicago, IL, for Andrew Craig.

Joshua Sachs, Chicago, IL, for Charles Green.

Michael Falconer, Chicago, IL, for Sammy Knox.

Ronald J. Clark, Harvey M. Silets, Edwin E. Brooks, Katten Muchin & Zavis, Chicago, IL, for Felix Mayes.

Noah Robinson, Chicago, IL, for Noah Robinson.

Thomas P. Sullivan, Thomas S. O'Neill, Jenner & Block, Chicago, IL, amicus curiae.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This is the most painful decision that this court has ever been obliged to render, making the crafting of this opinion a sad and difficult undertaking. Mindful of the consequences of our ruling, we would have preferred to have been able to reach a result other than what must be.

Significant questions of prosecutorial misconduct bring "Trial I" defendants Jeff Boyd, Edgar Cooksey, Andrew Craig, Charles Green, Sammy Knox, Felix Mayes and Noah Robinson before this court seeking new trials. Initially, we retained jurisdiction to address the following issues: (1) whether the government withheld evidence of post-incarceration, positive drug tests of witnesses Harry Evans and Henry Harris in violation of the principles set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny; and (2) to the extent that Evans and Harris testified that they had not used illicit narcotics while incarcerated, whether the government knowingly used perjured testimony during the course of trial. In light of the evidence adduced during these post-trial proceedings, however, we will expand our focus to consider the impact of other information within the possession of the government yet undisclosed to the defense, as well as additional instances of potentially perjured testimony. Finding that the government in fact (i) withheld information favorable to the defense in violation of *Brady* and its progeny, and (ii) suborned perjured testimony regarding such undisclosed evidence, we conclude that these defendants have been deprived of a fair trial and, consequently, grant their respective motions for new trial respecting all convictions, save Mayes' conviction for the intimidation of

witness Henry Harris (Count 12) and Green's conviction for the unlawful possession of firearms as a convicted felon (Count 58).

The consequences of our ruling today are tragic in many respects. It is a tragedy that the convictions of some of the most hardened and anti-social criminals in the history of this community must be overturned.

It is tragic that the United States of America has squandered millions of taxpayer dollars and years of difficult labor by the courts, prosecutors and law enforcement officers in the investigation and trial of these botched prosecutions.

It is tragic that the hard-earned and well-deserved reputations for professionalism of the United States Attorney's Office for the Northern District of Illinois and other federal law enforcement and penal agencies in this district have been so unfairly tainted by the actions of so few.

It is a personal tragedy for the lead El Rukn prosecutor who, in seeking to attain the laudable goal of ridding society of an organization of predatory career criminals, was willing to abandon fundamental notions of due process of law and deviate from acceptable standards of prosecutorial conduct. The others who followed his lead or failed to supervise him properly, of course, share in this disgrace.

## TABLE OF CONTENTS

I. Procedural Background ............................................................. 1283
II. Post–Incarceration Drug Use by Government Witnesses Henry Harris and Harry Evans ................................................................. 1289
 A. MCC Drug Test Results ............................................. 1290
 B. Direct Observation by Other Inmates ......................... 1293
 1. Nicholas Ahrens ............................................ 1293
 2. Raymond Bonnema ......................................... 1293
 3. Jackie Clay ................................................ 1294
 4. Michael Corbitt ............................................ 1295
 5. Earl Hawkins .............................................. 1296
 6. Derrick Kees ............................................... 1297
 7. Ervin Lee .................................................. 1297
 8. Harry Martin .............................................. 1297
 9. Abdul Jabbar Muhammad ................................. 1299
 C. Admissions of Illegal Drug Use ................................. 1299
 1. Admissions by Henry Harris ............................. 1299
 2. Admissions by Harry Evans .............................. 1300
 D. Other Evidence of Post–Incarceration Drug Use ............ 1301
 1. Henry Harris' Refusal to Provide a Urine Sample ..... 1301
 2. Henry Harris' Physical Appearance ..................... 1302
 3. Harry Evans' Physical Appearance ...................... 1303
 4. Monitored Telephone Conversations ..................... 1304
 5. Harry Evans' Possession of Cash ....................... 1306
 6. Harry Evans' Requests for Laxatives ................... 1307
III. Government Knowledge of Post–Incarceration Drug Use by Henry Harris and Harry Evans ...................................................... 1307
 A. Information Compiled by MCC Officials and Conveyed to Members of the United States Attorney's Office ........................... 1308
 1. General Information Relating to Drug Usage Problems on the Sixth Floor of the MCC ......................................... 1308
 2. The October 18, 1989 Memorandum Documenting Henry Harris and Harry Evans' Positive Drug Test Results ................ 1308
 3. AUSA Rosenthal's Conversation with William R. Hogan, Jr. Regarding the October 18, 1989 Memorandum .................... 1309
 4. Lt. Charles Mildner's Conversation with William R. Hogan, Jr. .... 1314
 B. Information Compiled by ATF Agents and Other El Rukn Task Force Investigators and Conveyed to Members of the United States Attorney's Office ................................................................. 1314

C. Suspicions of Post–Incarceration Drug Use Formulated by Members of the United States Attorney's Office and Conveyed to William R. Hogan, Jr. .................................................. 1315
 1. Suspicions of Tanya Van Blake .................................. 1315
 2. AUSA Theodore Poulos' Discussion with William R. Hogan, Jr. Regarding Harry Evans' Physical Appearance During Trial III Conducted Before Judge Mills ................................. 1316
 3. Harry Evans and the "Shoe Incident" .......................... 1317
D. Evidence Conveyed to Members of the United States Attorney's Office by El Rukn Cooperating Witnesses .............................. 1318
 1. Jackie Clay ...................................................... 1318
 (a) Conversations with William R. Hogan, Jr. .................. 1318
 (b) Conversations with Corinda Luchetta ...................... 1319
 2. Henry Harris .................................................... 1319
 (a) Conversations Regarding his Refusal on May 30, 1991 to Provide a Urine Sample ..................................... 1319
 (b) Conversations Regarding his Positive Drug Test ............. 1320
 3. Eugene Hunter .................................................. 1321
 4. Derrick Kees .................................................... 1321
E. Evidence Conveyed to Members of the United States Attorney's Office by Other Incarcerated Individuals ................................ 1321
 1. Michael Corbitt ................................................. 1321
 2. Harry Martin .................................................... 1322
IV. Aberrant Treatment of and Undisclosed Benefits Provided to El Rukn Cooperating Witnesses by Members of the Prosecution Team ............ 1322
A. Contact Visits and Inadequate Security Measures at the United States Attorney's Office and ATF Offices ................................ 1323
 1. Security Measures at the MCC .................................... 1323
 2. Conjugal Visits at the Federal Buildings ........................ 1324
 3. Harry Evans' Visitation Privileges .............................. 1326
B. Telephone Privileges Conferred upon El Rukn Cooperating Witnesses by Members of the Prosecution Team ............................ 1327
C. Personal Relations Between El Rukn Cooperating Witnesses and Paralegal Corinda Luchetta .......................................... 1328
D. Personal Relations Between El Rukn Cooperating Witnesses and AUSA William R. Hogan, Jr. ............................................ 1329
E. Alcohol Use by El Rukn Cooperating Witnesses in the United States Attorney's Office and ATF Offices ................................. 1330
F. Gifts, Clothing and Parties Conveyed to El Rukn Cooperating Witnesses by Members of the Prosecution Team .............................. 1331
V. Government Disregard of Post–Incarceration Drug Use ..................... 1332
A. Failure to Disclose or Investigate ................................... 1332
B. Deliberate Nature of the Failure to Disclose or Investigate ............ 1333
VI. Knowing Use of Perjured Testimony ...................................... 1335
A. Identification of Perjured Testimony ................................. 1336
 1. Testimony Regarding Post–Incarceration Drug Use ............... 1336
 2. Testimony Regarding Government Conferred Benefits ............ 1338
 3. Allegations that William R. Hogan, Jr. Coached Henry Harris and Other Witnesses to Lie about their Opportunity to Collude with Each Other ..................................................... 1339
 4. Henry Harris' Testimony Regarding the Robinson–Fort–Cooper Heroin Investment Partnership ................................. 1341
 5. Henry Harris' Testimony that Noah Robinson Introduced El Rukn Buyers to Narcotics Suppliers to Raise Bond Money for Jeff Fort in 1983 ..................................................... 1342
 6. Henry Harris' Testimony Regarding the Howard Johnson Motel Receipt ....................................................... 1342
 7. Jackie Clay's Testimony Regarding Noah Robinson's Solicitation of Derrick Porter to Kill Henry Harris ............................ 1342
 8. Henry Harris' Account of the Ballistrieri Incident ............... 1343
 9. Harry Evans' Testimony Regarding Louis Farrakhan ............. 1343

10. Derrick Kees' Testimony Regarding Edgar Cooksey's Role in the Charmane Nathan Murder ................................. 1343
11. Allegations that William R. Hogan, Jr. Coached Henry Harris to Lie Regarding the Interpretation of Title III Tapes ............ 1344
12. Generalized Allegations of False Testimony ...................... 1344
B. Defining "Perjury within the Prosecution's Case"—Government Knowledge and Use of Perjured Testimony ............................. 1344
C. Materiality of Perjured Testimony ................................. 1346
1. Perjured Testimony Regarding Post–Incarceration Drug Use ...... 1346
2. Perjured Testimony Regarding Witness Collaboration ............. 1348
3. Summary of Cooperating Witnesses' Testimony Relating to Each Count of Conviction ......................................... 1348
VII. Government Obligations under *Brady v. Maryland* ...................... 1351
A. Evidence within the Possession of the Government .................... 1352
1. Post–Incarceration Drug Use ................................... 1353
2. Government Conferred Benefits ................................ 1354
B. Evidence Possessed by the Government was Suppressed ............... 1354
1. Actual Knowledge of Post–Incarceration Drug Use .............. 1354
2. Waiver by Defendant Noah Robinson ......................... 1355
3. The Power of Subpoena ....................................... 1356
4. Impact of Production in Trial II ............................... 1357
C. Evidence Suppressed by the Government was Favorable to the Defense ... 1359
1. Post–Incarceration Drug Use ................................... 1359
2. Government Conferred Benefits ................................ 1361
D. Evidence Suppressed by Government was Material .................... 1361
1. Suppressed Evidence was not Merely Cumulative Impeachment ... 1362
2. Lead Prosecutor William R. Hogan, Jr.'s Conduct Respecting the Suppressed Evidence Compels a Finding of Materiality ......... 1364
VIII. Conclusion ................................................... 1365

## I. Procedural Background

Assembling the foundation of the government's celebrated effort to eradicate the notorious El Rukn street gang, on October 26, 1989, a special grand jury returned two indictments against a total of 65 El Rukn members or associates. The first indictment, numbered 89 CR 908, was assigned randomly to this court. This "labyrinthine" 305–page, 175–count indictment, nearly two inches thick and weighing almost four pounds, named 38 individuals as defendants, detailed a maze of well over 250 factually separate criminal acts committed from 1966 to 1989 in many different locations and, for each act, alleged the participation of varying combinations of· defendants and countless unindicted co-conspirators. Finding ill-conceived the government's ambition to pursue these 175 diverse charges in a single mega-trial of unprecedented projected duration, in a series of orders pursuant to Federal Rule of Criminal Procedure 14, we severed the indictment into five separate trials. *See United States v. Andrews,* 754 F.Supp. 1161 (N.D.Ill.1990) (*Andrews I* ); *United States v. Andrews,* 754 F.Supp. 1197 (N.D.Ill.1990) (*Andrews II* ); *United States v. Andrews,* 754 F.Supp. 1206 (N.D.Ill.1990) (*Andrews III* ); *United States v. Andrews,* 764 F.Supp. 1248 (N.D.Ill.1991) (*Andrews IV* ); *United States v. Andrews,* 764 F.Supp. 1252 (N.D.Ill.1991) (*Andrews V* ).

This court presided over the first of the severed trials, beginning on May 6, 1991, and including charges against defendants Jeff Boyd, Edgar Cooksey, Andrew Craig, Charles Green, Sammy Knox, Felix Mayes and Noah Robinson.[1] Assistant United

1. Trial I was comprised of the seven defendants facing the most serious charges, six "generals"— the top leadership of the El Rukns—as well as a purported cohort/financier of the organization. Lesser ranking El Rukn gang members were grouped in Trials II through V.

States Attorney William R. Hogan, Jr.[2] served as lead prosecutor for the government and was supported by Assistants Ross Silver- man and John Hartmann. On September 1, 1991, a jury rendered the following verdicts:

### Verdict as to Jeff Boyd

| Count | Charge | Verdict |
|---|---|---|
| One | Racketeering Conspiracy | Guilty |
| Two | Racketeering | Guilty [3] |
| Three | Narcotics Conspiracy | Guilty |
| Four | Conspiracy to Murder and Attempted Murder of Members of the King Cobras | Guilty |
| Seven | Triple Murder of Rico Chalmers, Vicki Nolden and Glendon McKinley | Guilty |
| Ten | Kidnapping of Patricia McKinley | Guilty |

### Verdict as to Edgar Cooksey

| Count | Charge | Verdict |
|---|---|---|
| One | Racketeering Conspiracy | Guilty |
| Two | Racketeering | Guilty [4] |
| Three | Narcotics Conspiracy | Guilty |
| Four | Conspiracy to Murder and Attempted Murder of Members of the King Cobras | Guilty |
| Five | Assault of Theotis Clark | Guilty |
| Nine | Interstate Murder–For–Hire of Leroy "Hambone" Barber | Not Guilty |

### Verdict as to Andrew Craig

| Count | Charge | Verdict |
|---|---|---|
| One | Racketeering Conspiracy | Guilty |
| Two | Racketeering | Guilty [5] |
| Three | Narcotics Conspiracy | Guilty |
| Four | Conspiracy to Murder and Attempted Murder of Members of the King Cobras | Guilty |
| Five | Assault of Theotis Clark | Guilty |
| Six | Murder of Robert Jackson | Not Guilty |

### Verdict as to Charles Green

| Count | Charge | Verdict |
|---|---|---|
| One | Racketeering Conspiracy | Guilty |

2. As observed elsewhere in this opinion, Hogan was lead counsel in other El Rukn prosecutions, was in charge of the pre-indictment investigation, controlled the El Rukn confidential informants, and apparently made every major decision regarding the prosecution of these cases.

3. In support of this verdict, the jury found that Boyd had committed Racketeering Acts 19 (conspiracy to murder members of the King Cobras), 22 (murder of Rico Chalmers, Glendon McKinley and Vicki Nolden, and attempted murder of Andre Chalmers), 25 (kidnapping of Patricia McKinley) and 31 (conspiracy to possess with intent to distribute and conspiracy to distribute controlled substances).

4. In support of this verdict, the jury found that Cooksey had committed Racketeering Acts 19 (conspiracy to murder members of the King Cobras) and 31 (conspiracy to possess with intent to distribute and conspiracy to distribute controlled substances).

5. In support of this verdict, the jury found that Craig had committed Racketeering Acts 19 (conspiracy to murder members of the King Cobras) and 31 (conspiracy to possess with intent to distribute and conspiracy to distribute controlled substances).

| | | |
|---|---|---|
| Two | Racketeering | Guilty [6] |
| Three | Narcotics Conspiracy | Guilty |
| Four | Conspiracy to Murder and Attempted Murder of Members of the King Cobras | Guilty |
| Five | Assault of Theotis Clark | Guilty |
| Six | Murder of Robert Jackson | Guilty |
| Fifty-Eight | Unlawful Possession of Firearms | Guilty |

### Verdict as to Sammy Knox

| Count | Charge | Verdict |
|---|---|---|
| One | Racketeering Conspiracy | Guilty |
| Two | Racketeering | Guilty [7] |
| Three | Narcotics Conspiracy | Guilty |
| Four | Conspiracy to Murder and Attempted Murder of Members of the King Cobras | Guilty |
| Ten | Kidnapping of Patricia McKinley | Guilty |

### Verdict as to Felix Mayes

| Count | Charge | Verdict |
|---|---|---|
| One | Racketeering Conspiracy | Guilty |
| Two | Racketeering | Guilty [8] |
| Three | Narcotics Conspiracy | Guilty |
| Twelve | Intimidation of Witness Henry Harris | Guilty |

### Verdict as to Noah Robinson

| Count | Charge | Verdict |
|---|---|---|
| One | Racketeering Conspiracy | Guilty |
| Two | Racketeering | Guilty [9] |
| Three | Narcotics Conspiracy | Guilty |
| Eight | Interstate Attempted Murder–For–Hire of Robert Aulston | Guilty |
| Nine | Interstate Murder–For–Hire of Leroy "Hambone" Barber | Guilty |
| Eleven | Tampering with Witness Henry Harris | Not Guilty |

6. In support of this verdict, the jury found that Green had committed Racketeering Acts 19 (conspiracy to murder members of the King Cobras), 21 (murder of Robert "Dog" Jackson) and 31 (conspiracy to possess with intent to distribute and conspiracy to distribute controlled substances).

7. In support of this verdict, the jury found that Knox had committed Racketeering Acts 1 (murder of Gilbert Conner), 19 (conspiracy to murder members of the King Cobras), 25 (kidnapping of Patricia McKinley) and 31 (conspiracy to possess with intent to distribute and conspiracy to distribute controlled substances).

8. In support of this verdict, the jury found that Mayes had committed Racketeering Acts 3 (murder of Willie McLilly and Roy Love), 26 (intimidation of witness Henry Harris) and 31 (conspiracy to possess with intent to distribute and conspiracy to distribute controlled substances).

9. In support of this verdict, the jury found that Robinson had committed Racketeering Acts 23 (conspiracy to murder Robert Peter Aulston and attempted murder of Robert Peter Aulston), 24 (conspiracy to murder and murder of Leroy "Hambone" Barber), 27 (conspiracy to murder Janice Denise Rosemond, attempted murder of Janice Denise Rosemond, and retaliation against and tampering with witness Janice Denise Rosemond), 30 (tampering with witness Henry Harris) and 31 (conspiracy to possess with intent to distribute and conspiracy to distribute controlled substances).

| Thirteen | Interstate Attempted Murder–For–Hire of Janice Denise Rosemond | Guilty |
| Fourteen | Retaliation Against Witness Janice Denise Rosemond | Guilty |
| Fifteen | Tampering with Witness Janice Denise Rosemond | Guilty |
| Sixteen | Retaliation Against Witness Henry Harris | Not Guilty |
| Seventeen | Tampering with Witness Henry Harris | Guilty |

---

On June 3, 1992, we sentenced Jeff Boyd, Andrew Craig and Edgar Cooksey as follows. Boyd received 20 years in the custody of the Attorney General on Count 1, 20 years on Count 2, 50 years on Count 3, 10 years on Count 4, 50 years on Count 7, and 50 years on Count 10, such terms of imprisonment to run concurrent to each other. Craig received terms of 600 months in the custody of the Attorney General on Counts 1, 2 and 3, to run concurrent to each other. Additionally, we sentenced Craig to 60 months on each of his non-guidelines convictions (Counts 4 and 5), to run concurrent to each other and concurrent with the 600 months. On Counts 1, 2, 3 and 4, we sentenced Cooksey to a term of mandatory life imprisonment pursuant to the United States Sentencing Guidelines. As to Count 5, a non-guideline count, we sentenced Cooksey to a term of 5 years, such imprisonment to run concurrent to his sentence of life imprisonment. Charles Green, Sammy Knox and Felix Mayes were sentenced by this court on June 24, 1992. Green received a term of life imprisonment under the United States Sentencing Guidelines on Counts 1, 2 and 3. Respecting his non-guidelines convictions, we sentenced Green to 10 years imprisonment on each of Counts 4, 5 and 6, and 5 years on Count 58, to run concurrent to each other and concurrent with his sentence of life imprisonment. Knox received a term of life imprisonment under the United States Sentencing Guidelines on Counts 1, 2 and 3. Further, we sentenced Knox to 10 years on each of Counts 4 and 10 (non-guidelines counts), to run concurrent to each other and concurrent with his sentence of life imprisonment. Mayes likewise received a term of life imprisonment under the United States Sentencing Guidelines on Counts 1, 2 and 3. As to Count 12, a non-guidelines count, we sentenced Mayes to 10 years imprisonment to run concurrent to his sentence of life imprisonment. Finally, on August 21, 1992, we sentenced Noah Robinson to a term of life imprisonment under the United States Sentencing Guidelines on Counts 1, 2 and 3. Respecting his non-guidelines convictions, we sentenced Robinson to 5 years on Count 8, life imprisonment on Count 9, 20 years on Count 13, 10 years on Count 14, 20 years on Count 15, and 10 years on Count 17, such terms of imprisonment to run concurrent to each other and concurrent to his sentence of life imprisonment imposed under the guidelines.

Judge Suzanne Conlon presided over the second severed trial in Case No. 89 CR 908. That trial, which included charges against defendants Henry Andrews, George Carter, William Doyle, J.L. Houston and Derrick Porter, began on July 8, 1991 and ended with verdicts on August 30, 1991. Andrews, Carter and Doyle were found guilty of various criminal violations. The charges against Houston were severed upon his motion grounded in ineffective assistance of counsel, and the charges against Porter were dismissed at the close of all evidence pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Assistant United States Attorneys William R. Hogan, Jr., Theodore Poulos and Patrick J. King prosecuted the case on behalf of the government.

The third of the severed trials was conducted by Judge Richard Mills of the Central District of Illinois,[10] and included charges

---

10. Pursuant to designation by Chief Judge William J. Bauer of the United States Court of Appeals for the Seventh Circuit, Judge Mills temporarily held a district court within the Northern

against defendants Thomas Bates, Jerome Crowder, Bernard Green, Louis Hoover, Roland Lewis and Edward Williams. The trial began on October 1, 1991, culminating in verdicts on December 10, 1991. Each of the six defendants was found guilty of various criminal violations. Assistant United States Attorneys Theodore Poulos and John Hartmann prosecuted the case on behalf of the government.

Judge Harold A. Baker of the Central District of Illinois presided over the fourth trial in Case No. 89 CR 908.[11] That trial, which included charges against defendants Lawrence Crowder, Floyd Davis, Michael Sardin, James Speights and Melvin Tillman, began on October 17, 1991, and ended with verdicts on November 9, 1991. Each of the five defendants was found guilty of various criminal violations. Assistant United States Attorneys William R. Hogan, Jr., Patrick King and Michael Pace prosecuted the case on behalf of the government.

The fifth severed trial initially included charges against Eddie Franklin, J.L. Houston (previously severed from Trial II before Judge Conlon) and Isiah Kitchen. The trial began on March 2, 1992, before Judge John Tinder of the Southern District of Indiana,[12] with Assistant United States Attorneys William R. Hogan, Jr. and Theodore Poulos prosecuting the case on behalf of the government. After two weeks of trial, Judge Tinder severed from the prosecution those charges against Isiah Kitchen. Respecting Franklin and Houston, the jury returned verdicts on April 22, 1992, finding each guilty of various criminal violations. Kitchen was tried separately before Judge Allen Sharpe of the Northern District of Indiana,[13] such trial beginning on December 1, 1992, and concluding with the return of verdict on De-

cember 10, 1992. The jury found Kitchen guilty of various criminal violations. Assistant United States Attorney William R. Hogan, Jr. served as lead prosecutor in the Kitchen trial.

The second indictment returned on October 26, 1989, numbered 89 CR 909, was assigned to the calendar of Judge James Holderman. That indictment named 27 El Rukn members or associates, and alleged similar offenses to those charged in 89 CR 908. Judge Holderman has conducted two separate trials in Case No. 89 CR 909. The first began on April 9, 1991, and included charges against fourteen alleged El Rukn "ambassadors." On August 9, 1991, the jury found ten of the defendants guilty of various criminal offenses. Three defendants were acquitted of all charges, and a mistrial was declared as to one defendant who subsequently plead guilty. Assistant United States Attorneys Theodore Poulos, Victoria Peters and Michael Pace prosecuted the case on behalf of the government. Judge Holderman began the second trial in Case No. 89 CR 909 on September 23, 1991. On October 31, 1991, the jury found each of the defendants, Thomas Burnside, Codell Griffin and C.D. Jackson, guilty of various criminal violations. Assistant United States Attorney William R. Hogan, Jr. served as lead prosecutor, and was aided by Assistants Ross Silverman and Victoria Peters.

In order to secure the above described convictions, the government relied extensively on the testimony of numerous El Rukn "cooperating witnesses." Charged in one of the October 26, 1989 indictments, these individuals all are, or were, members or associates of the El Rukn organization. Of the 38 defendants charged in Case No. 89 CR 908, the following nine negotiated deals with the

District of Illinois under the authority of 28 U.S.C. § 292(b).

11. Pursuant to designation by Chief Judge William J. Bauer of the United States Court of Appeals for the Seventh Circuit, Judge Baker temporarily held a district court within the Northern District of Illinois under the authority of 28 U.S.C. § 292(b).

12. Pursuant to designation by Chief Judge William J. Bauer of the United States Court of

Appeals for the Seventh Circuit, Judge Tinder temporarily held a district court within the Northern District of Illinois under the authority of 28 U.S.C. § 292(b).

13. Pursuant to designation by Chief Judge William J. Bauer of the United States Court of Appeals for the Seventh Circuit, Judge Sharpe temporarily held a district court within the Northern District of Illinois under the authority of 28 U.S.C. § 292(b).

government, forgoing the uncertainty of trial in exchange for a pledge of cooperation: Jackie Clay, Harry Evans, Henry Leon Harris, Earl Hawkins, Eugene Hunter, Derrick Kees, Freddie Sweeney, Anthony Sumner and Ricky Dean Williams. In the end, Jackie Clay, Harry Evans, Henry Harris, Earl Hawkins, Eugene Hunter, Derrick Kees and Freddie Sweeney testified at Trial I before this court.

The instant motions for new trial stem from allegations of post-incarceration drug use on the part of government witnesses Henry Harris and Harry Evans, such information in the possession of the government prior to the commencement of Trial I, yet not disclosed to the defense.[14] Coinciding questions of prosecutorial misconduct were raised in post-trial motions by defendants in other El Rukn trials.[15] In conjunction with these motions, Judges Conlon and Holderman each conducted expansive evidentiary hearings. Judge Conlon began her evidentiary hearing

on October 15, 1992, and, after hearing a total of 24 witnesses, concluded on January 5, 1993. The post-trial hearing before Judge Holderman began on November 16, 1992, and, after a total of 37 witnesses had testified, ended on December 31, 1992. Rather than duplicate our colleagues' evidence gathering efforts, with the concurrence of the parties, we have agreed to consider the testimony presented before Judges Conlon and Holderman to the limited extent that such testimony is relevant to the issues presently pending before this court.[16]

Following the conclusion of the post-trial hearings before Judges Conlon and Holderman, the government disclosed a significant amount of additional information bearing on the post-incarceration drug use of witnesses Harris and Evans and related matters. As a result of the newly disclosed information, this court elected to undertake a supplemental evidentiary hearing limited in scope to such

14. Prior to their sentencings, Boyd, Craig and Robinson filed several motions for new trials alleging that the government had not disclosed information indicating that Harris and Evans had used illicit narcotics while incarcerated at the Metropolitan Correctional Center in Chicago. In order to give these motions the careful consideration they deserve, we stayed judgment on these defendants' sentences. On October 29, 1992, long after judgment had been entered on their respective sentences, defendants Cooksey, Green, Knox and Mayes sought leave to adopt the post-trial motions filed by co-defendants Boyd, Craig and Robinson. Without objection from the government, we granted Cooksey, Green, Knox and Mayes leave to adopt the post-trial motions relating to Harris and Evans' post-incarceration drug use.

15. The rulings on these post-trial motions have been mixed. Recently, Judges Conlon and Holderman have granted post-trial relief on the basis of the government's suppression of evidence concerning Harris and Evans' post-incarceration drug use. *United States v. Andrews*, 824 F.Supp. 1273 (N.D.Ill.1993) (Conlon, J.); *United States v. Burnside*, 824 F.Supp. 1215 (N.D.Ill.1993) (Holderman, J.). Prior to these rulings Judges Baker, Mills and Sharpe, without the benefit of an evidentiary hearing, denied post-trial motions based on similar allegations of prosecutorial misconduct. *United States v. Kitchen*, 832 F.Supp. 217 (N.D.Ill.1993) (Sharpe, J.); *United States v. Crowder*, No. 89 CR 908 (N.D.Ill. Mar. 4, 1992) (Baker, J.); *United States v. Bates*, No. 89 CR 908 (N.D.Ill. May 22, 1992) (Mills, J.). Similarly, determining that the government had not violat-

ed its obligations under *Brady* and its progeny, Judge Tinder orally denied a motion for mistrial grounded in prosecutorial misconduct. Transcript of Proceedings before the Hon. John Daniel Tinder at 7314–15 (Apr. 15, 1992). In light of Judges Conlon and Holderman's rulings, renewed motions for new trial are currently pending before Judges Baker, Mills, Sharpe and Tinder.

16. This court is most appreciative of the excellent work of Judges Conlon and Holderman, who conducted extensive evidentiary hearings in their El Rukn trials, which in addition to our own evidentiary hearings have comprised a thorough and comprehensive post-trial record upon which we rely herein. For the sake of convenience, we will refer to the transcript of post-trial proceedings before Judge Conlon with the letter "C" followed by the page number. Similarly, we will refer to the transcript of post-trial proceedings before Judge Holderman with the letter "H" followed by the page number. Exhibits admitted into evidence during the post-trial hearing before Judge Conlon are designated by sequential number preceded by "CDE" (indicating a defense exhibit) or "CGE" (indicating a government exhibit). Exhibits admitted into evidence during Judge Holderman's post-trial hearing are referenced by "HDE" (indicating a defense exhibit) or "HGE" (indicating a government exhibit) followed by the description of the exhibit as marked. The transcript of the trial before Judge Conlon is designated "C Tr." followed by the page number. Finally, the transcript of the trial before Judge Holderman is denoted "H Tr." followed by the page citation.

evidence not fully developed at the previous hearings before Judges Conlon and Holderman. To aid the court in an impartial and learned marshalling of evidence, over the government's initial objection, we appointed Thomas P. Sullivan, partner at Jenner & Block and former United States Attorney for the Northern District of Illinois, as *amicus curiae*.[17] Sullivan's comprehensive knowledge of and experience with the workings of the Office of the United States Attorney for the Northern District of Illinois and other federal law enforcement and penal agencies in this district proved of invaluable assistance to the court. Sullivan brought forth new witnesses at the hearings, conducted examinations and filed a comprehensive post-trial analysis of the evidence. We are grateful for the many hours he devoted to this assignment and the excellent quality of his work. In a combined effort to expedite the proceeding and to avoid the logistical problems associated with bringing each of the seven Trial I defendants back to Chicago from their respective institutions nationwide, we severed Felix Mayes, conducting the hearing on his behalf alone. To ensure that defendant Mayes would not be prejudiced by the absence of a collective effort, we appointed Harvey M. Silets, a distinguished former Assistant United States Attorney and partner at Katten Muchin & Zavis, as co-counsel to Mayes' talented trial attorney, Ronald Clark, who had served as lead counsel at Trial I.

We are most appreciative of Silet's willingness to accept this assignment.

The hearing began on May 24, 1993, and, after 29 witnesses had testified over seven full days, concluded on July 8, 1993.[18] Pursuant to petitions filed by the United States Attorney at the request of this court,[19] the following witnesses testified under a grant of immunity: Harry Martin, Eugene Hunter, Jackie Clay, Earl Hawkins, Derrick Kees, Michael Corbitt, Henry Harris, Harry Evans and Ervin Lee.[20] Given the thoroughness and exceptional nature of the effort by Sullivan, his assistant Thomas S. O'Neill, Clark, Silets and his associate Edwin E. Brooks, the remaining Trial I defendants each have elected to adopt as their own the post-trial testimony elicited on behalf of defendant Mayes, offering such testimony without addition or subtraction.[21]

## II. Post–Incarceration Drug Use by Government Witnesses Henry Harris and Harry Evans

The evidence adduced during the post-trial hearings before this court and Judges Conlon and Holderman, coupled with the exhibits respectively admitted therein, overwhelmingly indicate that government witnesses Henry Harris and Harry Evans possessed and used illicit narcotics while confined on the sixth floor of the Metropolitan Correctional Center in Chicago ("MCC Chicago" or "MCC"),[22]

17. Although initially objecting to the injection of an *amicus curiae* into these post-trial proceedings, the government nonetheless has cooperated fully with Mr. Sullivan.

18. References to the transcript of post-trial proceedings before this court will be denoted with the letter "A" followed by the page number. Exhibits admitted into evidence during our post-trial hearing are denoted by sequential number preceded by the letters "AE." The transcript of Trial I is designated with the letter "R" followed by the page number.

19. Upon United States Attorney Fred Foreman's recusal from supervisory control over the El Rukn cases effective December 7, 1992, John A. Smietanka, the United States Attorney for the Western District of Michigan, was appointed Acting United States Attorney as to the El Rukn matters. Mr. Smietanka is to be commended for his candor and professional demeanor throughout the entirety of these post-trial proceedings, attributes which have greatly facilitated the court's truth-seeking function.

20. Beyond the legal implications stemming from the grant of immunity, to the extent that some of these witnesses have plead guilty before this court and are awaiting sentencing, we have agreed not to use any self-incriminating testimony given during these post-trial proceedings in determining the validity of their respective plea agreements or the appropriate sentence to be imposed. Of course, this promise does not extend to any perjury which may have occurred during the course of these proceedings.

21. Further, although the issues presently pending before the court have been fully briefed since April 26, 1993, these defendants, along with defendant Mayes, have been afforded leave to file supplementary, post-hearing briefs.

22. Both the sixth and eleventh floors serve as segregation units at the MCC. As was the case with almost all of the El Rukn cooperating witnesses, during their stay at the MCC Chicago, Harris and Evans were housed in protective custody on the sixth floor at the request of the

such activity commencing in 1988 and continuing through and beyond the time period during which these witnesses testified at Trial I.[23] Notwithstanding Harris and Evans' persistent statements to the contrary, A847–48, C562, H1607–08 (testimony of Henry Harris); A1297, C294; H2165 (testimony of Harry Evans), the evidence supporting this conclusion is plentiful and stems from a variety of different sources, some, of course, more credible than others. This evidence is detailed below.

### A. MCC Drug Test Results

Appreciating that inmate visitation privileges create the risk of a drug-infested environment, the MCC Chicago, at the direction of the Federal Bureau of Prisons, has developed a drug testing program designed to detect and deter inmate drug usage. Under this urinalysis program, applicable at all times relevant to these post-trial proceedings, the target population for testing is divided into four categories: (1) high risk inmates, including those who have previously tested positive for drugs and those whose presentence investigation report or central file suggest a drug risk; (2) inmates selected pursuant to a random, computer-generated list; (3) inmates targeted under the saturation urine surveillance program; and (4) inmates returning from furlough or community activities. A1058–59 (testimony of Lt. Randall D. Simek); C202–03 (testimony of Edward M. Russell); CDE No. 33, at 1–3 (MCC's Urine Surveillance Program). From approximately August of 1988 until September of 1989, Edward M. Russell served as the Special Investigative Supervisor ("SIS") at the MCC Chicago and, as such, was responsible for the maintenance of the urine surveil-lance program. C193–195 (testimony of Edward M. Russell); CDE No. 33, at 3 ("The SIS is responsible for the maintenance of the [urine surveillance] program."). All staff assigned to take urine from a targeted inmate are required to first review and sign a written sheet delineating sampling instructions and regulations. CDE No. 33, at 3. Once the inmate provides the urine sample, he must verify that the number on the bottle corresponds with the number on the lab sheet, initialing the lab sheet beside his name and specimen number. Id. at 6. The sample is then shipped to PharmChem Laboratories, Inc. for analysis. See A1059–60 (testimony of Lt. Randall D. Simek); H357 (testimony of Charles H. Mildner III). In the event the laboratory identified traces of illicit narcotics in a sample, the SIS would contact the MCC medical department to determine if the inmate had received any prescribed medication which could explain the positive result. A1060 (testimony of Lt. Randall D. Simek); C195–96 (testimony of Edward M. Russell). To the extent that such medication could have explained the positive test result, an incident report would not be generated and no discipline would follow. C197 (testimony of Edward M. Russell). MCC officials use a "urinalysis logbook" to record relevant information surrounding the drug test, including the inmate's name and register number, the time the sample was requested and subsequently given, the name of the officer who took the sample, the sample identification number, the result of the test after it is received from the laboratory and, if the result is positive, whether such result is authorized on the basis of prescribed medication. C195–203 (testimony of Edward M. Russell).

United States Attorney's Office. H902 (testimony of Warden A.F. Beeler, Jr.). Harris stayed on the sixth floor from July 15, 1988 to July 25, 1988, October 17, 1988 to November 18, 1988, March 21, 1989 to October 31, 1989, March 27, 1990 to November 25, 1991, February 21, 1992 to April 9, 1992, November 16, 1992 to November 28, 1992, December 28, 1992 to January 11, 1993, and June 18, 1993 to July 2, 1993. AE No. 56, at 5 (Harris Inmate History Report) (Note: this exhibit, produced by the government after the post-trial hearing, was marked and admitted by the court upon its own motion.). Evans was housed on the sixth floor of the MCC from August 8, 1988 to August 10, 1988, September 11, 1988 to September 21, 1988, September 29, 1988 to October 31, 1988, November 11, 1988 to November 18, 1988, November 20, 1988 to April 14, 1989, May 1, 1989 to October 23, 1989, March 29, 1991 to June 11, 1991, July 23, 1991 to August 10, 1991, and September 15, 1991 to March 11, 1993. Id. at 10–16 (Evans Inmate History Report).

23. Evans began his testimony in Trial I on May 29, 1991, and concluded on June 10, 1991. Harris testified at Trial I beginning on July 11, 1991, and ending on July 19, 1991.

According to the urinalysis logbook maintained at the MCC Chicago, on April 12 and May 10, 1989, government witness Harry Evans tested positive for codeine and morphine. CGE No. 9, at 1–2; HGE MCC Urinalysis Log Excerpt at 1–2. Likewise, while confined at the MCC, Henry Harris tested positive for morphine on May 11, 1989. CGE No. 9, at 2; HGE MCC Urinalysis Log Excerpt at 2. Although the logbook indicates that the positive result of May 10, 1989 (Evans) was authorized, there is no similar indication regarding the positive tests of April 12, 1989 (Evans) and May 11, 1989 (Harris). CGE No. 9, at 1–2; HGE MCC Urinalysis Log Excerpt at 1–2; C513–17 (testimony of Charles H. Mildner III).

On October 18, 1989, the MCC prepared a memorandum documenting drug test results for all El Rukn government witnesses. AE No. 5 (Memorandum from Charles H. Mildner III to Warden A.F. Beeler of October 18, 1989). That memorandum notes the two positive tests for Evans and one positive test for Harris as described above. Regarding the propriety of the results, the memorandum indicates that the positive test result of May 10, 1989 (Evans) was authorized, while those of April 12 (Evans) and May 11, 1989 (Harris) were unauthorized. *Id.*

The government does not dispute that Harris' drug use as reflected in the test of May 11, 1989, was unauthorized, *i.e.*, not attributable to any prescribed medication. Government's Brief in Opposition to Defendants' Motions for Post–Trial Relief at 1, 5 (Feb. 24, 1993). Instead, that Harris tested positive for morphine is weighty evidence that a few days prior to May 11, 1989, Harris ingested an opiate, such as heroin. *See* C211–12 (testimony of Edward M. Russell) (Bureau of Prisons estimates that the maximum detection period after illicit drug use is approximately 72 hours). As a result of the positive test, SIS Technician William R. Fall generated an incident report on June 5, 1989, and, after a disciplinary hearing conducted on June 27, 1989, Harris was sanctioned with 15 days disciplinary segregation and loss of visiting privileges for six months. AE No. 21 (Harris Incident Report of May 11, 1989, and Report of Disciplinary Hearing). Notably,

during the course of the June 27, 1989, disciplinary hearing, Harris claimed that he was working with MCC officials to identify illegal drug use on the sixth floor. According to Harris, in so doing, he "had to indulge in narcotics to keep the heat off [him] and gain the confidence of other inmates in the unit." *Id.* While the explanation is far-fetched and unsupported by credible evidence, it is nonetheless an admission that the positive test stemmed from the use of illicit narcotics. Harris has since retracted this statement, claiming that he lied during the disciplinary hearing at the direction of Lt. Russell, and that he did not use illegal drugs. A851–52; C595; H1487–88. Harris now attributes his positive test result to an MCC correctional officer who tainted his May 11, 1989 urine sample in retaliation for Harris' discovery of, and intent to disclose, organized corruption at the MCC. A850–51; C576–77, 592; H1476–82. This story, like his previous tale of using narcotics to gain the confidence of other inmates in connection with an investigation of drug use on the sixth floor, is improbable and unsupported by credible evidence. In the end, the positive drug test stands as a trustworthy indication that Harris in fact had indulged in illegal narcotics while incarcerated on the sixth floor of the MCC.

Respecting Evans' positive tests for codeine and morphine on April 12, 1989 and May 10, 1989, the government contends that both are attributable to his prescribed use of Tylenol with codeine, a drug which metabolizes into morphine. Although the October 18, 1989 memorandum from Mildner to Warden Beeler indicates that Evans' positive test of April 12, 1989 was unauthorized, the government has advanced evidence that, at the time Mildner wrote the memorandum, he was relying solely on the urinalysis logbook, which did not reflect whether the positive result was authorized by the medical department. C515–16 (testimony of Charles H. Mildner III). Unbeknown to Mildner, six days after the test results came back from PharmChem, on May 1, 1989, Physician's Assistants Margarette R. Russell and George F. Conrado sent a memorandum to Lt. Mayfield, stating that "[o]n the date discussed (4/12/89) [Harry Evans] would have tested

positive for Codeine. He was taking them for medical reasons via pill line." CGE No. 10; C514–16 (testimony of Charles H. Mildner III). According to Mildner, had he the benefit of this information, he would have indicated in the October 18, 1989 memorandum that Evans' positive test of April 12, 1989 was authorized by the medical department. C514–17. Concerning Evans' drug test on May 10, 1989, as noted above, both the urinalysis logbook and the October 18, 1989 memorandum indicate that the positive result was authorized, and defendants have not contended otherwise.

A review of Evans' extensive medical records, however, does not readily indicate that Evans received any authorized medication that would have triggered either of the positive test results. In relation to the sample taken on April 12, 1989, it is undisputed that, pursuant to prescription, Evans ingested Tylenol 3 (with codeine) on March 30, 1989. According to MCC medical records, Evans' prescription for Tylenol 3 (with codeine) was discontinued on April 1, 1989. CDE No. 10, at 1 ("Inmate refused to take his morning dose pill line medication. Inmate refused to take his morning medication because his Tylenol # 3 was discontinued."); C249–50 (testimony of Dr. Cynthia Alston). Nothing in these records indicate that Evans was prescribed Tylenol with codeine, or any other medication that would have caused a positive test for codeine or morphine, at the MCC between April 1 and April 12, 1989. CDE No. 10, at 1–7; C252 (testimony of Dr. Cynthia Alston). To the contrary, Evans' medical records indicate that on April 3 and April 6, 1989, Evans had attempted unsuccessfully to obtain Tylenol 3 (with codeine). CDE No. 10, at 2–4; C251–52 (testimony of Dr. Cynthia Alston). In the absence of any indication that Evans received treatment in a facility other than the MCC between April 1 and April 12, 1989,[24] it is evident that, for a period of thirteen days prior to the April 12, 1989 sampling, Evans was not prescribed any

medication which would have prompted a positive test for codeine or morphine.

On April 14, 1989, Evans was admitted to the Columbus–Cuneo–Cabrini Medical Center for chronic renal failure and, after considerable treatment, was discharged on May 1, 1989. CGE No. 2, at 1 (Evans Discharge Summary); C246 (testimony of Dr. Cynthia Alston). The discharge summary for Evans' stay at the Columbus Medical Center indicates that he was treated with Tylenol 3 (with codeine). CGE No. 2, at 2. The nurse's records indicate that his last dosage of Tylenol 3 came on April 30, 1989, at 7:30 p.m., ten days before the May 10, 1989 sampling. C244 (testimony of Dr. Cynthia Alston). His discharge medication, however, did not included Tylenol with codeine, see CGE No. 2, at 2, and Evans' MCC medical records from May 1 through May 10, 1989, are devoid of reference to any prescribed medication which would trigger a positive test for codeine or morphine for a sample drawn on May 10, 1989. CDE No. 10, at 12–18; C252–53 (testimony of Dr. Cynthia Alston).

Drawing upon the Bureau of Prisons' estimate that urinalysis testing cannot detect in the average person drugs ingested at least 72 hours prior to sampling, it is apparent that Evans' positive tests of April 12 and May 10, 1989, cannot be explained on the basis of prescribed medication. From a medical perspective, however, Harry Evans was not an average person in the Spring of 1989. To be sure, he had been suffering from chronic renal failure at the time both samples were drawn. According to Dr. Alston, persons in renal failure excrete drugs much more slowly than the average person. C244–45. Thus, we are confronted with the following question: In light of his medical condition, is it possible that the codeine-based Tylenol remained in Evans' system for as long as ten and thirteen days? Although Dr. Alston supposes it possible, C244–45, we do not believe the question can be answered with a suffi-

---

24. This time period is prior to the start of Evans' dialysis program, which began in approximately December of 1989. A1300 (testimony of Harry Evans); A1146 (testimony of Dr. Cynthia Alston). Once Evans began receiving dialysis, his medication was controlled by the treating nephrolo-

gist, who kept medical records independent of the MCC. See AE Nos. 27 (medical records of Harry Evans a/k/a Harry Smith, Hyde Park Kidney Center), and 29 (Harry Evans' outpatient hemodialysis records, WSKC Dialysis Services).

cient degree of scientific certainty. In other words, the two positive tests standing alone are not an unequivocal indication that Evans used illicit narcotics while housed on the sixth floor of the MCC. When coupled with the evidence described below, however, these tests become probative of post-incarceration, illegal drug use on the part of Harry Evans.

### B. Direct Observation by Other Inmates

During the course of these post-trial proceedings, the following nine inmates, housed at various times on the sixth floor of the MCC with the El Rukn cooperating witnesses, testified that they observed Harry Evans and/or Henry Harris use or possess illicit narcotics: Nicholas Ahrens, Raymond Bonnema, Jackie Clay, Michael Corbitt, Earl Hawkins, Derrick Kees, Ervin Lee, Harry Martin and Abdul Jabbar Muhammad. Neither Nicholas Ahrens, Raymond Bonnema nor Abdul Jabbar Muhammad testified before this court and, as such, we cannot make a complete determination of the credibility of their testimony. The credibility of the remaining witnesses is certainly suspect. First and foremost, they are all convicted felons. Further, as noted below, some of their current stories deviate significantly from prior statements to federal agents and previous testimony given before Judges Conlon and Holderman. Indeed, Harry Martin has admitted that he lied under oath while testifying in the post-trial hearings before Judges Conlon and Holderman. A19–35, 72–74. Taken individually, the testimony offered by these individuals in connection with the instant post-trial proceeding is weightless. Taken together, however, to the extent that their accounts are consistent with each other and bolstered by independent evidence of illegal drug use, the testimony supports this court's finding that Harris and Evans indulged in illicit narcotics while housed on the sixth floor of the MCC.

### 1. Nicholas Ahrens

Nicholas Ahrens plead guilty in *United States v. John Cappas, et al.,* No. 88 CR 91 (N.D.Ill.) (Kocoras, J.), rendered his services as a cooperating witness in connection with that case, and was housed on the sixth floor of the MCC from approximately September of 1988 to October, 1991. C932. Ahrens testified that, one day in the late afternoon in the fall of 1988, he had observed Henry Harris use an illicit narcotic. C938–40; H2805–07. Ahrens and Harris, along with a number of other inmates whom Ahrens could not remember, were in a holding cell at the Everett McKinley Dirksen Federal Building ("Dirksen Building") waiting to be returned to the MCC. C939; H2807. Standing at the toilet, located in the middle of the holding cell and partially encircled by three walls, Harris snorted a substance through his nose. C939; H2805. Harris identified the drug as heroin and, after showing it to Ahrens, offered to share it with him. C939–40; H2805. Ahrens had no idea where the heroin came from or what Harris did with the excess he possessed. H2807. Ahrens' account is corroborated by the United States Marshal's Service transportation records, which, although incomplete for the fall of 1988, indicate that Ahrens and Harris were transported together between the MCC and the Dirksen Building on at least one occasion in the fall of 1988. *See* CDE No. 20 (Harris Visitation Memorandum); HDE Ahrens Visitation Memorandum.

### 2. Raymond Bonnema

Raymond Bonnema, like Ahrens, plead guilty and testified for the government in the *Cappas* case. C738–39; H1798–99. As a cooperating witness, Bonnema was housed on the sixth floor of the MCC from about March of 1989 to March, 1990. C740–41; H1782. Bonnema testified that he twice observed Harris snort illegal drugs.[25] The first inci-

---

25. We observe that approximately one week after Bonnema testified before Judge Holderman on November 27, 1992, Bonnema received a threatening letter. C760–63 (testimony of Raymond Bonnema). The letter stated:

> Your mother will die for what you did! We know her address in Chicago. We also know your grandparents' address. We will [cut] one of them also. Don't go crying to Willie Clem-

mens. *He is one of us.* We have spoken and he hates you *white* devils like we do! So when she gets her throat cut *smile* it is Allah's way! El Rukn Lives! Praise Allah!!!

CDE No. 66 (Bonnema Letter). Bonnema testified that, at the time, the only El Rukns housed at the institution at which he resided were Jackie Clay and Henry Harris. C760–61. Bonnema believes that a unit manager at the institution,

dent occurred in approximately May of 1989, i.e., the same month Harris furnished the urine specimen which caused the positive test for morphine. C746. While together in a holding cell on the fifth floor of the MCC waiting to be brought to the Dirksen Building,[26] Bonnema saw Harris snort a white substance from a small baggy. C746–47; H1786. Bonnema asked Harris if the white powder was cocaine. C747; H1786. Harris stated that the substance was heroin and offered some to Bonnema. C747; H1786.

Approximately one month later, Bonnema once again observed Harris snorting a white powder. C747–49; H1788–89. Bonnema was performing his duties as an orderly on the sixth floor when he saw Harris by the telephone in the recreation room snort the substance from a folded-up piece of paper. C748; H1788. Bonnema did not speak to Harris on this occasion and, as such, could not positively identify the substance. H1789.

### 3. Jackie Clay

Jackie Clay, a former El Rukn and current cooperating witness, was housed on the sixth floor of the MCC from February 27, 1989 to December 12, 1989, April 26, 1991 to August 17, 1991, September 19, 1991 to November 26, 1991, and February 20, 1992 to April 1, 1992. AE No. 56, at 9 (Clay Inmate History Report). Clay testified that he observed Harry Evans and Henry Harris use karachi heroin at the MCC on three separate instances between the spring and fall of 1989. A442. The first episode took place in the recreation room on the 6th floor. C956; H4621. Clay and Earl Hawkins, another El Rukn cooperating witness, were sitting at a card table in the middle of the room, and Evans and Harris were standing by the two pay phones on the wall approximately three feet from the card table. C956; H4621, 4624–25. Evans and Harris had placed an aluminum foil package of karachi heroin on

the ledge of one of the telephones. C957; H4621. Both Evans and Harris snorted the substance, using a match book to bring the brown powder from the aluminum foil to their noses. C957; H4622. After Evans and Harris had snorted the drug three or four times, Evans folded the excess powder in the aluminum foil and put it in the breast pocket of his jumpsuit. H4623.

Approximately one week later, Clay and Evans were together again in the recreation room. No one else was present. C958; H4626. Evans made a telephone call and, while talking, retrieved an aluminum foil package from his sock. C958; H4626–27. Evans opened the package, revealing its contents as karachi heroin, and began snorting the substance. C958; H4626. Clay saw Evans lift the brown powder from the aluminum foil to his nose about four or five times over a fifteen minute period. C958.

The final incident occurred roughly two weeks later in the library on the sixth floor. C959; H4627–28. Upon arriving at the library, Clay sat down with Evans and Harris to talk. H4630. After ten minutes, Evans fetched from his sock an aluminum foil package filled with karachi heroin. C960; H4630. Evans placed the package on the table, and he and Harris snorted the narcotic. C960; H4630.

In addition to witnessing the above-described drug use, on a separate occasion in the summer of 1989, Clay observed Harris and Evans in possession of narcotics. Harris seemingly had obtained narcotics from a visitor at the MCC. As he returned to his cell with the package, Evans, who occupied the cell next door, began to bang on the wall demanding his part of the drugs. C967; H4698. Harris told Evans to wait until the change in shift, but Evans could not wait. C967; H4698. A few minutes later Evans

---

Willie Clemmens, showed Harris a newspaper article summarizing Bonnema's post-trial testimony before Judge Holderman and, in response, Harris sent the threatening letter. C761–63. Harris denied sending Bonnema the letter, instead blaming Harry Martin. H4131–35. Despite the threat, on December 23, 1993, Bonnema testified before Judge Conlon in a manner consistent with his previous testimony before Judge Holderman.

**26.** United States Marshal's Service transportation records indicate that Bonnema and Harris were transported together from the MCC to the Dirksen Building on three occasions in April and May of 1989. *See* CDE No. 20 (Harris Transportation Logs); CDE No. 40 (Bonnema Transportation Logs).

yelled to Harris, "I'm going to wash up, send me some deodorant." C967; H4699. Harris called out for Officer Gray, now deceased, to pass the deodorant to Evans. C967; H4699. Gray took the deodorant but, instead of giving it to Evans, brought it to the washroom. C967; H4699. A couple of minutes later Gray returned with the deodorant in two pieces and a package of narcotics in his hand. C968; H4699. Gray stated "you guys knew you couldn't get anything past me, I'm an old-timer." C968; H4699. While Clay assumes that Officer Gray "wrote up" Evans and Harris, C968; H4699, we observe that the parties have not produced an incident report to substantiate the allegation.

### 4. Michael Corbitt

For a period of twenty years, Michael Corbitt was a corrupt police officer. A768. He is now a convicted felon. Corbitt testified that he was housed on the sixth floor of the MCC on two separate occasions enduring 20 and 10 months respectively, the first stay beginning on October 7, 1987, and the second commencing at some point in 1991. A737–38, 751. According to his inmate history report, however, Corbitt was housed at the MCC from October 8, 1987 to August 28, 1989, from December 7, 1989 to January 13, 1990, and again from May 26, 1990 to June 23, 1990. AE No. 53, at 1. Contrary to his testimony, it appears that Corbitt was neither incarcerated at the MCC on a second occasion for a period of roughly 10 months nor housed at that facility at any time between June 24, 1990 and June 28, 1993. While it is possible that his inmate history report is inaccurate, the discrepancy does nothing to bolster Corbitt's credibility.[27]

Corbitt was able to ferret out three specific instances of drug use on the part of various El Rukn cooperating witnesses, including Harris and Evans. First, during his initial stay at the MCC, which according to him began in October of 1987 and lasted roughly 20 months, Corbitt witnessed Henry Harris and Derrick Kees snort a white powder, be-

lieved to be either cocaine or heroin. A740. The incident allegedly occurred in a holding cell on the fifth floor, specifically in room 524, while Kees and Harris were waiting to be brought from the MCC to the Dirksen Building. A789, 740. Second, Corbitt recounted an event, also transpiring during his first visit at the MCC, involving Evans, Harris and an Officer Gray, similar to that told by Clay. Corbitt described the incident as follows:

A. I believe it was mid-afternoon, around 2:00 o'clock in the afternoon, and I believe Harris had come back from a visit and had walked over to Evans' cell on the way back to his own, and there's a slot where they feed you in the front of the cell door and Evans—Harry Evans' cell door was open and the officer was bringing Evans—I mean, Harris back to his cell and he broke over towards Harry Evans' cell and passed something into the cell. Officer Gray immediately locked down Harris and went in and shook down Harry Evans' cell. At that time he found a large deodorant container—and I was out on the floor, you have to understand, doing my job—a deodorant container full of a white powdered substance—not full but half-full of a white-powdered substance. I then call the seg lieutenant and several other officers to the floor. There is a major discussion about the problem. I was then locked down and it was discussed by the generals that he had been caught with heroin.

Q. He?

A. Harry Evans, the stuff that was passed by Leon Harris to Harry Evans. I don't recall any—again, I don't recall any incident report being written, and that was the last time that we saw Officer Gray on the floor. He was no longer on that floor again after that day.

A755–56. Finally, Corbitt testified that, during his initial stay, Harris had once showed Corbitt a container and identified its contents

27. Corbitt did not testify in the hearings before Judges Conlon and Holderman, rather his story was introduced by stipulation. See H4709–10. To avoid the public disclosure of Corbitt's identity, the parties agreed to the use of a pseudonym, "John Doe." Integral to this arrangement, the government stipulated to his credibility. H4803. In that Corbitt appeared before this court in person, providing an opportunity for the court to observe his demeanor, the government does not stipulate to Corbitt's credibility for the purposes of the instant post-trial proceeding. A757.

as cocaine. A759–60. Harris had just returned from a visit and proceeded directly to the telephones in the recreation room on the sixth floor. A759. At the time, Corbitt was using one of the two phones. A759. Harris had produced a tin foil package and began snorting some of the cocaine off the ledge of the second phone. A759–60.

Additionally, Corbitt generally alleged that, on each of the two occasions that he was housed on the sixth floor of the MCC, he personally observed various El Rukn cooperating witnesses using illegal drugs. During his first stay at the MCC, beginning in October of 1987 and lasting approximately 20 months, Corbitt claims he saw Evans, Harris, Hunter, Hawkins, Clay and Kees use narcotics. A739; 760–61. Corbitt specifically identified Clay and Hunter as using only marijuana, as opposed to heroin and cocaine, and stated that Kees had smoked marijuana and snorted some kind of powdered substance on numerous instances. A760–61. According to Corbitt, these incidents usually occurred on the sixth floor in the law library or in the recreation room by the telephones. A761. During his second visit at the MCC, which he believes began in 1991 and lasted roughly 10 months, Corbitt maintains that he observed all of the above cooperating witnesses, save Hawkins and Evans (who, according to Corbitt, was not at the MCC throughout this period of time), use illicit drugs. A742. At this time, Corbitt states that these cooperating witnesses (i.e., Harris, Hunter, Clay and Kees) were indulging in karachi heroin, cocaine and marijuana. A742. Corbitt described the environment on the sixth floor during his second visit as more permissive, stating that the El Rukn cooperating witnesses were using drugs openly at cafeteria-type tables in the middle of the floor and in their rooms. A761.

Respecting the source of these drugs, Corbitt testified that, during his first stay at the MCC, prisoners on the sixth floor were allowed contact visits with their guests and that, on many occasions, he noticed visitors passing to El Rukn cooperating witnesses bags and balloons filled with either a white powder or marijuana. A745. Corbitt, who was an orderly on the sixth floor, found pieces of rubber gloves used to bring drugs into the institution on the floor of the visiting room. A744. Corbitt maintains that, on numerous occasions, he personally observed Harris, Evans and Kees swallow balloons filled with narcotics given to them by visitors. A766, 745. In conjunction with their visits, these cooperating witnesses often requested and received laxatives from physician's assistants, presumably to help excrete the balloons. A766. At sometime prior to his second visit, in an effort to eliminate contact visits, the MCC erected a wall in the sixth floor visiting room running from floor to ceiling. A746. Inmates were supposed to communicate with their guests over a telephone intercom system, as the divider was intended to physically separate the inmate from his visitor. A748. The partition, however, had a door which, if left unlocked, would enable inmates to cross over to the visitor's side. A743–44. According to Corbitt, on at least ten occasions the door in fact was not locked, and he observed El Rukn cooperating witnesses on the other side of the partition with their visitors. A744. In an outright disregard for the MCC prohibition of contact visits, these cooperating witnesses and their guests would smoke marijuana in the visiting room, passing it back and forth between each other. A744.

### 5. Earl Hawkins

Earl Hawkins, a former El Rukn and current cooperating witness, was housed on the sixth floor of the MCC from April 29, 1987 to April 30, 1987, September 11, 1987 to December 20, 1988, April 27, 1989 to December 12, 1989, April 26, 1991 to November 24, 1991, February 20, 1992 to March 31, 1992, January 25, 1993 to April 7, 1993, and June 21, 1993 to June 24, 1993. AE No. 56, at 7 (Hawkins Inmate History Report). Hawkins testified that, in both 1989 and 1991, he observed two other El Rukn cooperating witnesses use drugs at the MCC, the first on just one occasion and the second on two occasions. A640–41. Although Hawkins was reluctant to identify these individuals by name for fear of retribution, A622–23, 641, we gather he was referring to Evans and Harris.

### 6. Derrick Kees

Derrick Kees, a former El Rukn and current cooperating witness, resided on the sixth floor of the MCC from May 19, 1989 to May 19, 1990, February 19, 1991 to May 12, 1992, and from January 25, 1993 to March 26, 1993. AE No. 56, at 1 (Kees Inmate History Report). Kees testified that, at some time between the spring of 1989 and the spring of 1990, he observed both Harry Evans and Henry Harris use drugs in the recreation room on the sixth floor of the MCC. On the first occasion, Kees was in the recreation room with Harris and Evans, when Harris retrieved from his sock a foil package containing karachi heroin, a brown-powdered substance. A683. Both men inhaled the powder through their noses. A682. On a second occasion between the spring of 1989 and the spring of 1990, Kees saw Harris snort karachi heroin off the ledge of a telephone in the recreation room. A682–83. Kees was able to identify the substance based on its color and because Harris told him it was karachi heroin. A682. On this occasion, Harris offered Kees some of the drug, but Kees declined. A683. Although not able to specifically identify Evans' source of drugs during this time period, Kees testified that, according to Harris, Harris received drugs from his girlfriend, Bodollar. A684.

In an interview with FBI agents on March 19, 1993, Kees told the agents that "EVANS and HARRIS were drug addicts and they used drugs consistently from 1989 through the trials in 1991." Whatever the basis for Kees' opinion that these individuals used drugs during the time they testified in Trial I, it is clear that Kees' personal observation of drug use is limited to the period between the spring of 1989 and the spring of 1990. Indeed, Kees testified that he did not personally observe either Evans or Harris use drugs in 1991. A684–85.

### 7. Ervin Lee

Ervin Lee, a former El Rukn and current cooperating witness, was housed on the sixth floor of the MCC from April 24, 1991, until February 25, 1993. AE No. 56, at 3 (Lee Inmate History Report). Lee testified that, at some point in 1992,[28] he shared a sixth floor cell with Evans for roughly two to three weeks. A1416. One evening during this living arrangement, Lee observed Evans, who was sitting on his bed at the time, snort a white-powdered substance. A1416. Evans told Lee that the powder was aspirin and that he, Evans, was snorting it because he could not swallow pills. A1416. In that Evans was swallowing 10–15 pills a day at that time, and because Evans was up all night after snorting the substance, Lee concluded that the powder was an illicit narcotic. A1416–17. Although not asked about Evans' drug use at the hearings before Judges Conlon and Holderman, see C882–904; H3201–3317, Lee recounted this same story to FBI agents in an interview dated March 23, 1993.

### 8. Harry Martin

Harry Martin, a career criminal unaffiliated with the El Rukn street gang, was housed on the sixth floor of the MCC from February of 1991 to June of 1992. A51. Martin began his testimony before this court by admitting that he had testified falsely before Judges Conlon and Holderman regarding when Evans had used drugs. A27. In an effort to make his overall story plausible, Martin decided to admit to Judges Conlon and Holderman that Evans had used drugs at the MCC. A78–83. Martin, however, attempted to limit his testimony concerning Evans' drug use to December of 1991. Martin testified that during the first week of December 1991 he picked a package of cocaine from Harry Evans' pocket at the MCC. C1096; H4322–24. Martin also told Judges Conlon and Holderman that shortly after this incident, he had observed Evans smoking cocaine on the sixth floor of the MCC. C1096–97; H4321–22.

---

**28.** The government considers irrelevant all drug use and similar events post-dating Trial I. ·To be sure, for purposes of the government's obligations under *Brady* and its progeny, it is axiomatic that the government need not disclose information that does not come into existence until after trial. However, this is not to say that such evidence is irrelevant to these post-trial proceedings. To the contrary, while the government may be under no obligation to disclose the information, subsequent incidents of post-incarceration drug use bear on the factual issue of whether such conduct likewise occurred prior to and during Trial I.

Martin further stated that he had no personal knowledge that Evans had used drugs in July and August of 1991, though he was willing to admit that he overheard a telephone conversation during this time period in which Evans told somebody that he wanted an ounce, and not a gram (presumably of narcotics). C1094–95.

. Given an opportunity to tell the truth before this court, under a grant of immunity, Martin testified that Evans had been using drugs "basically throughout ... the trials, throughout the entire thing. He had been high, nodding, dropping money, dropping drugs on the floor ... from the time that he got there until I left." A27–28. Martin explained that, during his stay on the sixth floor, drugs were readily available. A51. Martin reiterated that his account concerning how he picked from Evans' pocket a package of cocaine in December of 1991, and subsequently saw him smoke it, was true. A26–28, 38, 51.

At the government's request, Martin was subjected to an FBI polygraph examination on May 5, 1993, concerning his recently changed story. The FBI polygraph analyst concluded that Martin was truthful when responding to all relevant questions asked during the test. AE No. 1, at 5 (Martin Poly-

graph Results). Two of those questions, and Martin's responses thereto, were as follows:

1. Did you lie under oath during the El Rukn hearing about when Harry Evans used drugs? Answer—Yes.

7. Did you ever see Evans with drugs in his possession at the MCC during the El Rukn trials? Answer—Yes.

AE No. 1, at 5–6 (Martin Polygraph Results).[29] Martin's assertion that he had observed Evans with drugs in his possession at the MCC "during the El Rukn trials" evidently included the time during which Evans testified at Trial I. See A27–28, 79–80.

During his interview with the FBI on April 22, 1993, Martin recalled another incident involving Evans and narcotics which, for whatever reason, was not addressed during the post-trial hearing before this court nor those before Judges Conlon and Holderman. According to Martin, Evans had returned from the United States Attorney's Office when $20 and some drugs fell out of his pocket. AE No. 2, at 8. Although Evans did not notice that he had dropped these items, Martin, cognizant of the present correctional officer, stepped on the drugs and money so that they would not be detected. *Id.* When Martin was able to retrieve the articles, he gave them back to Evans. *Id.* During this

**29.** The government contends that it is improper for this court to place any credence on the results of Martin's polygraph exam. We disagree. "Polygraph (lie detector) test results long have been admissible in this circuit under the sound discretion of the trial judge, provided that this discretion is not abused." *United States v. Smith,* 869 F.2d 348, 353 (7th Cir.1989); *see also United States v. Williams,* 737 F.2d 594, 610–11 (7th Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *United States v. Feldman,* 711 F.2d 758, 767 (7th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983); *United States v. Black,* 684 F.2d 481, 483 (7th Cir.), *cert. denied,* 459 U.S. 1043, 103 S.Ct. 463, 74 L.Ed.2d 613 (1982); *United States v. Rumell,* 642 F.2d 213, 215 (7th Cir.1981). In each of the cases cited above, and every other case we have found on the matter, the issue of the admissibility of polygraph test results arises on appeal after the trial judge has denied a defendant's proffer of the exculpatory results of an *ex parte* test. Predictably, under such circumstances, the Seventh Circuit has held that the trial court did not abuse its discretion in excluding the evidence. The reasoning is best expressed by the court in *United States v. Dorfman,*

532 F.Supp. 1118, 1136 (N.D.Ill.1981): "[T]here is reason to believe that tests such as the one conducted here, which are performed at the request of the examinee without advance notice to the Government, are particularly unreliable since the examinee knows that if he 'fails' the test his counsel will not submit the results to the Government, and therefore is under less stress." *See also Feldman,* 711 F.2d at 767. In the instant case, however, we are not confronted with polygraph test results initiated by a defendant without prior notice to the government. Rather, the test in question (along with Ronald Evans' test cited *infra* ) was initiated at the request of the government and administered by a FBI polygraph expert, adding an aura of reliability not present in the cases cited above. Further, while the test results in the above cited cases were sought to be offered in front of a jury which was to determine guilt or innocence, we encounter the current test results in the context of a post-trial proceeding. In the absence of a jury, the fear of undue reliance on the results disappears. For these reasons, we will admit into evidence the results of Martin's polygraph test (along with the results of Ronald Evans' polygraph test).

interview, Martin also stated that both Harris and Evans would receive drugs from visitors at the United States Attorney's Office, and would smuggle them back to the MCC in either legal papers or in Evans' body. *Id.* Given his medical condition at the time, Evans had a number of sores on his body and, therefore, the guards did not search him upon return to the MCC. *Id.*

### 9. Abdul Jabbar Muhammad

On February 3, 1993, Allan Ackerman, who at the time served as Noah Robinson's attorney, received an affidavit from an individual named Abdul Jabbar Muhammad. Based on the contents of this affidavit, defendant Knox sought an opportunity to call Muhammad as a witness before this court. Defendant Knox's Submission Regarding Additional Evidentiary Hearing, at 2 (Mar. 9, 1993). At the suggestion of the government, rather than allow Muhammad to testify, we granted Knox leave to submit the Muhammad affidavit as an exhibit to his reply brief in support of his motion for new trial. *United States v. Boyd,* No. 89 CR 908, slip op. at 2, 1993 WL 134776 (N.D.Ill. Apr. 11, 1993).

At the time of the affidavit, Muhammad was incarcerated in a federal institution in Memphis, Tennessee, serving 262 months for bank robbery. Muhammad Affidavit ¶ 2, at 1 (attached to Government's Response to Defendant Knox's Submission filed on March 26, 1993). Muhammad states that, on April 19, 1989, he was returned to the MCC Chicago for resentencing. *Id.* ¶ 3, at 1. Upon his return, Muhammad became friendly with Evans and Kees. *Id.* ¶ 5–6, at 1. Respecting illegal drug use, Muhammad claims that "on several occaisions [sic] I was asked by Bro. Evans did I want any cocaine, and I have seen cocaine in his possession." *Id.* ¶ 16, at 2. Although rejecting Evans' offer, Muhammad asked "what size cocaine" he had, to which Evans responded "8-balls." *Id.* ¶ 17–18, at 2. Respecting the source of the drugs, Muhammad states "the conversation revealed that Bro. Evans was obtaining his drugs from members of the prosecutor's office." *Id.* ¶ 11, at 2.

### C. Admissions of Illegal Drug Use

Despite their current denials, A847–48, C562, H1607–08 (testimony of Henry Harris); A1297, C294; H2165 (testimony of Harry Evans), both Henry Harris and Harry Evans previously have admitted to the possession and use of illegal drugs while incarcerated and cooperating with the government. These admissions were made to a number of different persons, both before and after Harris and Evans' respective testimony in Trial I.

### 1. Admissions by Henry Harris

On no less than nine separate occasions, Henry Harris confessed to post-incarceration drug use or possession. We begin with a conversation between Harris and Ervin Lee that took place in the recreation room of the sixth floor at some time in May of 1991. After Lee had revealed his negotiated sentence, other inmates in the recreation room, possibly including Evans, Hunter, Kees and Martin, stated that he got a bad deal because none of the other cooperating witnesses testified about Lee in front of the grand jury. H3209–13 (testimony of Ervin Lee). In response, Harris stated, "Well, when I went in front of the grand jury, I was so high that, you know, I could have mentioned your name a few times." H3213. Harris also told Lee that he, Harris, had smoked cocaine while at the Kluczinski Federal Building. A1424.

In August of 1991, during a conversation with Tanya Van Blake, a paralegal in the United States Attorney's Office, Harris again admitted to post-incarceration drug use. At the time, the fact that Harris had tested positive for morphine on May 11, 1989, had been recently disclosed to the public in proceedings before Judge Conlon. H3838–39 (testimony of Tanya Van Blake). Van Blake asked Harris how it was that he tested positive for drugs. H3838. In response, Harris told her that Evans had a bottle of soda which, unbeknown to Harris, also contained heroin. H3839. When Evans saw a guard approaching, he handed the bottle to Harris who consumed some of the beverage laced with heroin. H3839.

Mustaq Malik, Harris' post-trial roommate at an unidentified federal institution, likewise testified that Harris bragged about post-incarceration drug use at the MCC Chicago. H3002–05. Harris not only admitted to us-

ing heroin and cocaine but, referring to himself as the "king of heroin," told Malik that he sold drugs from the MCC. H3000, 3003. Respecting his source, Harris informed Malik that the drugs came from the United States Attorney's Office and from his girlfriend during visits. H3004–05. Of course, as is the case for most everyone associated with these post-trial proceedings, Malik found it difficult to separate which of Harris' stories were true and which were not. H3054–55.

In December of 1992, after testifying in one or both of the post-trial hearings before Judges Conlon and Holderman, Harris told Harry Martin that he had been using drugs at the MCC. A38, 61–62 (testimony of Harry Martin). Specifically, Harris claimed to have used marijuana, karachi heroin and cocaine. AE No. 2, at 9 (April 22, 1993 FBI Interview of Martin). According to Martin, Harris obtained his drugs from visitors and never told Martin that he, Harris, had received drugs from personnel at the United States Attorney's Office. *Id.* at 9–10.

The remaining five episodes have been detailed in subsections II(A) and (B) of this opinion, but are worth repeating in the present context. First, during a MCC disciplinary hearing conducted on June 27, 1989, Harris admitted to using illegal drugs, explaining that, in an effort to "sniff out narcotics on the 6th floor, . . . I had to indulge in narcotics to keep the heat off me and gain the confidence of other inmates in the unit." AE No. 21 (MCC Incident Report and Report of Disciplinary Hearing regarding Harris' positive drug test of May 11, 1989). Second, while unselfishly attempting to share his drugs with Nicholas Ahrens in the fall of 1988, Harris identified the substance that he snorted in the holding cell at the Dirksen Building as heroin. C939; H2805. Third, while sharing a holding cell on the fifth floor of the MCC with Raymond Bonnema in May of 1989, Harris produced a baggy filled with a white substance, identified the substance as heroin and offered some to Bonnema. C747; H1786. Fourth, at some time between October 1987 and August 1989, Harris showed Michael Corbitt a container and identified its contents as cocaine. A759–60. Finally, Harris snorted in Derrick Kees' presence a brown-powdered substance off the ledge of a telephone in the sixth floor recreation room in the spring of 1989. Harris told Kees the substance was karachi heroin. A682–83.

2. Admissions by Harry Evans

As did Harris, Evans has admitted to various individuals that he has used and possessed illegal drugs while incarcerated on the sixth floor of the MCC. For instance, Evans told Nicholas Ahrens on several occasions in the fall of 1988 that he, Evans, had been using heroin at the MCC. C934; H2802 (testimony of Nicholas Ahrens). Evans had been complaining about having chest pains and told Ahrens that "all the heroin he had been doing" was the cause. C934; H2802–03. On at least one instance, Evans admitted to Ahrens that he, Evans, was presently under the influence of narcotics. C938. Respecting his source, Evans stated that he received the drugs from visitors, possibly his girlfriend. C935; H2803. Evans also told Ahrens that at times he, Evans, passed to Harris heroin concealed in the battery compartment of a portable radio. C936–37; H2808.

Likewise, Evans had a number of conversations with Derrick Kees regarding drug use and possession. In 1989, Evans told Kees that he, Evans, obtained drugs from his girlfriend, Beverly Wordlow, while at the ATF office on the 39th floor of the Kluczinski Building. A689–90 (testimony of Derrick Kees). During this same time period, Evans (who was in his cell at the time) asked Kees (who was in the recreation room on the sixth floor of the MCC) if he would have his girlfriend bring Evans drugs in exchange for money. A690–91. Kees declined. A691. During the spring of 1991, Kees and Evans once again discussed Evans' drug use. Evans told Kees that he, Evans, was using "dope." A726. Given his past experience with Evans, Kees interpreted the term "dope" to mean heroin. A726. Respecting his source of drugs from January of 1991 to the spring of 1992, Evans divulged to Kees that his girlfriend would leave drugs in certain locations at the dialysis centers where Evans received treatment. A687–88. Evans would then go sit in that spot and retrieve

# 1301

the drugs, using some at the center and bringing the remainder back to the MCC in the lining of his clothes. A688.

Lenell Smith, who had been housed and worked as an orderly on the sixth floor of the MCC from February of 1992, testified that, on two occasions in May of 1992, Evans asked Smith to smuggle for Evans heroin from the sixth floor visitation room. H2688–90. Further, in April or May of 1992, Smith overheard a conversation between Evans (who was in the recreation room) and Harris (who was in a room across from the recreation room) during which both men stated that they had just snorted illegal drugs. H2691–92. Finally, a few days later, Smith, Martin, Evans and Harris were playing cards in the law library on the sixth floor. H2692–93. Harris accused Evans of almost botching his testimony in an ongoing trial. H2693. Evans replied, "man, it might have been the dope." H2693.

Ervin Lee testified concerning an incident transpiring in William R. Hogan, Jr.'s office on the 14th floor of the Dirksen Building. Lee, Evans, Evans' mother, Evans' girlfriend and Ed Diamond were present. A1423. Evans' mother handed Evans some telephone bills and Evans' girlfriend some money. A1423. At the same time Evans' mother pulled something from her mouth and handed it to Evans. A1423. Evans continued to look at the telephone bills, stating "yeah, okay, I'll pay it." A1423. Later that day, Evans asked Lee to bring something back to the MCC for Evans. A1423. After Lee inquired what he wanted brought back, Evans responded money. A1423. Lee, however, believed Evans had obtained drugs from his mother and wanted Lee to smuggle the drugs into the MCC. A1423–24. Accordingly, Lee refused. A1423–24.

Evans has made similar statements to Michael Corbitt, Jackie Clay, Harry Martin and Abdul Jabbar Muhammad concerning his possession and use of illegal drugs while incarcerated and cooperating with the government. *See* FBI Interview of Michael Corbitt, at 4 (May 5, 1993); C964–65 (testi-

mony of Jackie Clay); AE No. 2, at 8 (Martin FBI Interview of April 22, 1993); Muhammad Affidavit ¶ 11, 16–18.

### D. Other Evidence of Post–Incarceration Drug Use

The following circumstantial evidence further bolsters this court's conclusion that Evans and Harris possessed and used drugs while incarcerated on the sixth floor of the MCC: (1) Harris' refusal to provide a urine sample on May 30, 1991; (2) Harris' physical appearance; (3) Evans' physical appearance; (4) Evans' statements during phone conversations monitored by MCC officials; (5) Evans' possession of cash at the MCC; and (6) Evans' repeated requests for laxatives. We address each piece of circumstantial evidence in seriatim.

### 1. Henry Harris' Refusal to Provide a Urine Sample

On May 30, 1991, a mere 42 days prior to testifying before this court in Trial I, Henry Harris refused to provide a urine sample, prompting MCC Lt. K. Goforth to file an incident report. AE No. 23, at 1 (Harris Incident Report of May 30, 1991, and Report of Disciplinary Hearing); A850 (testimony of Henry Harris). As a result of both this incident and an episode where Harris threatened Derrick Kees with bodily harm, Harris was subjected to a disciplinary hearing on June 27, 1991, 14 days prior to testifying before this court in Trial I. AE No. 23, at 2. Curiously, the hearing took place in a jury room at the Dirksen Building on a day during which Harris testified in the first trial before Judge Holderman. H1677–89 (testimony of Theodore Poulos); H1393–97 (testimony of Robert Hafer). Electing not to call any witnesses on his behalf, Harris admitted his guilt to the disciplinary hearing officer and received a sanction of 15 days disciplinary segregation. AE No. 23, at 2–3. Harris also promised that "[i]f requested in the future, I will provide a urine sample."[30] *Id.* at 2.

There are four categories of prohibited acts at the MCC: Greatest, High, Moderate

---

**30.** We observe that Harris subsequently refused to provide a urine sample when brought back to the MCC just days prior to testifying before this

court on June 28, 1993. A850 (testimony of Henry Harris).

and Low Moderate. CDE No. 1, at ch. 4 p. 1 (Bureau of Prisons Regulations Regarding Discipline). Refusal to provide a urine sample, labelled a code 110, is a prohibited act falling within the "Greatest" severity level. *Id.* at ch. 4, p. 3. Indeed, MCC officials view the refusal to provide a urine sample "just like ... [using] a drug." C528; H478–81 (testimony of Charles H. Mildner III); *see also* H802–03 (testimony of Robert Hafer) (refusing to provide a urine sample equivalent to testing positive for an illegal drug). Since the incident, Harris has given a variety of different reasons for his refusal to provide a urine sample. He told the disciplinary hearing officer that, at the time of the refusal, he was "upset." AE No. 23, at 2. In contrast, Harris told paralegal Corinda Luchetta that "he was just too tired" to provide a specimen. H1842–44 (testimony of Corinda Luchetta). Harris now maintains that the refusal stemmed from his fear that MCC officials would have tainted the sample in retaliation for his discovery of, and intent to disclose, organized corruption at the MCC. A850–51; C576–77, 592; H1476–82. Harris' mutating account of his refusal to provide a urine sample on May 30, 1991, simply is not credible. A more likely scenario is that Harris refused to provide a urine specimen in an attempt to conceal illegal drug use shortly prior to the request.

2. Henry Harris' Physical Appearance

Randall Simek, currently a Lieutenant at the MCC, was assigned to the sixth floor on day watch in November and December of 1988 and, after a short stint in Los Angeles, from August of 1990 to the present has had significant contact with the El Rukn cooperating witnesses housed on the sixth floor. A945–46 (testimony of Randall Simek). Simek testified that, based on periodic changes in Harris' behavior and appearance, he suspected that Harris had been using drugs post-incarceration. A968–71, 975, 981. Specifically, there were intervals where Simek observed Harris with glassy eyes, unable to walk in a straight line, and mumbling. A968. Notably, Simek recalls that, during November and December of 1988, Harris' behavior and physical appearance differed significantly from weekdays to weekends. A968–71. On weekdays, as a habit, Harris was never

ready for his regular trips over to the Dirksen Building, requiring the staff to coerce him to get his bed made and put on his jumpsuit. A969. On weekends, however, rather than being coerced, Harris, on his own initiative, notified the staff that he was ready to go. A969. When Simek arrived to escort him to the R & D area on the fifth floor, Harris' "appearance had changed in that he had put on, out of the two jumpsuits available to him, the best one available [and] wore cologne." A969–70. Simek observed that, upon Harris' return from these weekend sojourns, his pupils were often dilated and he exhibited symptoms of drug use. A970. Simek reported these incidents to his supervisor, SIS Lt. Jones. A971.

Likewise, Jackie Clay testified during these post-trial proceedings that he too noticed symptoms of drug use displayed by Henry Harris. Clay stated that from August to October of 1989, he observed Harris in a "drugged condition" approximately four or five times. H4693–94. At the time, Clay was an orderly on the sixth floor and, on these occasions as he passed Harris' cell, he observed Harris sitting in his cell in a stupor, nodding. A4693. When Clay spoke to him, Harris talked back in a "slurred voice." A4693. Clay further noted that Harris' eyes were "droopy." A4693. Clay's account of Harris' appearance in 1989 has not wavered. The same cannot be said of his observations regarding Harris' physical condition in 1991. Before Judge Holderman, Clay was asked: "Now, after 1989, did you ever see Mr. Harris again at the Metropolitan Correctional Center acting in such a fashion that led you to believe he was under the influence of narcotics?" H4694. Clay responded, "No." H4694. During the post-trial hearing before Judge Conlon, Clay again conceded that, by 1991, Harris was not exhibiting outright signs of drug use. C1008. Clay testified before this court, however, that Harris in fact had displayed symptoms of drug use after 1989. A445–46. Clay explained the contradiction in his testimony as follows:

The way that I was explaining that is that it was—it was more controlled that Evans was. Evans was outright. Harris, he was like staying in his cell, and the only time

that you could see Harris or anything is if you passed by his cell going to the shower or something like that.

And that's when I had viewed him sit up at the desk, and it seemed to me like he was at a nodding state or something like that.

. . . .

... What I wanted to explain was that it wasn't in the same fashion that it was in '89. In '89 it was more outright than it was in '91. '91 one had learned to conceal it and stay to theirself.

A445–46.

Together, Simek and Clay's testimony establish that Harris was exhibiting signs of drug use in late 1988 and early 1989. Respecting Harris' condition in 1991, however, Simek did not testify that he observed symptoms of drug use in Harris after August 1990 and, given the internal inconsistencies, we view Clay's account with skepticism. Nonetheless, in light of the evidence linking Harris to drug use during 1991, including his failure to take a drug test on May 30, 1991, it is likely that Harris would exhibit symptoms of drug use during this time frame. And, if anyone were to notice these symptoms, given the mobility associated with his position as an orderly on the sixth floor coupled with his past experience with Harris and drugs, Clay becomes the most probable observer.

### 3. Harry Evans' Physical Appearance

Virtually every witness who came in contact with Harry Evans testified that his post-incarceration physical appearance was consistent with a person under the influence of drugs. *See, e.g.,* A28–29 (testimony of Harry Martin) (observed Evans nodding, scratching, moving slowly, falling asleep while sitting in a chair, and consuming sugar and sugar products); A214–16, 346–50 (testimony of William R. Hogan, Jr.) (describing Evans' deteriorating physical condition during the trials, including being tired and developing sores over his arms and legs); A369–71 (testimony of Eugene Hunter) (from 1990 to 1992, observed symptoms of drug use in Evans, including nodding); A444–45 (testimony of Jackie Clay) (observed during both 1989 and 1991 Evans nodding, dozing off, drooling, exhibiting slurred speech, and stumbling); A540–542 (testimony of Sergeant David J.

O'Callaghan) (Evans' appearance could give the impression that he was under the influence of narcotics as his eyes were glazed, he exhibited slurred speech and often did not know what was going on); A552–55 (testimony of Theodore Poulos) (concerned that Evans looked like he was on drugs prior to and during the trial before Judge Mills given his physical appearance); A641–42 (testimony of Earl Hawkins) (observed symptoms of drug use in one fellow cooperating witness, presumably Evans); A685–86, 726–27 (testimony of Derrick Kees) (from January of 1991 to the spring of 1992, observed symptoms of drug use in Evans, including nodding with his mouth wide open, scratching, dozing off and falling out of chairs); A861–68 (testimony of Henry Harris) (during 1991 and including on a day Evans testified before this court in Trial I, observed Evans display symptoms of drug use, such as nodding, scratching, picking sores, dozing off and falling out of chairs); A1126–27 (testimony of David Avery) (Evans showed symptoms of drug use, including being lethargic and falling from his chair); H2706–07 (testimony of Lenell Smith) (both Evans and Harris appeared to be under the influence of drugs in April of 1992).

However, as was the case with his positive drug test results, the conclusion to be drawn from Evans' physical appearance is ambiguous, at least when considered in isolation. Hogan, Poulos, O'Callaghan and Brannigan each testified that they believed Evans' physical symptoms were attributable to his medical problems and dialysis treatment. A347–51 (testimony of William R. Hogan, Jr.); A552–54 (testimony of Theodore Poulos); A542–43 (testimony of Sergeant David J. O'Callaghan); A1171–73 (testimony of Officer Daniel Brannigan). Their opinion was corroborated by the testimony of three doctors who treated Evans at various times during his incarceration. Each of these doctors explained that the symptoms associated with renal failure and kidney dialysis treatment, including drowsiness, lethargy, itching, scratching and vomiting, are similar to the symptoms exhibited by a person using illicit narcotics. A1147–48 (testimony of Dr. Cynthia Alston); A1208–11 (testimony of Dr.

Don Hollingsworth); A1227–30 (testimony of Dr. George Dunea). While this similarity makes it difficult to distinguish between the alternate causes, all three doctors testified that the symptoms they observed in Evans appeared consistent with his medical condition, as opposed to illicit drug use. A1149 (testimony of Dr. Cynthia Alston); A1211 (testimony of Dr. Don Hollingsworth); A1230 (testimony of Dr. George Dunea). The medical records produced by Drs. Hollingsworth and Dunea, AE Nos. 27–29, as well as those furnished by the Federal Prisoner Medical Center in Springfield, Missouri, AE No. 51A–C, support Evans' claim that he had refused a number of dialysis treatments which, according to Dr. Dunea, eventually would cause his physical condition to deteriorate. A1227, 1235–36 (testimony of Dr. George Dunea). Evans further stated that he would not take his prescribed medication prior to testifying at the trials in order to be clear-headed. A1300–01. According to Evans, this failure "took a toll" on him, so much so that, during the trial before Judge Mills, Evans had to be removed from the witness stand. A1300–01.

In light of Evans' medical condition, it is not only plausible, but indeed reasonable, for a person with no knowledge of Evans' history of drug use to attribute his physical symptoms to the effects of renal failure and kidney dialysis treatment. To be sure, we have no doubt that these symptoms are, at least in part, the product of his medical condition. When placed in the context of the testimony adduced during these post-trial proceedings, however, evidence of Evans' physical appearance is also probative of illegal drug on the part of Harry Evans.

### 4. Monitored Telephone Conversations

Edward Gannon, who has served as a Monitoring Officer in the SIS Department of the MCC, testified that all non-attorney telephone calls to and from the MCC are recorded and monitored on a random and targeted basis. A1021–23. Pursuant to this process, MCC officials monitored two telephone conversations involving Harry Evans in 1992. The first transpired on January 28, 1992, at roughly 1:30 p.m. *See* AE No. 19, at 1 (Inmate Phone Call Weekly Monitoring Report for February 6–12, 1992). Officer Gannon detected this call a week after it took place after conducting a search for all telephone calls to a targeted phone number. A1023 (testimony of Edward Gannon). In that the MCC saves the tapes of recorded conversations for only six months, a transcript of the actual phone call was unavailable during these post-trial proceedings. A1025. Rather, we were guided by Officer Gannon's summary of the call, reported as follows:

> Inmate Evans, 98793–024, of the 6th floor SHU, was heard talking about how his brother ripped him off. The party inmate Evans had called had given something to Evans' brother who was supposed to give that object to Inmate Evans. Neither party mentioned what the object was; However, Inmate Evans stated that when he got it there was nothing but a few "pebbles" left. "Pebbles" is a street term for cocaine particles. Inmate Evans is currently on dialysis, which makes urine testing impossible. This phone number is being monitored for further activity. An investigation continues.

AE No. 19, at 1. Officer Gannon's conclusion that the term "pebbles" referred to cocaine particles rests on his experience and studies regarding drugs. A1024–25. Evans testified that he does not remember engaging in such a conversation, and that he has never heard of the term "pebbles" as it may refer to drugs. A1309, 1347.

Despite Evans denial, this phone conversation stands as probative evidence respecting whether Evans received drugs from his half-brother, Ronald Evans. During an interview with the FBI on April 22, 1993, Harry Martin stated for the first time that Harry Evans received illegal narcotics from his half-brother Ronald Evans during visits at both the MCC and the Dirksen Building. Martin also stated that Ronald Evans "stashed" drugs for Harry Evans in the bathrooms at the Dirksen Building. AE No. 2, at 6. Martin attributed this information to Jackie Clay, who for whatever reason was not asked about Ronald Evans during his post-trial testimony before this court.

Ronald Evans was hired to work as a custodian in the Dirksen Building on June

17, 1991, in the midst of Trial I. A510–11, 521 (testimony of Ronald Evans). Ronald Evans testified that he has visited Harry Evans both at the MCC and in the United States Attorney's Office in the Dirksen Building. A512–14. He also ran into Harry Evans in the dock area of the Dirksen Building as Harry was being transported to and from the MCC. A512–13. Ronald Evans acknowledged that he is a current drug user and that he has used heroin as recently as April of 1993. AE No. 14, at 1 (Ronald Evans FBI Interview of May 4, 1993). However, he denied providing drugs to his half-brother and, contrary to a prior statement to the FBI, did not recall a conversation with Harry Evans in which Harry stated that he was receiving drugs at the MCC. A514, 528. Notably, on May 4, 1993, Ronald Evans was subjected to an FBI polygraph examination, during which he was asked the following questions and gave the following responses:

A. Have you ever gotten unauthorized access to information about the El Rukn trials? Answer—No.

B. Did you provide unauthorized information about the El Rukn trials to anyone? Answer—No.

C. Have you provided drugs to any El Rukn gang members since they have been in jail? Answer—No.

D. Do you know who has been providing drugs to any El Rukn gang members since they have been in jail? Answer—No.

AE No. 14, at 2 (Ronald Evans Polygraph Results). The FBI polygraph analyst concluded the Ronald Evans was truthful when answering questions A and B. *Id.* However, the analyst found that Ronald Evans' answers to questions C and D were indicative of deception.[31] *Id.* Although circumstantial, this evidence coupled with the content of the January 28, 1992 phone conversation sug-

gests that Harry Evans has received illicit narcotics from his half-brother, Ronald Evans.[32]

The second monitored telephone conversation occurred on August 5, 1992. AE No. 38, at 1 (Transcript of Conversation Between Harry Evans and Beverly Wordlow). The conversation was initiated by Harry Evans who placed a collect call to the United States Attorney's Office. *Id.* Former Assistant United States Attorney Theodore Poulos answered the call and, at Evans' request, forwarded the call to Beverly Wordlow at an outside number. *Id.* at 1–2. The colloquy between Evans and Beverly proceeded as follows:

EVANS: Man what was that uh, that particular demonstration you gave me man. Why did you do that?

BEVERLY: I couldn't get it. Why did it get (UI)?

. . . .

BEVERLY: I had enough of that.

EVANS: I know. But shit, you shouldn't have got that because that wasn't right, that was uh . . .

BEVERLY: That was.

EVANS: It wasn't right. I'm telling you it wasn't right. It wasn't right man. I would never you, I wouldn't even wanted you to do that, because it wasn't right man See, see you (UI) one thing you gotta remember that you did where I'm at you understand. When you when you when you manifested something like that like that it got to be able . . .

BEVERLY: Huh?

EVANS: When you manifested something like that it gotta be able to stand, uh, hold up a day, two days you understand. When

---

**31.** Respecting the admissibility of Ronald Evans' polygraph test results, see *supra* footnote 29.

**32.** Notably, AUSA William R. Hogan, Jr. learned in August of 1991 (*i.e.*, toward the end of Trial I) that Harry Evans had a half-brother working as a custodian in the Dirksen Building. A189. While Evans was being transported to the MCC from the Dirksen Building, Hogan noticed Evans talk to Ronald Evans who was mopping a floor in the hallway at the time. A291. Evans told Hogan

that Ronald was his half-brother. A292. Despite Evans status as a key witness in a highly publicized case, and despite the fact that his half-brother was hired in the midst of Trial I, Hogan took no steps to determine if Ronald Evans might be a security risk. A292–93. Hogan's inaction is particularly troubling in that Harry Evans testified during Trial I that Ronald was a senior member of the Four Corner Rangers, a predecessor to the El Rukn street gang. R2278.

you just lay there and working and put the whipper pill on it it ain't nothing no more.

BEVERLY: I ain't puttin' ...

EVANS: I ain't talkin' about you. Is you listening? Is you listenin'? I ain't talkin' about you. I'm talkin' about wherever you, where you got, where you got it from. That wasn't uh, that wasn't in his rare form. That was something that they scrambled up theyself. If you didn't do it they did it. That's what I'm trying to tell you. You can't, I can't, you can't do it. I can't use none like that. Cuz it ain't gonna it ain't gonna, it ain't, it ain't nothing. You understand what I'm sayin' now. Not like that. Not with that kind of quantity. Quantity. That's too much for that. It ain't gonna hold. You understand what I'm sayin' now. It won't hold baby. That's what I'm trying to tell you. I I know what you saying. I ain't saying you. I'm saying it won't hold. That's something like when you met uh KEN or like that, that somethin' like you gotta you know carry on with him like uh 24 hours you know what I'm saying. Well it would be like a cake. It falls. You hear me?

....

EVANS: Yeah. That's what I'm trying to say. You know they like that, I was trying to catch you and tell you what did, go half, go yellow line, right, uh you had to go that way and then make the rest up, uh and uh and and and uh and dime you know what I'm saying? Uh uh of rachi (phonetic). You hear me? See I I mean not, buy a couple of rachis and then I could've you know make, it could worked like that but naw I couldn't yeah you're right. It was, it it was you know. It was like yeah, but it ain't, it wasn't, it ain't for (UI) not like that one. I was gonna buy you a TV man. You know, I was buyin' you a TV this week. I can't, I couldn't even do it now. You know. I couldn't even, I couldn't do nothing man. I ain't the man, I I lost. You know, I lost on that that's why I was tellin' you big girl say uh, without tellin' you know uh, I had needed it like that you know. That's why I was expressin' that to you. Like that, that's why I ain't if you uh try to manifest right.

BEVERLY: Hmm.

....

EVANS: Okay Baby. Everything all right. I was gonna buy you a TV man. I was gonna buy you a colored TV this week, man. I can't do it now though. But I'm tryin' to hustle back up on it again. Try to hustle again, okay.

*Id.* at 3–7, 10. When confronted with the transcript of this conversation, Evans initially disclaimed any recollection of the content of the call. A1348–51. At the same time, he denied it was about drugs. A1348–51. After apparently discerning that his evasive tactics were not advancing his cause, Evans suddenly "remembered" that this call was in fact a discussion about drugs. A1351. Evans, however, denied that Beverly delivered bad drugs to him at the MCC, and denied that he was instructing Beverly to bring a better grade of karachi heroin next time. A1351–53. Rather Evans claimed that he was helping Beverly in a drug sting for the benefit of the ATF. A1351. Evans further denied that he was going to buy Beverly a television set with the proceeds from his drug sales at the MCC; instead Evans maintained that he was merely suggesting to Beverly that she buy a TV with the money the ATF was going to pay her for her work. A1353. Evans' explanation regarding the meaning of this conversation is simply incredible.

5. Harry Evans' Possession of Cash

The possession of relatively large quantities of unexplained cash certainly is probative of the purchase and sale of narcotics. In the present context, cash can be viewed as a special mean, such as tools or apparatus, the possession of which is indicative of the commission of an act requiring that special mean.[33] During the course of these post-

33. Of course, any person who provides an inmate with "any United States or foreign currency" violates 18 U.S.C. § 1791(a)(1), as defined in 18 U.S.C. § 1791(d)(1)(E), and may be punished with a fine, imprisonment up to one year or both pursuant to 18 U.S.C. § 1791(b)(4). Likewise, any inmate who possesses "any United States or foreign currency" violates 18 U.S.C. § 1791(a)(2), as defined in 18 U.S.C. § 1791(d)(1)(E), and may be punished with a

trial proceedings, two witnesses testified that Evans in fact possessed such unexplained quantities of cash.

Michael Corbitt testified that, at sometime during 1988, MCC officials searched Evans' cell and found a large amount of cash. A763–64. According to Corbitt, the money, totalling roughly $2000 to $3000, was comprised of $100 bills and was kept in one of Evans' shoes. A763–64. At the time, Corbitt happened to be outside of Evans' cell performing his duties as an orderly on the sixth floor. A764. Corbitt acknowledges that he originally stated the money was seized from Eugene Hunter, but claims it was merely a mistake of the tongue. A763; May 3, 1993 FBI Interview of Corbitt, at 1. Similarly, Harry Martin testified that Evans "had been ... dropping money ... on the floor ... from the time that he [Evans] got there until I [Martin] left." A28; see also AE No. 2, at 8 (describing incident where Evans dropped both a $20 bill and drugs from his pocket).

In response, Evans specifically denied that MCC officials found cash in his cell. A1304. Further, we observe that the parties have not produced an incident report or similar documentation to substantiate Corbitt's allegation respecting Evans' possession of cash at the MCC.

6. Harry Evans' Requests for Laxatives

There is some evidence that El Rukn cooperating witnesses used laxatives to facilitate illegal drug use. As previously noted, Michael Corbitt testified that, on numerous occasions, he personally observed both Harris and Evans swallow balloons filled with narcotics in an effort to smuggle the contraband into the MCC. A766, 745. In conjunction with these episodes, Harris and Evans often requested and received laxatives from physician's assistants, presumably to help excrete the balloons. A766. Although Evans denied using laxatives to excrete narcotic-filled balloons, A1305, Corbitt's testimony has been corroborated by that of MCC Lieutenant Randall Simek. Simek recalls an incident occurring sometime in 1988 where Evans asked Simek for "Ex lax." A971–72. At the

time, Evans was in his cell on the sixth floor and had complained of stomach problems. A972. Simek refused Evans' request for "Ex lax," and believes that Evans instead received "Kaopectate," an anti-diarrhetic. A972. While Simek had not personally observed an inmate swallow drugs in a balloon, he testified that, as a consequence of contact visits, it would be "very simple ... to place— if you were trying to conceal drug paraphernalia or drugs—a balloon-like object in your mouth and then transfer the item [without detection] to the inmate, who would then swallow said item, and then at a later time [excrete it]." A967.

As is the case with most of the above discussed circumstantial evidence, Evans' requests for laxatives is insufficient in itself to establish that he used and possessed illegal narcotics while incarcerated at the MCC. However, when considered in conjunction with the other evidence of Evans' drug use, including the positive drug test results, the eyewitness testimony, his prior admissions and the remaining circumstantial evidence, Evans' requests for laxatives becomes probative of post-incarceration drug use.

III. Government Knowledge of Post–Incarceration Drug Use by Henry Harris and Harry Evans

As overwhelming was the evidence that government witnesses Harris and Evans possessed and used illegal drugs while incarcerated at the MCC, so too is the evidence that various members of the El Rukn "prosecution team" were informed of such misconduct prior to the close of evidence in Trial I. These members of the prosecution team include not only paralegals and subordinate Assistant United States Attorneys, but also lead prosecutor Williams R. Hogan, Jr. and former First Assistant United States Attorney Ira Raphaelson. Hogan and Raphaelson received information regarding post-incarceration drug use from the following sources: (a) MCC officials; (b) agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF") and other El Rukn task force investigators; (c) other members of the United States Attorney's Office; (d) El Rukn cooperating wit-

fine, imprisonment up to one year or both pursu- ant to 18 U.S.C. § 1791(b)(4).

nesses; and (e) other incarcerated individuals.

A. Information Compiled by MCC Officials and Conveyed to Members of the United States Attorney's Office

That Evans and Harris had been using illegal drugs while incarcerated at the MCC came as no surprise to various MCC officials who testified during these post-trial hearings. Indeed, considerable documentation of such drug use had been compiled at the MCC. The following is a synopsis of the information concerning Harris and Evans' illegal drug use conveyed by MCC officials to members of the United States Attorney's Office, including Hogan and Raphaelson.

1. General Information Relating to Drug Usage Problems on the Sixth Floor of the MCC

By the fall of 1989, various MCC officials had come to suspect a drug usage problem on the sixth floor of the MCC, where Evans and Harris were housed. MCC personnel Edward Gannon and Randall Simek both testified that they heard about an incident where Correctional Officer Ollie Gray confiscated from Evans a deodorant container filled with heroin. A1015–20 (testimony of Edward Gannon); A1083–85 (testimony of Randall Simek). Simek testified that he, along with other correctional officers, suspected that both Harris and Evans were using drugs. A981. In accord with his personal experiences with Harris, Simek wrote a memorandum to his supervisor, SIS Lt. Jones, detailing Harris' change in personal appearance and conveying his suspicion of a drug usage problem. A971, 975. Simek recalled seeing other reports, memoranda and log book entries indicating that Evans and Harris had been using drugs at the MCC. A975–77.

At about the same time, based on a review of the substantial documentation of drug usage by El Rukn cooperating witnesses, including the lieutenant's logbook (where Simek's memorandum would be located, A975–76) and the various documents evincing Harris and Evans' positive drug tests in April and ·May of 1989, Warden Arthur Beeler became aware of a drug problem on the sixth floor of the MCC. C416–17; H915–16 (testi-

mony of Arthur Beeler). Given the perceived severity of the problem, on October 17, 1989, Beeler met with former First Assistant United States Attorney Ira Raphaelson to discuss his plans to build a noncontact visiting area on the sixth floor. C415–16; H929–30. The meeting took place in Raphaelson's office, and lasted only a few minutes. C416; H932. Beeler informed Raphaelson of the drug problem on the sixth floor, and informed him that he planned to erect a wall from floor to ceiling in the sixth floor visiting room in order to "terminate contact social visits." C416; H931–32. Raphaelson responded, "Do what you have to do, Art." C416–17. During this meeting, Beeler did not specifically mention that El Rukn cooperating witnesses were using illegal drugs. H931. Raphaelson acknowledged that he had discussions with Warden Beeler about his concerns that contraband (*i.e.*, weapons and narcotics) was being smuggled into the MCC via contact visits on the sixth floor. H1228–30 (testimony of Ira Raphaelson). Raphaelson, in turn, told William Hogan, Jr., who served as lead prosecutor for Trial I, of "Warden Beeler's concerns of contraband coming to the El Rukns." H1232.

While it appears that, on this occasion, Warden Beeler did not specifically inform Raphaelson or Hogan that El Rukn cooperating witnesses possessed and used drugs on the sixth floor of the MCC, the nature of his visit to the United States Attorney's Office should have raised that specter.

2. The October 18, 1989 Memorandum Documenting Henry Harris and Harry Evans' Positive Drug Test Results

On the same day that he visited Raphaelson (October 17, 1989), Beeler spoke with former SIS Lt. Charles Mildner about "ongoing cases and matters." C418. While Beeler had no specific recollection of the conversation, given his concerns regarding drug usage on the sixth floor, Beeler testified that it would be logical that he asked Mildner to prepare a memorandum detailing urinalysis test results for the El Rukn cooperating witnesses. C418–20. Mildner in fact prepared such a memorandum, directed to the attention of Warden Beeler and dated Octo-

ber 18, 1989, summarizing drug test results for El Rukn cooperating witnesses. AE No. 5. As previously described in subsection II(A) of this opinion, the memorandum notes that Harry Evans tested positive for drugs on April 12 and May 10, 1989, and that Henry Harris tested positive on May 11, 1989. *Id.* The memorandum further indicates that the positive tests of April 12 (Evans) and May 11, 1989 (Harris) were unauthorized. *Id.*

Warden Beeler's prior concerns regarding communication with the United States Attorney's Office, coupled with his specific actions upon receiving the October 18, 1989 memorandum, indicate that he caused the memorandum to be delivered to both Raphaelson and Hogan. In December of 1988, Warden Beeler issued a written policy directive to Associate Warden Max Nuss establishing a procedure whereby MCC officials would inform the appropriate Assistant United States Attorney of all positive drug tests on pretrial inmates.[34] C366–67, 374–76. Warden Beeler anticipated that the Assistant United States Attorney who would be informed would be the assistant handling the case. C376. Pursuant to this policy directive, Hogan would have been informed of Harris and Evans' positive tests for unauthorized codeine and morphine. C376–77, 390, 403.

Whether or not a subordinate took action in compliance with the above described procedure, on or about October 18, 1989, Warden Beeler personally delivered to the United States Attorney's Office a copy of the memorandum he received from Mildner, leaving the document with First AUSA Ira Raphaelson's secretary. C424 (testimony of Warden Beeler). Raphaelson's secretary, Cynthia Ward, provided the document to Raphaelson who, in turn, routed it to then AUSA Lawrence Rosenthal. H1824–30 (testimony of Cynthia Ward); H44–45 (testimony of Lawrence Rosenthal). According to Raphaelson, in accordance with his common practice, it is most likely that he provided Hogan with a copy of the memorandum. H1142–43. Hogan has consistently denied receiving a copy of this memorandum prior to the commencement of these post-trial proceedings. A209–10, 276–77; C224; H144–46, 150. Rather, he claims that he saw the memorandum for the first time when it was faxed to him in Los Angeles by his attorney in October of 1992.[35] A209, 276–77; H144–46.

### 3. AUSA Rosenthal's Conversation with William R. Hogan, Jr. Regarding the October 18, 1989 Memorandum

Former AUSA Rosenthal testified that, upon receiving the October 18, 1989 memorandum, he approached Hogan in or near his office to inquire as to why the document had been routed as such. A592–93; C64–65; H48. According to Rosenthal, Hogan indicated that he did not know why Rosenthal had received the memorandum. A593; C65; H48. Rosenthal then stated that the content of the memorandum would be a real problem for the government, opining that the positive

---

**34.** We observe that this policy applied only to "pretrial" inmates, and not "holdovers." H905–07, 1025–27, 1048. There is considerable debate as to whether Harris and Evans were in fact classified as "pretrial" inmates prior to the filing of federal charges on October 26, 1989. H1390–91, 1414–16, 1420–22. MCC Executive Assistant Robert Hafer testified that the two classifications were amorphous, H1393, and that a person not yet charged with a federal crime could in fact be considered a "pretrial" inmate. H1412. Hafer further testified that he believed Evans and Harris were classified as "pretrial" inmates at the time of their positive tests. H1390–91. Indeed, a review of Harris' inmate history report reveals that he was in fact classified as a "pretrial" inmate from March 6, 1989 to October 31, 1989. AE No. 56, at 4. Likewise, respecting his stay at the MCC from August 8, 1988 to November 22, 1989, Evans was classified as a "pretrial" inmate from August 8 to 13, 1988, September 21, 1988

to May 1, 1989, and June 2 to 22, 1989. AE No. 57, at 6 (Note: this exhibit, like AE No. 56, was produced by the government after the post-trial hearing and was marked and admitted by the court upon its own motion). It is unclear from the unit notation what designated Evans enjoyed from May 1, 1989 to June 1, 1989, and again from June 22, 1989 to November 22, 1989. *See id.* In any event, setting Evans' status aside, it is evident that Warden Beeler's policy would have applied to Harris at the time he tested positive for morphine on May 11, 1989.

**35.** At the request of then United States Attorney Fred Foreman, *see* CDE No. 54, Hogan and two of his paralegals, Corinda Luchetta and Tanya Van Blake, received funds from the Department of Justice to retain private counsel for these proceedings.

drug tests were discoverable and should be disclosed to the defense. A593; C65–67; H48. Hogan responded in substance that the memorandum would not be a problem. A593; C65, 74; H48. Based on a prior experience with a cooperating witness who tested positive for drugs, Rosenthal reiterated to Hogan that the test results were discoverable and should be disclosed to the defense. A594; C65, 74; H48. The conversation ended with Hogan's response that no problem existed and Rosenthal had nothing to worry about. A594–95; C65, 74; H48–49. Although recognizing that Hogan was busy at the time and that the conversation was brief, Rosenthal testified that he was certain that Hogan was aware of the contents of the October 18, 1989 memorandum, H49–50, an indication that Hogan had previously received the memorandum himself.

Hogan, however, steadfastly and emphatically denied that Rosenthal informed him about the positive tests as documented by the October 18, 1989 memorandum. A277–78; C224; H147–48, 157, 169, 266–67, 271. According to Hogan:

> There's no way that Mr. Rosenthal could have said to me during that time frame that these witnesses [Harris and Evans] were coming up dirty in urinalysis tests at the MCC and I would have failed to understand what he was saying or focused on it. I'm saying that, in my opinion, Mr. Rosenthal is mistaken about what he told me. He did not tell me, in my mind I'm virtually certain, that any of my witnesses had turned up positive in drug tests at the MCC.

H147–48; see also A278 ("[T]he conversation that Larry Rosenthal has relayed as having occurred between us did not occur in that I didn't hear anything of that nature that he said and I made no responses of the nature that he says I made.... I am denying that that conversation occurred in the fashion that he says it did."). Rather, Hogan claims to have first learned of the positive drug tests on August 15, 1991. A168, 211; C222; H82. On that date, pursuant to subpoena, MCC officials presented in open court before Judge Conlon a copy of a memorandum, from Charles Mildner to Charvella Christmas and dated August 15, 1991. AE No. 6. This memorandum details the positive drug tests attributable to Harris and Evans but, unlike Mildner's previous memorandum to Warden Beeler, does not indicate whether the positive results were authorized by prescribed medication. Id. Hogan testified that, based on a conversation with MCC Executive Assistant Bob Hafer that lasted no more than three to four minutes, he concluded that the positive test results for both Harris and Evans were authorized. A208, 211–12, 282–83.

In light of the above evidence, the government is willing to concede that AUSA Rosenthal in fact received a copy of the October 18, 1989 memorandum from Mildner to Warden Beeler. Government's Brief in Opposition to Defendants' Motions for Post–Trial Relief at 8 n. 5 (Feb. 24, 1993); Government's Post–Hearing Brief at 13 (July 26, 1993). Accordingly, as knowledge of one prosecutor is attributable to other prosecutors in the same office for *Brady* purposes, the government urges the court not to "address [or] resolve any conflict between the testimony of Mr. Rosenthal and Mr. Hogan." Government's Brief in Opposition to Defendants' Motions for Post–Trial Relief at 9 n. 5 (Feb. 24, 1993). This court, however, confronts an unprecedented circumstance. A former Assistant United States Attorney has come forward, directly contradicting Hogan's claim of ignorance. Placed in proper context, the resolution of the instant conflict touches upon issues which transcend the obligations imposed under *Brady*, namely the duties of candor and sincerity maintained by all government prosecutors. Were we to ignore altogether Hogan's apparent transgression in regard to these duties, this court would be remiss.

As an issue of credibility, we conclude that Rosenthal in fact informed Hogan of the positive test results on or about October 18, 1989. We begin by observing that Rosenthal, currently a high-ranking public official in the City of Chicago's legal department, possesses no discernible interest, either personal or professional, in the outcome of this case. The same cannot be said for Hogan. As a professional matter, Hogan has a motive to give false and incomplete testimony in order to preserve the convictions he battled

for years to attain. On a person level, the stigma of the instant allegations of misconduct coupled with the threat of discipline from the Office of Professional Responsibility of the United States Justice Department and/or the Illinois Attorney Registration and Disciplinary Commission, provide a substantial incentive to deny wrongdoing regardless of the truth.

The credibility of Rosenthal's testimony is further bolstered by the circumstances under which he came forward. Rosenthal volunteered his recollection of the October 18, 1989 memorandum and subsequent conversation with Hogan to Michael Shepard in a social context. At the time, Shepard headed the Public Integrity Section of the Department of Justice. He is now the Interim United States Attorney for the Northern District of Illinois. Rosenthal came forward with this information unaware of any corroborating evidence. After he had testified before Judge Conlon, at the suggestion of Judge Holderman, the government searched its files relating to *United States v. Tocco*, 88 CR 841 (N.D.Ill.) (Holderman, J.), Rosenthal's previous case in which a government cooperating witness tested positive for drugs at the MCC. In that file, the government located the October 18, 1989 memorandum from Mildner to Warden Beeler, corroborating Rosenthal's testimony before Judge Conlon. In that he obviously testified truthfully about receiving the memorandum, we can discern no reason why he would detail a conversation with Hogan regarding the substance of the memorandum, if the testimony were not true.

Finally, Rosenthal has not only appeared before this court as a witness in these post-trial proceedings, but he has prosecuted cases before the court as a former Assistant United States Attorney. Consistent with the characteristics of his post-trial testimony in this case, as a prosecutor Rosenthal conducted himself with the utmost degree of professionalism and candor. Rosenthal's track record before this court strengthens our conclusion that his post-trial testimony was forthright.

In contrast, Hogan's conduct in previous stages of this case has left his credibility marred long before he took the witness stand during these post-trial proceedings.[36] Rather than confronting the obstacles inherent in this prosecution with candor and professionalism, Hogan sacrificed personal—and professional canons of—ethics to fulfill his quest for one-sided justice. From the outset, we have had occasion to label Hogan's conduct as "disingenuous." For instance, prompted by defendants' motions for severance and the obvious unmanageability of the initial indictment, this court more than once requested that the government submit a severance proposal. *See Andrews II*, 754 F.Supp. at 1199 (citing *United States v. Andrews*, No. 89 CR 908 (N.D.Ill. May 10, 1990); Transcript of Proceedings (August 31, 1990)). On behalf of the government, Hogan declined to propose a plan contending that the case could only be tried as indicted and flatly stating that all counts and all defendants must be tried together.[37] *Id.* at 1199–1200 (citing Govern-

---

**36.** It is with great reluctance that we delve into Hogan's past conduct before this court. Hogan is a talented, hard-working prosecutor. His zeal to prosecute those who would violate the laws of the United States is a sincere one. We reference the following incidents, all of which appear on the public record, only to the extent that they are relevant to the instant credibility determination that we are required to make.

**37.** Ironically, as a result of these post-trial proceedings, we have been afforded an insight into the indictment process as it related to this case. In a memorandum dated July 27, 1989, Tom Scorza set forth to the Indictment Committee many of the very concerns this court detailed in *Andrews I* regarding Hogan's desire to prosecute an enormous amount of El Rukn defendants in one mega-trial. Significantly, Scorza wrote:

I told Bill Hogan that, in my judgment, there is simply no way that the indictment, as presently conceived, can be properly handled within our office or in the court system. Bill's response was that he fully expects that a large number of the presently-proposed defendants can be dropped out of the indictment and that a large number of even the remaining defendants would plead before trial. But I think that even on the most optimistic assumptions, e.g., that we drop 25 of the present 75 defendants from the indictment and that half the remaining 50 defendants plead guilty, we still would have a proposed prosecution that, as a practical matter, simply cannot be efficiently and successfully handled. I cannot imagine what pretrial discovery would be like in the proposed case, whether there are 25, 50 or 75 defendants; I cannot imagine how long the pretrial motions

ment's Brief in Opposition to Severance (May 31, 1990)). Once we granted the motions for severance on November 6, 1990, proposing our own severance plan and offering the government still another opportunity to comment upon it, the government filed a motion for continuance to allow it more time to submit an alternate severance plan. Surprisingly, in support of its motion (a document signed by Hogan), the government stated that it had "always recognized the manageability problems caused by this case," and that it had long been willing to "'participate in the formulation of a severance plan.'" *Id.* at 1200 (quoting Government's Motion for Continuance at 1 n. 1 (Nov. 9, 1990) (quoting *Andrews I,* 754 F.Supp. at 1181)). Even more surprisingly, to advance this spurious contention, Hogan, on behalf of the government, pointed to a handwritten chart handed to one of the court's law clerks at the conclusion of a pretrial conference held on August 31, 1990. *Id.* at 1200 n. 2. In light of such an improper *ex parte* communication and because of "the government's somewhat inaccurate recollections of the events that led to *Andrews I,*" we took great pains in *Andrews II* to document Hogan's "questionable pretrial machinations." *Id.* at 1201 n. 4.

Consider further Hogan's subsequent submission of a motion to reset the trial date in Trial II, arguing that it would be impossible for the government to try three overlapping El Rukn cases. This court addressed the motion in a status hearing conducted on May 2, 1991, at which time we took exception to a variety of factual statements made by Hogan in support of the motion. First, paragraph 1 of the motion stated: "On March the 8th, 1991, the Honorable Marvin Aspen issued an order setting the trial date in Andrews II for July 8. According to Judge Aspen's March 8, 1991 order, Andrews II was to follow

Andrews I, which was then and still is scheduled to begin on May 6, 1991." As we noted on May 2, 1991, the statement was false:

> I have a copy of my March 8 order and I will read you it in its entirety: "Jury selection in Andrews II will commence on July 8, 1991. No extensions shall be granted. It is so ordered."
>
> I see nothing in that order to indicate that it's going to follow Andrews I. As a matter of fact, it was my intention for the case to follow Judge Holderman's trial, not Andrews I. So that statement is just incorrect.

Transcript of Proceedings at 20–21 (May 2, 1991). Hogan also represented that the third trial would place "an impossible strain" on the United States Marshals' Service. However, as we previously observed:

> The marshals' service, as I understand it, as I read the statute, is to provide security to the court; it is not an adjunct of your office. Your office does not have to speak for it. But I will tell you that I consulted with the marshals' service this morning. Some of the gentlemen that I consulted with are right here in the courtroom right now, and the bottom line is that, yes, it would be a strain on their office but, yes, they are perfectly able to handle a third trial.

*Id.* at 21–22. During the course of the status hearing, Hogan once again disingenuously stated: "And I think we have been—we have tried extremely hard to comply with this Court's trial schedules and other matters." *Id.* at 18. In response, we reminded Hogan of his previous uncooperative behavior:

> I don't think so Mr. Hogan. I think that you have thwarted this Court's efforts to bring this case to trial earlier in an efficient manner on frequent occasions. I have stated that on the record and I cer-

---

period would have to be, and how many Assistants we would have to assign to answer those motions; I can't imagine what it would be like to try the proposed case, again even if we somehow radically trim the number of defendants. We are talking about a trial that will take from nine months to a year; that will obliterate the assigned judge's calendar and the lives of the assigned Assistants; and that will pose insurmountable security problems to boot.

AE No. 13, at 1. In the end, Scorza suggested that "we are going to have to come up with alternatives to the proposed *en masse* and all-encompassing indictment." *Id.* at 2. Needless to say, neither Hogan nor the Indictment Committee heeded this sage advice.

We note also that we have found nothing in this record to indicate that Scorza's involvement in the El Rukn cases was anything other than honorable.

tainly can't agree with that statement. I wouldn't bring it up again, Mr. Hogan, but I can't let that statement go into the record and be silent indicating any agreement to it. You haven't been helpful at all, Mr. Hogan.

*Id.* at 18–19. Finally, we note that in support of this motion, Hogan argued that, while the United States Attorney's Office had approximately 110 assistants available to try criminal cases, many of which were experienced prosecutors, the government could not try any of the El Rukn cases without him because of the unique and extensive knowledge of the case he had accumulated during the years of the investigation. Indeed, in connection with this case, Hogan purported

to be a walking encyclopedia of information. We contrast Hogan's near-photographic memory in previous stages of this prosecution to the countless instances in which he answered questions during these post-trial proceedings, "Not that I recall." [38] In sum, we conclude that Rosenthal in fact informed Hogan of Harris and Evans' positive drug test results on or around October 18, 1989. Further, taken together, the following pieces of evidence indicate that Hogan had received the October 18, 1989 memorandum shortly before his conversation with Rosenthal: (1) that Raphaelson received the memorandum and would have forwarded to Hogan and Rosenthal as a matter of course; (2) that the memorandum was discovered in the *Tocco*

---

**38.** Likewise reflecting poorly on Hogan's credibility were the ill-judged intimidation tactics he employed in the face of an adverse ruling. Consider, for instance, Hogan's response to the court's ruling in *Andrews II*. In *Andrews II*, we adopted, with certain revisions, the bulk of the government's proposed changes to the severance plan outlined in *Andrews I*. Nonetheless, Hogan filed a motion to reconsider, arguing that, insofar as *Andrews II* did not wholly adopt the government's proposed changes, the ruling constitutes an impermissible amendment to the original indictment. After briefly discussing the matter during a status hearing held on December 12, 1990, Hogan offered the following veiled threat:

Mr. Hogan: I may be a bit premature by saying this, but I think that the Court's determination of that issue or those issues that we raised yesterday [in our motion to reconsider *Andrews II*] may have an impact on the dates that these trials begin, from our standpoint. The Court: You have to be less cryptic on that. Mr. Hogan: Well, depending on whether or not the court allows the trial of the narcotics case in our Trial I, if you deny that we may well take an appeal on the basis that we raised in our motion yesterday, and that would have the effect of kicking this back to some indeterminate period. The Court: Well, I don't know what kind of appeal. You're talking about a mandamus? Mr. Hogan: No. I am talking about an appeal based on the amendment in the indictment on the legal issues that we raised yesterday. The Court: As I told you, the indictment is not amended; it's severed. We are trying only the charges in the indictment. There is no amendment, and I don't think there's any right to appeal. You can mandamus anything I do, and if that's what you want to do, that's fine. But let me— Mr. Hogan: We are not suggesting we want to do that, by any means.

The Court: Let me suggest to you that I am not delaying this trial for any appeal because there is no appeal of an amended indictment because none is amended. I am severing. I am not precluding you from trying each and every portion of your indictment. The term "held in abeyance" simply means that it's not going to be tried at this particular trial. I am not requiring you to prove something that is not in the indictment nor am I in any way amending the indictment. I mean, that's a term that you use, but the way you use that term, you could apply it to any severance and I don't think it makes sense. So I don't intend—

Transcript of Proceedings at 31–34 (Dec. 12, 1990); *see also* Transcript of Proceedings at 16–24 (Apr. 15, 1991).

We also note that this colloquy with Hogan is relatively benign when compared to other credibility confrontations Hogan encountered with District Court Judges in other El Rukn prosecutions. *See, e.g.,* the government's unsuccessful attempt to recuse Judge Holderman from conducting the post-trial hearings in *United States v. Burnside,* 824 F.Supp. 1215 where, in the memorandum in support of the motion to recuse, Interim United States Attorney Michael J. Shepard summarized Hogan's confrontations with Judge Holderman as follows:

... there is no question that the trial of this case was filled with exchanges between the court and the government's lead prosecutor that reveal an antipathy and distrust by the court far outside the normal range of relationships between a court and counsel.... [The] court ... made clear ... its unshakable judgment that the prosecutor could not be believed and, in the court's view, the prosecutor [Hogan] did not even think he was obligated to be truthful.

This court, of course, has relied solely upon its own evaluation of Hogan's credibility and has not considered credibility findings of its judicial colleagues who have tried other El Rukn cases prosecuted by Hogan.

file, corroborating Rosenthal's claim that he received the document; and (3) that, according to Rosenthal, Hogan appeared familiar with the content of the memorandum during his discussion with Rosenthal.

#### 4. Lt. Charles Mildner's Conversation with William R. Hogan, Jr.

Former SIS Lt. Charles Mildner testified that, in May or June of 1991, he had a conversation with Derrick Kees which caused Mildner to question Kees' emotional stability. A925–27. Mildner had gone to the sixth floor to talk to Kees after receiving from him a written complaint requesting a meeting with a staff member. A924–25. The conversation took place through the food slot of Kees' cell. A926. Kees explained to Mildner that he, Kees, believed he was being "set up" on the sixth floor. A927. Specifically, Kees told Mildner that Harry Evans had offered him drugs and that Kees felt this was a set up in retaliation for the assault on Harris with a broom stick, such assault occurring on or about May 5, 1991. A927. Rather than construing Kees' statements as indicative of drug usage on the sixth floor, Mildner considered Kees as mentally unstable and paranoid. A926–27. Nonetheless, just to be sure, Mildner attempted to subject Evans to a urinalysis test, only to learn that because of Evans' medical problems he could not urinate. A930–31.

Without delay, Mildner approached Mark Henry, who served as Warden at the MCC Chicago from December 31, 1989 to July 27, 1991, and expressed his concerns regarding Kees' mental capacity. A927–28. Mildner expressly informed Warden Henry of Kees' charge that Evans had offered Kees drugs. A928. Henry suggested that Mildner inform Hogan of the situation. A928. The parties have stipulated that Warden Henry, if called, would have testified that he does not recall speaking to Mildner about Kees' allegations that Evans possessed narcotics at the MCC. Stipulation as to Former Warden Mark Henry ¶ 1, at 1.

Immediately after his meeting with Warden Henry, Mildner telephoned Hogan. A928–29. Mildner explained to Hogan that he, Mildner, believed Kees was emotionally unstable and paranoid. A929. Mildner explicitly informed Hogan of Kees' charge that Evans had offered Kees illegal drugs. A929. According to Mildner, Hogan responded in substance, "No, that's not happening," i.e., Evans did not possess narcotics and offer some to Kees. A929–30. The conversation ended with Hogan promising to talk to Kees and Evans and to take care of any problem that existed. A930. Hogan testified that he recalled such a conversation with Mildner, in which Mildner told Hogan that Kees was acting paranoid and that Evans was out to get him. A1364–65. Hogan, however, claimed that Mildner mentioned "nothing about drugs" during the course of the conversation. A1365.

Despite Hogan's denial, we find that Mildner in fact informed Hogan of Kees' allegation that Evans offered Kees illicit narcotics in May or June of 1991, i.e., days prior to or during the course of Trial I. Not only did Mildner testify as such, but it is reasonable to assume that Mildner would attempt to bolster his suspicion of Kees' instability by detailing the underlying basis for such a charge.

#### B. Information Compiled by ATF Agents and Other El Rukn Task Force Investigators and Conveyed to Members of the United States Attorney's Office

The ATF case agents and other task force investigators who had substantial contact with the El Rukn cooperating witnesses each testified that they did not observe any cooperating witness use, possess or attempt to obtain illegal drugs at any time during the investigation and trials. A540 (testimony of Sergeant David J. O'Callaghan); A1171 (testimony of Officer Daniel Brannigan); H4560 (testimony of ATF Special Agent Lewis G. Wolfe); H4773 (testimony of ATF Special Agent Thomas O'Brien); Stipulation as to ATF Special Agents Tim Wilson and Dan Young, and Chicago Police Officer James Fitzmaurice. There is some evidence, however, that this group of individuals had been informed of rumors of drug use by El Rukn cooperating witnesses and, in turn, communicated those rumors to William Hogan, Jr.

ATF Special Agent Tom O'Brien testified that, in late 1990 or early 1991, he met with

WITSEC [39] Deputy Marshals Jerry Lyda and J.J. Gonzalez in the WITSEC Marshal's Office. H4768–69. During this meeting Deputy Lyda informed O'Brien that "El Rukns on the 6th floor of the MCC were bragging about . . . receiving drugs at the federal building." H4769. Neither Deputy Lyda nor Gonzalez have a recollection of telling O'Brien about a rumor that El Rukn cooperating witnesses were receiving drugs. H4688 (testimony of Deputy Lyda); H4663 (testimony of Deputy Gonzalez). Deputy Lyda does recall, however, informing O'Brien generally about rumors in order to ensure that O'Brien knew about WITSEC rules and regulation. H4688–89.

After his conversation with Lyda and Gonzalez, O'Brien returned to the United States Attorney's Office and encountered Officer Brannigan. H4770. O'Brien informed Brannigan of the rumor, and the two decided to contact Hogan. H4770. O'Brien and Brannigan found Hogan in the hallway on the eighth floor and told him of the rumors the WITSEC Marshals had heard. H4770–72. Although advising Hogan that he thought the rumors were unfounded, O'Brien recognized that Harry Evans was housed on the sixth floor and, as such, advocated confronting Evans with the rumor.[40] H4772. Officer Brannigan testified that he recalls O'Brien telling him of the WITSEC rumor, but does not recall informing Hogan. A1182–84. Hogan testified that: "I have no recollection of such a conversation with Agent O'Brien. He may well have said something to me of that nature." A300–01. Hogan was quick to add that if he had been informed of the rumor he "would have known that it wasn't true." A301.

C. Suspicions of Post–Incarceration Drug Use Formulated by Members of the United States Attorney's Office and Conveyed to William R. Hogan, Jr.

Various members of the United States Attorney's Office, assistants and paralegals alike, testified that, during the El Rukn trials, they developed suspicions that Harry Evans was using illegal drugs. While the majority of the suspicions may have been expressed after the conclusion of Trial I, they are nonetheless relevant to our present inquiry by virtue of who they were conveyed to: the lead prosecutor, William R. Hogan, Jr. Discussed *infra* Section IV and subsections V(B) & VII(D)(2) of this opinion, Hogan's state of mind is a significant issue in the context of the instant post-trial motions. Specifically, the conclusion that Hogan (a) possessed knowledge of Harris and Evans' post-incarceration drug use, and (b) neither disclosed such information to the defense nor took steps to stop or punish Evans and Harris, begets questions such as: (1) Was Hogan's failure to stop or punish Harris and Evans motivated by his desire to provide a benefit or inducement to them?; and (2) Was Hogan's failure to disclose the evidence of such post-incarceration drug use a calculated and deliberate attempt to subvert the judicial process? In light of the substantial evidence indicating that Hogan had been informed of Harris and Evans' post-incarceration drug use prior to learning of his colleagues' suspicions, and given Hogan's reaction thereto, these later expressions become probative of Hogan's state of mind, *i.e.*, they suggest answers to the above listed questions. In a similar vein, these later events are relevant to the extent that Hogan's responses to his colleagues' suspicions suggest that he actively attempted to camouflage his prior knowledge of Harris and Evans' illegal drug use. It is within this framework that we detail the following events.

1. Suspicions of Tanya Van Blake

Tanya Van Blake began her employment in the United States Attorney's Office on July 1, 1991, as a paralegal. C1024; H3816 (testimony of Tanya Van Blake). Shortly after July 1, 1991, Van Blake was assigned to work on the El Rukn prosecutions. C1024–25; H3816. During the course of her work, Van Blake had substantial contact with a number of the El Rukn cooperating witnesses, including Harry Evans. C1025. Van Blake testified that, during the late summer

---

**39.** The term "WITSEC" is an abbreviation for "Witness Security."

**40.** That O'Brien singled out Evans to confront with the rumor suggests that O'Brien previously had suspected that Evans was receiving and using drugs.

or early fall of 1991,[41] on several occasions she observed Evans, while in the United States Attorney's Office being prepared to testify, nodding off in midsentence and with dilated pupils. C1031–32; H3819–20. As these observations were usually preceded by visits from Evans' common-law wife, Beverly Wordlow, and his mother, Van Blake suspected that Evans was obtaining and using illegal drugs. C1034–35; H3820. On more than one occasion, Van Blake told her supervisor, paralegal Corinda Luchetta, about her suspicions that Evans had been under the influence of drugs. C1032–36; H3820–21. Luchetta indicated that she would inform Hogan of Van Blake's suspicions. C1033–34; H3821. Luchetta in fact spoke to Hogan and, a couple of days later, reported back to Van Blake. C1036–37; H3821–3822. Luchetta told Van Blake that, unless she had actually witnessed drugs change hands, Hogan was not interested. C1037; H3822. She reiterated, "I've talked to Mr. Hogan. Leave it alone." C1037; H3822.

Luchetta testified that, in September of 1991, she in fact was informed by Van Blake of her suspicions that Evans had been under the influence of drugs. C780; H3782–84. According to Luchetta, Van Blake described Evans' physical condition and stated that she believed Evans was receiving drugs from "his own mother." C781. Luchetta also recalls telling Hogan of Van Blake's concern, but denies that Hogan instructed her to notify Van Blake to "leave it alone." C781–82; H3784. Rather, Luchetta claims that Hogan told her to have Van Blake come and speak with him. H3784. Not surprisingly, Hogan professes no specific recollection of Luchetta informing him of Van Blake's suspicions. A298–99; C1166.

2. AUSA Theodore Poulos' Discussion with William R. Hogan, Jr. Regarding Harry Evans' Physical Appearance During Trial III Conducted Before Judge Mills

Former Assistant United States Attorney Theodore Poulos served as lead prosecutor during Trial III conducted before Judge Mills and, as such, bore the responsibility of putting Harry Evans on the witness stand. A551 (testimony of Theodore Poulos). Poulos testified that during the course of his examination of Evans, along with everyone else in the courtroom, Poulos was struck by the substantial deterioration in Evans' physical condition. A553. According to Poulos, Evans looked very sleepy, his head was hanging and he had a hard time keeping his eyes open. A553. Poulos believed that Evans' appearance was attributable to his medical condition and, after a brief conversation with AUSA Hartmann, Poulos altered his trial strategy and elicited from Evans his medical history in an attempt to explain his current condition. A553.

Shortly thereafter, Poulos informed Hogan of the incident. A553–54. Poulos recalls that the conversation took place on the fourteenth floor of the United States Attorney's Office, and that he, Hogan and Hartmann were present. A554. While conveying Evans' condition to Hogan, Hartmann explicitly stated that Evans looked as if he were under the influence of drugs. A554. Hogan did not respond, other than to agree with Poulos' appraisal that Evans' physical appearance was a result of his medical maladies. A554.

Hogan specifically recalls talking to Poulos and Hartmann about Evans' physical appearance on the witness stand before Judge Mills. A215–16. Hogan description of the conversation was similar to Poulos' and included Hartmann's remark that Evans looked as if he were on drugs. A215–16. Rather than giving serious consideration to the possibility that Evans was using illegal drugs, however, Hogan reminded Poulos and Hartmann that not only had Evans' dialysis schedule been disrupted, but he had been taking roughly twenty pills a day for a variety of medical ailments. A216; see also C1143 (testimony

41. During her two appearances during these post-trial proceedings, Van Blake has evinced some uncertainty as to the precise timing of the observations described above. While testifying before Judge Holderman, Van Blake was firm in her conviction that the events in question occurred in October of 1991, i.e., after the conclusion of Trial I. H3819. When she later testified before Judge Conlon, Van Blake stated that she observed Evans' condition in the "summer of 1991," C1032, 1034–36, leaving open the possibility that the event occurred prior to the conclusion of Trial I.

of William R. Hogan, Jr.) ( [Hartmann said] something to the effect that ... [Evans] looked extremely ill and practically looked as if he was doing drugs or on drugs of some sort. I said, yes, he was doing a lot of different kinds of drugs. He was undergoing dialysis on an irregular basis, that he was very sick. I related basically to them what was apparent to their own eyes, that he was ill.").

3. Harry Evans and the "Shoe Incident"

On the weekend following Evans' manifest physical deterioration before Judge Mills, Evans received a visit from his mother on the eighth floor of the United States Attorney's Office. A554 (testimony of Theodore Poulos). Given the possibility that Evans may have been using illegal drugs, "in an abundance of caution," Poulos instructed both Evans and ATF Agent Ed Diamond, who was guarding Evans, that Evans was not to have any physical contact with his mother. A555, 559–60. Upon her arrival, Poulos greeted Evans' mother and asked her to take a seat at one end of a large table in the conference room on the eighth floor. A560. Evans sat at the other end of the table, at which point Poulos left the conference room under the supervision of Agent Diamond. A560. After approximately an hour and a half, Poulos returned to the conference room to find that Evans' mother had left. A560–61. Poulos resumed working with Evans on El Rukn related matters. A561. During their next break, Poulos asked Agent Diamond for a report regarding Evans' visit. A561. Diamond initially stated that Evans had no physical contact with his mother. A561. After a brief pause, however, Diamond noted an exception and described to Poulos an incident where Evans removed his shoe from his foot and passed it to his mother, stating "look at my gym shoes, mom." A561. Poulos became very upset and confronted Evans with the fact that he disobeyed Poulos' explicit order. A561. After Poulos had "chewed him out," Evans' temper escalated to the point where Poulos became concerned and contacted Hogan to help calm

down Evans. A561. Hogan spoke with Evans in private in the reception area next to the front door on the eighth floor. A562. Poulos had no idea what Hogan said to him, but observed that Evans was crying. A562.

Evans testified that he recalls neither a visit where he passed his gym shoe to his mother nor Hogan talking to him in the reception area after such an incident. A1298. Evans, however, does recall that Hogan once told him in substance, "If I catch you with drugs, I'll nail you." A1298–99. Evans claims that Hogan threatened to prosecute him for illegal drug use on the basis of other cooperating witness' statements to Hogan that Evans appeared to be under the influence of narcotics. A1298–99.

Hogan specifically recalls this incident and, like Poulos, testified that it occurred during the weekend after the conversation with Poulos and Hartmann regarding Evans' condition while testifying before Judge Mills. A216. Hogan stated that after arriving on the eighth floor upon Poulos' request, Poulos briefly described to Hogan the circumstances under which Evans passed his gym shoe to his mother. A216–17. While Hogan described Evans' statements with great specificity, he did not testify as to what he said to Evans, other than the fact that he "was simply trying to calm him down." A220. Hogan's testimony before Judge Conlon, however, was slightly different. Hogan testified that, rather than merely trying to calm Evans down, Hogan confronted Evans with concerns over the cause of his physical condition. C1145–46. Specifically, Hogan stated that he told Evans "that there was concern about whether his condition had been influenced by anything other than legitimate medication, that is, some sort of illicit substance." C1146. Evans denied using illegal drugs and became incensed that Hogan could even suggest such a thing. C1146. With Evans' denial, Hogan abandoned the issue and, seemingly did not inform Poulos of his confrontation of Evans. *See* A568 (testimony of Theodore Poulos).[42]

---

42. Harris testified to a similar incident, only occurring one day prior to Evans' testimony in Trial I. According to Harris, he was with Corinda Luchetta and the marshals assigned to guard

him in the "war room" on the eighth floor of the Dirksen Building, a room directly across from Poulos' office. A864–65. Harris stated that he stepped into the hallway and saw Beverly Word-

D. Evidence Conveyed to Members of the United States Attorney's Office by El Rukn Cooperating Witnesses

The following El Rukn cooperating witnesses testified that they informed AUSA Hogan or some other member of the United States Attorney's Office that Evans and Harris had possessed and used illegal drugs while confined at the MCC: Jackie Clay, Henry Harris, Eugene Hunter and Derrick Kees. As previously stated, standing alone, we would give little credence to these individual's allegations. Taken together, and in light of the other evidence presented during these post-trial proceedings, the following testimony bolsters the court's conclusion that AUSA Hogan and other members of the United States Attorney's Office learned of Harris and Evans' continuing drug use prior to the conclusion of Trial I.

### 1. Jackie Clay

#### (a) Conversations with William R. Hogan, Jr.

Jackie Clay testified that, between the spring and fall of 1989, he told AUSA Hogan on three to four occasions that Evans and Harris were using drugs at the MCC. A446. According to Clay, Hogan's general response was, "How could they be getting drugs in? I'll check into it." A446–47. Whether rhetorical or not, Clay did not offer an opinion to Hogan as to the source of Harris and Evans' drugs. A460. Further, despite claiming to see Harris and Evans use heroin on three occasions during this time period, Clay did not tell Hogan that he personally observed Evans and Harris use drugs. A448. Hogan testified that, from the spring to the fall of 1989, he does not recall having any conversa-

tion Clay regarding drug use on the part of either Evans or Harris. A1363.

While not afforded the opportunity before this court, Clay detailed these conversations during his testimony before Judges Conlon and Holderman. The first instance that Clay told Hogan of drug use at the MCC occurred in July or August of 1989. H4724. Clay telephoned Hogan collect from the MCC, seeking to have the call forwarded to an outside number. C968–69; H4724. As was customary, Hogan, prior to patching the call through, engaged in a three to four minute conversation with Clay. H4724. During the course of this conversation, Clay told Hogan that "these guys over here" were dope fiends, that they slobber and nod, and that he did not want to be housed with them any longer. C969; H4727–28. Clay recalled specifically naming Evans and Harris as the "guys" using drugs. C969; H4724. While less certain, Clay believes that he told Hogan that the drug they were using was heroin. H4725. Hogan's response was essentially, "They couldn't be. How could they get it in?" C969.

Shortly after this first conversation, Clay again told Hogan about Harris and Evans' drug use. C969–70; H4726–27. The second conversation took place in Hogan's office on the fourteenth floor of the Dirksen Building. C970; H4726. Clay told Hogan that "the guys over there [were] still using drugs and I didn't want to be around them." C970; H4726. Clay also told Hogan that "Kees [was] starting a lot of confusion over there." H4726. Hogan told Clay, "Jackie, they're not using drugs. How are they getting it in? How would they get it in?" C970; H4726–27. Clay responded, "I don't know how they

low (Evans' common-law wife), Evans' mother, and another "guy" who looked like he was high on drugs. A865. Harris claimed that he informed Poulos that "some drugs might be passed." A865. According to Harris, Poulos called ATF agents O'Brien and Young to intervene, and eventually Hogan arrived on the scene. A865–66. Harris claims that, on the way out of Poulos' office with Evans, Hogan pointed his finger at Evans and stated "If I catch you using drugs, I'm going to nail you." A866–67. Poulos testified that, although the event Harris described shared some extreme basic similarities to the so-called "shoe incident," the incident did

not take place as Harris described. A1273–74. Further, it is evident that the episode Harris described could not have occurred at the time Harris claims, calling into question the veracity of his entire story. Harris testified that this incident took place one day after he and Tanya Van Blake had observed Evans nod off while tying his shoe before going to court to testify in Trial I. A863–64, 876. Evans, however, testified in Trial I from May 29, 1991 to June 10, 1991, *i.e.*, prior to the date Van Blake began work at the United States Attorney's Office on July 1, 1991.

[are] getting it, man, but the boys [are] on dope over there." C970; H4727.

Clay's third conversation with Hogan occurred in September of 1989, again over the telephone before Hogan forwarded Clay's call to a third party. C971; H4727. Once again Clay repeated to Hogan that "they were still messing around with drugs." C971; H4728. Hogan responded simply, "I'll look into it." C971; H4728.

Finally, Clay stated that he spoke with Hogan in late October of 1989. C971–72; H4730. Once again, Clay initiated the conversation over the telephone in anticipation of having his call forwarded to an outside number. C972; H4730. Clay told Hogan that "the guys [were] still using drugs over there." C972; H4730. Hogan stated, "Jackie, I said I was going to look into it." H4730. Recognizing that Hogan had run out of patience, Clay let the issue drop. H4730–31. Clay testified that, for purposes of this last conversation, he was not referring to Evans, as he had been transferred from the MCC in September or October of 1989. H4728. As a testament to Clay's memory, Evans' inmate history report indicates that Evans was in fact transferred from the MCC on October 23, 1989. AE No. 56, at 11.

(b) Conversations with Corinda Luchetta

Clay also testified that, in the summer of 1991, he told Corinda Luchetta over the telephone that he suspected Harris and Evans were using drugs. A446–48; 467–68. Luchetta allegedly responded that she would inform Hogan. A448. Although Luchetta was not confronted with this specific allegation, Luchetta has testified that she first learned of Harris' 1989 positive drug test on August 15, 1991, when introduced before Judge Conlon. C808. Luchetta also testified that the first time she learned of specific information about why Harris might have tested positive for drugs was when Harris' disciplinary records were introduced before Judge Tinder in April of 1992. H3799–3800. Were Luchetta to testify in a manner consistent with these prior statements, she would no doubt deny that Clay informed her in 1989 of drug use on the part of Harris. Further, we observe that the gravity of Clay's claim is diminished by his chameleon-like testimony

regarding who he named to Luchetta as using drugs. Before Judge Holderman, Clay specifically stated that he was only referring to Evans when he talked with Luchetta in 1991. H4732–33. Clay, however, testified before both Judges Conlon and this court that he was referring to both Evans and Harris during his conversation with Luchetta. A468; C1008.

·2. Henry Harris

(a) Conversations Regarding his Refusal on May 30, 1991 to Provide a Urine Sample

As discussed *supra* subsection II(D)(4) of this opinion, Harris was disciplined on June 27, 1991, both for his fight with Derrick Kees and for his refusal to provide a urine sample upon request. The government concedes that the evidence adduced during these post-trial proceedings demonstrates that on May 30, 1991, "Harris refused to take a urine test at the MCC, and that the next day, he told [paralegal Corinda] Luchetta about this refusal." Government's Post–Hearing Brief at 13 (July 26, 1993). Indeed, Luchetta stated that Harris claimed to be "too tired" to provide the sample. C721–22; H1842–43. Further, Luchetta knew that Harris had been disciplined as a result of the refusal. C724. Despite the fact that Hogan was her direct supervisor, Luchetta denied telling Hogan about Harris' refusal to submit to the drug test. C723–24; H1846.

Hogan testified that he learned of the June 27, 1991 disciplinary hearing, conducted over a noon recess while Harris was testifying in the first trial before Judge Holderman, from AUSA Poulos that evening after it occurred. A284–85. Hogan claimed that neither Poulos nor anybody else informed him that the hearing included charges that Harris had refused to submit to a drug test; rather, Hogan was told it concerned only the fight with Kees. A284–87. Notably, Hogan stated that he "didn't really care about what the subject matter was," but instead was upset over the timing of the hearing and the fact that it "had upset Harris' testimony." A287. Hogan admits that he called MCC Executive Assistant Bob Hafer (who along with a Mr. Campbell conducted the hearing), concerning

the discipline of Harris while he was on the witness stand, but denied that the two discussed the subject matter of the hearing. A285–87. Poulos affirmed that he aware of the disciplinary hearing, but accepted Harris' word that the proceeding occurred solely as a result of the fight with Kees. A569. Harris, on the other hand, claims that Poulos knew that the disciplinary hearing concerned Harris' refusal to provide a urine sample. A917. Harris stated that he and Poulos argued in the jury room where the hearing occurred for fifteen or twenty minutes. A917. During the course of this argument, Harris told Poulos, "man, you could have me for a disciplinary hearing concerning some drugs, man, and on cross-examination—what kind of game is this here?" A917.

That Hogan and Poulos, two experienced prosecutors, would not inquire about the nature of a disciplinary proceeding conducted against a key government witness while he was testifying at trial is simply absurd. Further, notwithstanding the likely fact that Luchetta had told Hogan of Harris' refusal prior to the disciplinary hearing, Hogan's claim that his conversation with Hafer was limited to the timing of the hearing is incredible. In any event, the incident report regarding the May 30, 1991 refusal and the subsequent DHO report of June 28, 1991 clearly reveal the subject of the disciplinary hearing. *See* AE No. 23. As such, even if this court were to credit Poulos and Hogan's claimed ignorance, we could safely conclude that these federal prosecutors deliberately avoided learning about the subject matter of the hearing in order to elude the possibility that such information would have to be disclosed to the defense in the various ongoing El Rukn prosecutions, including Trial I.

### (b) Conversations Regarding his Positive Drug Test

Harris testified that, in October of 1989, he told Hogan that he, Harris, had tested positive for drugs on May 11, 1989. A852–57. The conversation allegedly occurred in Hogan's office and no one else was present. A853. Harris began the conversation by telling Hogan "that there are some strange things going on at the MCC." A853. Harris then stated that he had tested positive for illegal drug use, but did not use drugs. A853. Finally, Harris told Hogan that he wanted to be transferred from the MCC, threatening that, if he was not transferred, he would not cooperate with the government any longer. A853. At this point, according to Harris, Hogan asked Harris what had happened regarding the positive drug test. A853. Harris relayed the story regarding the tainting of his urine sample in retaliation for his discovery of, and intent to disclose, corruption at the MCC. A853. According to Harris, as a result of this conversation he was moved from the MCC on October 31, 1989. A854. Indeed, Harris' inmate history report indicates that he was in fact transferred from the MCC on October 31, 1989. AE No. 56, at 4–5.

We observe that June 28, 1993, marked the first occasion Harris testified regarding the above described conversation with AUSA Hogan. To be sure, while testifying before Judge Holderman, Harris was asked the following questions, and gave the following answers:

Q. As soon as you got the papers [*i.e.*, the DHO Report, AE No. 23], though, you called Mr. Hogan and complained, didn't you, about how you were getting it stuck up your whatever?

A. Mr. Hogan didn't know nothing about the urine test, sir.

. . . .

Q. Didn't you complain to Mr. Hogan about how they were framing you over there?

A. I thought I just told the Court—well, Hogan didn't care nothing about what's going on over there, man. He just cared about the case, that's it.

H1569–70. Similarly, before Judge Conlon, Harris was asked: "Mr. Harris, did you ever tell Mr. Hogan of your positive drug test in 1989?" C603. Harris responded, "No, sir." A603. Harris, however, readily acknowledged that his testimony before Judges Conlon and Holderman was perjured. A854–57. Harris explained that he lied on these previous occasions in an effort to protect both himself and Hogan. A857. Hogan denies

that Harris ever told Hogan that he, Harris, had failed a drug test. A291.

### 3. Eugene Hunter

Hunter testified that, in July of 1991 (*i.e.*, during Trial I), he told AUSA Hogan that Evans "may be getting high." A371–73. The conversation allegedly took place in Hogan's office, and no one else was present. A372. Hogan asked Hunter, "What makes you say that?" A373. Hunter replied, "Just from the way he [was] acting, from the way he looked." A373. The conversation ended with Hogan stating, "Well, that's not enough." A373. Hogan testified that he had no such conversation with Hunter in July of 1991. A1364. Hogan, however, conceded that he remembers "talking generally in the fall, in the October period [of 1991], about Evans and his drug use. Hunter was probably around for some of those conversations." A1364.

As did Harris, Hunter also testified that the subject of Evans' physical appearance was discussed openly by everyone connected with the El Rukn prosecution, including the Assistant United States Attorneys, their paralegals, members of ATF and the Chicago Police Department, and the other cooperating witnesses. A373–74. Hunter believes that he discussed Evans' condition separately with both Van Blake and Luchetta. A374–76. Hunter could not recall the specific dates of these conversations, or whether they occurred before or after Trial I, but stated that they occurred in 1991 while some El Rukn trial was ongoing. A374, 417. Van Blake testified that she recalled such a conversation with Hunter, but that it occurred in October of 1991. H3819–22.

### 4. Derrick Kees

Finally, Derrick Kees testified that, in 1989 or 1990, he mentioned to Hogan the possibility that Harris had been using drugs post-incarceration. A693–94. The conversation took place in Hogan's office, and no one else was present. A693. Kees simply asked Hogan, "What about Toomba [Harris] using drugs?" A693–94. Kees asked this question in the context of complaining to Hogan about being harassed at the MCC. A718–20. According to Kees, Hogan did not respond.

A694. We observe, however, that in an interview on March 19, 1993, Kees told FBI agents that he never told Hogan about Harris' drug use because Hogan would only ignore it as he did Kees' other complaints. A729–30. Further, Hogan testified that he does not recall this conversation with Kees. A1363–64.

### E. Evidence Conveyed to Members of the United States Attorney's Office by Other Incarcerated Individuals

Apart from the cooperating witnesses, other inmates housed on the sixth floor testified that they either told or attempted to tell members of the United States Attorney's Office that various El Rukn cooperators were using drugs at the MCC. These other inmates are Michael Corbitt and Harry Martin.

### 1. Michael Corbitt

Michael Corbitt testified that, during his "second visit" at the MCC in 1991, he had a brief telephone conversation with AUSA Hogan wherein he, Corbitt, attempted to inform Hogan of drug use on the part of various El Rukn cooperating witnesses. A749–53. Corbitt claims to have arranged the phone conversation through another inmate, David Avery, whom Corbitt said was "dealing with" Hogan. A749. According to Corbitt, he told Hogan that he wished to discuss "some of the things that were going on on the sixth floor [of the MCC] with people that he [Hogan] was going to use for witnesses in a case." A752. Hogan asked Corbitt to elaborate, to which Corbitt responded that he did not want to talk about the matter over the phone. A752. Hogan then informed Corbitt that he would have to speak to AUSA Thomas Scorza, Hogan's supervisor and Corbitt's prosecutor. A752. In that Corbitt did not wish to speak to Scorza, Corbitt told Hogan to "forget about it." A752. Avery testified that he did not recall facilitating a phone conversation between Hogan and Corbitt, although he remembered setting up a call between Corbitt and an FBI agent concerning a matter unrelated to the El Rukns. A1119–20. Hogan testified that he has never talked to Corbitt. A1364. Corbitt's claim is further diminished in that his inmate history report reveals that he was not housed at the MCC at any time in 1991. AE No. 53, at 1. In

any event, based on Corbitt's own testimony, he did not convey anything of substance to Hogan. A752.

Corbitt also testified that he spoke with various MCC correctional officers, including Lt. Randall Simek, about his observations of drug use by El Rukn cooperating witnesses. A789-91. Corbitt claims that his conversation with Simek occurred during his first stay at the MCC, and that no one else was present. A790 Simek recalls such a conversation with Corbitt. However, according to Simek, Corbitt only said, in effect, "somebody is getting something up here," but provided no specifics. A1251-53.

### 2. Harry Martin

Harry Martin testified that, in the summer of 1991, he told AUSA Kristina Anderson (Martin's sponsoring AUSA and, at the time, Hogan's girlfriend) that Evans was ordering drugs over the sixth floor telephone and was "walking around in a state like he was high." A23-24. According to Martin, Anderson responded, "Again? I'll tell Bill Hogan." A24. Martin admitted that he had testified falsely regarding this very matter while testifying before Judge Holderman in December of 1992. A24-25, 74. Indeed, Judge Holderman himself asked Martin: "Did you ever mention to Ms. Anderson at any point in time since you were talking with her about these—this drug usage?" H4344. Martin replied, "No, I didn't." H4344. When asked why not, Martin stated, "To be frank, to be honest, I didn't think they wanted to know." H4335. Anderson specifically denied that this conversation transpired. A137. Nonetheless, during an FBI-administered polygraph examination on May 5, 1993, Martin was asked "Did you personally tell Kristina Anderson during the El Rukn trials that Harry Evans was using drugs." AE No. 1, at 5. The polygraph analyst concluded that Martin's positive response was truthful and, as such, we will give some credence to his current testimony.

Martin also testified that he personally informed AUSA William R. Hogan, Jr. that Harry Evans was using drugs. A25-27. Martin claims that, during the early fall of 1991, he telephoned Hogan and told him about the incident where he had "picked"

cocaine from Evans' pocket. A26-27. According to Martin, Hogan merely responded, "Okay," and the conversation ended. A27. Hogan testified that Martin never told him that Evans was using drugs at the MCC, A170-72, 207, adding that "I've never in my life had a conversation with an inmate from the MCC that I wouldn't want to have repeated in court because—for a variety of reasons, not the least of which is that every single conversation over there is taped." A171. Hogan did recall, however, a conversation with Martin in January of 1992, wherein Martin told him that Evans was having unspecified problems at the MCC. A172, 207. As was the case with Martin's testimony regarding his conversation with AUSA Anderson, an FBI polygraph analyst determined that Martin was truthful with respect to his claim that he told Hogan of Evans' drug use. AE No. 1, at 6.

Finally, Martin testified that Harris, on some unspecified date, told Martin that he, Harris, was present when AUSA Hogan received the October 18, 1989 memorandum detailing Harris and Evans' positive drug tests. A63. For whatever reason, Harris was not asked during this post-trial proceeding about his presence for this event. We observe, however, that the United States Marshal's records show that Harris was transported to AUSA Hogan's office in the Dirksen Building on October 19, 1989. CDE No. 20 (Harris Visitation Memorandum).

### IV. Aberrant Treatment of and Undisclosed Benefits Provided to El Rukn Cooperating Witnesses by Members of the Prosecution Team

Throughout the course of these post-trial proceedings, evidence emerged from which we can conclude that the government bestowed upon the El Rukn cooperating witnesses substantial, yet undisclosed, benefits. Viewed in isolation, any one of these benefits may appear trivial at best. Taken together, however, they are relevant to our instant inquiry in two respects. First, a number of the benefits directly facilitated post-incarceration drug use or provided an opportunity for such conduct. Second, the benefits conferred on the El Rukn witnesses are indicative of a type of preferential treatment af-

forded to no other government cooperating witness. They evince a motive on the part of the government to curry favor with the El Rukn cooperating witnesses in order to ensure continued and favorable cooperation. As discussed in the following section of this opinion, it is this very motive which explains the government's failure to (1) discipline its witnesses for post-incarceration drug use, and (2) disclose to the defense information of the same.

A. Contact Visits and Inadequate Security Measures at the United States Attorney's Office and ATF Offices

It is undisputed that the government permitted the El Rukn cooperating witnesses to receive contact family visits at the United States Attorney's Office and in the ATF offices on the 39th floor of the Kluczinski Building. The visits were all authorized by AUSA Hogan, and the majority took place in his presence. A235–39, 246–47 (testimony of William R. Hogan, Jr.). In contrast to the security measures adopted at the MCC in response to the recalcitrant behavior of the El Rukn cooperating witnesses during visits on the sixth floor, Hogan allowed these visits to transpire without regard to specific and adequate security measures. According to one ATF agent, such visits outside of the MCC were unprecedented and, as such, no standard procedure existed to ensure that the visits transpired without a breach of security. A1007 (testimony of Special Agent Louis Wolfe). Lax security at the federal buildings not only afforded the cooperating witnesses with an opportunity to engage in conduct prohibited at the MCC, but also facilitated Harris and Evans' drug use.

1. Security Measures at the MCC

As a necessary context to our discussion regarding lax security at the United States Attorney's Office and the ATF offices, we begin with the security measures adopted at the MCC. Prior to June of 1990, the visiting room on the sixth floor of the MCC was such that inmates and their visitors could have physical contact. According to MCC Lt. Randall Simek, the inmate was allowed to embrace and kiss the visitor at the beginning and end of the visit. A956–57. While the inmate and visitor sat on opposite ends of a

table in the sixth floor visiting room, they were permitted to hold hands above the table top. A957. Any further physical contact would result in termination of the visit. A956–57. Visiting hours for non-attorneys ran from noon until 8:30 p.m., and inmates on the sixth floor were allowed up to five one-hour visits per week. A950–51. Only one inmate and his visitor were permitted to use the visiting room at any given time. A951. When a visitor arrived at the institution, the visitor was screened through a metal detector at the entrance. A951–52. Any loose clothing or other items carried by the visitor was secured in a locker in the main lobby. A952. The visitor would then be escorted up to the sixth floor visiting room, along the way passing through doors opened and closed via a central control center located on another floor of the institution. A953. Once the visitor was in the visiting room, two correctional officers would proceed to the inmate's cell and secure him in handcuffs through an access slot in the door. A953–54. The cell door would then be opened and the inmate pat-searched outside the cell. A954. Next, the inmate is escorted to the visiting room through a "shakedown" room located next door. A954–55. After entering the visiting room through the shakedown room, the inmate would place his hands through an access slot in the secured door between the two rooms allowing the correction officer to remove the handcuffs. A956. The ensuing visit would be monitored not only by a correctional officer stationed directly outside the room and observing the visit through a window, but also through a one-way circuit camera attached to monitors in the control center and the lieutenant's office. A956–58. After the visit has concluded and the visitor has been escorted back to the main lobby, the inmate is again secured in handcuffs, brought into the shakedown room and subjected to a visual strip-searched. A958–59. The inmate is then escorted to his cell. A960. At the end of the day, the visiting room is inspected for any possible contraband left behind and, only after such inspection, the orderly is allowed to clean the room. A960–61.

Despite the existence of the above described security measures, officials at the

MCC detected a drug problem on the sixth floor in the late summer and early fall of 1989. H915–16 (testimony of Warden Beeler). Indeed, in a written memorandum directed to Warden Beeler and dated June 20, 1989, Associate Warden Max Nuss stated: "Visits are not supervised for long periods of time, thus permitting inmates and visitors to pass contraband.... A recent increase in drug use has been detected." HDE Nuss Memorandum of June 20, 1989. Accordingly, in an effort to terminate contact visits on the sixth floor, Warden Beeler had a barrier erected in the visiting area of the sixth floor in June of 1990. The barrier ran from floor to ceiling, forcing inmates to communicate via telephone and viewing each other through a window. A948, 965 (testimony of Lt. Randall Simek); AE No. 16. The barrier included a manually operated door, which was to be kept secure during inmate visits. A964. After the erection of the wall, the procedures surrounding the visit remained the same, with the exception that the inmate was not strip-searched after the visit. A964.

Of course, no system is foolproof and, to the extent that the door in the barrier was left open for whatever reason, contact between the inmate and visitor could occur. Indeed, both Earl Hawkins and Michael Corbitt testified that they observed other El Rukn cooperating witnesses engaging in sexual contact after the barrier had been constructed in the sixth floor visiting room. A640 (testimony of Earl Hawkins); A743–49 (testimony of Michael Corbitt). Corbitt testified that, on at least ten occasions, the access door in the barrier was unlocked allowing inmates to cross over to the visitor's side of the partitioned room. A744. According to Corbitt, the surveillance camera was mounted on a swivel and could be turned in another direction away from the inmate and his visitor. A744. Corbitt also claims that when he would clean the visiting room at the end of the day, he would frequently find used condoms. A744. To be sure, if true, these allegations are indicative of negligence and possibly corruption by individual officers at the MCC, a serious matter certainly requiring further attention by senior MCC officials. Nonetheless, it is evident that senior officials at the MCC have taken significant endeavors to eliminate contact visits, and thus the flow of contraband into the institution. As discussed below, the same cannot be said with regard to visits in the United States Attorney's Office and in the ATF offices on the 39th floor of the Kluczinski Building.

2. Conjugal Visits at the Federal Buildings

Of the El Rukn cooperating witnesses that received visitors while at the United States Attorney's Office and in the ATF offices on the 39th floor of the Kluczinski Building, Ervin Lee, Earl Hawkins, Henry Harris and Eugene Hunter admitted that they had engaged in sexual intercourse with a visitor at one or both of the two federal buildings. Further, the evidence gathered during the course of these post-trial proceedings suggests that members of the "prosecution team" had knowledge of and condoned such behavior, notwithstanding the fact that engaging in a sexual act is prohibited conduct at the MCC.

Lee testified that, on an unspecified date, he once had sex with his girlfriend in the United States Attorney's Office. A1420. At the time, Lee and his girlfriend were in an empty office next door to AUSA Hogan's office on the 14th floor of the Dirksen Building. A1421. Although the door was open, neither of the two agents guarding Lee were in the room at the time, nor were they observing the visit from the doorway. A1421. Rather, they were sitting outside of Hogan's office, presumably oblivious to the conjugal nature of Lee's visit. A1421.

Hawkins acknowledged that, on one occasion in 1992, he engaged in sexual intercourse with his common-law wife during a visit at the ATF offices on the 39th floor of the Kluczinski Building. A629. As was the case during Lee's visit, none of the guards assigned to Hawkins supervised his visit with his common-law wife. A630.

Harris testified that, in 1988 and early 1989, he engaged in sexual activity with two different women fifteen times during visits at the ATF offices on the 39th floor of the Kluczinski Building. A838. Harris stated that he was usually guarded at the ATF offices by Special Agents Wolfe and Brannigan. A839. While he did not believe that

Wolfe was aware of his exploits, Harris claimed that Brannigan not only knew of Harris' conduct, but also condoned it. A840. According to Harris, he would ask Brannigan if he could "step in the room [with his visitor] . . . close the door and get me a little bit." A840. Harris stated that Brannigan often allowed the request, responding "Okay, but hurry up." A840. With that, Brannigan would permit Harris and his visitor to socialize behind a closed door. A839–40. Harris admitted that he had previously testified falsely before Judges Conlon and Holderman regarding his sexual activity, and had attempted to induce one of his visitors to corroborate his lie. A841–43. Brannigan specifically denied Harris' accusation, stating that he did not even recall Harris receiving fifteen visits during the time that Brannigan was guarding Harris. A1178–79. We also observe that Harris did not include this incident in his list of "Things to be Remembered, Important," which he prepared in anticipation of his post-trial testimony before this court. See AE No. 18.

Finally, Hunter admitted that, in 1990, he had sex with his wife once on the eighth floor of the Dirksen Building and four times in the ATF offices. A378–79. On the one occasion in the United States Attorney's Office, Hunter and his wife were visiting in an empty office across from AUSA Poulos' office. A380–81. Like Harris, Hunter shut the door wherein his visit took place without interference from any of the agents assigned to guard him. A381. Hunter recalls that AUSAs Hogan and Poulos both warned him not to have sex with his female visitors. A410. Respecting his visits over at the Kluczinski Building, Hunter likewise shut the door to the room where he and his wife were visiting. A382. On one occasion at the ATF offices, a guard left Hunter alone with his wife behind a closed door, promising to knock before entering the room. A382. Hunter also recalled that, during another partially closed door visit, ATF Agent Wolfe told Hunter, "If you're doing what I think you're doing in there, you are going to piss me off." A383. Wolfe denied permitting Hunter to have a family visit behind closed doors or uttering the words Hunter attributed to him. A1002–03. Like Wolfe, the other ATF Agents and CPD officers testified that they did not permit or observe sexual contact between the witnesses and their visitors. See A495 (testimony of Special Agent Carl Jessen); A545–46 (testimony of Sergeant David J. O'Callaghan); A996–97 (testimony of Special Agent Thomas Murphy); A1180 (testimony of Officer Brannigan); Stipulation of Wilson, Young and Fitzmaurice.

To the extent that the prosecution did not knowingly allow its cooperating witnesses to engage in sexual intercourse with visitors, the lax security surrounding these visits, including leaving these witnesses unsupervised in a room with their visitors behind closed doors,[43] certainly provided an enticing opportunity. That El Rukn cooperating witnesses in fact engaged in sexual conduct with visitors at the United States Attorney's Office and ATF offices is significant for two reasons. As an initial matter, the mere fact that they were allowed contact visits at the federal buildings, while prohibited from having such visits at the MCC, constitutes a benefit conferred which was not disclosed to the defense. Even more significantly, such contact visits coupled with shamefully lax security afforded the cooperating witnesses an uninhibited avenue for the flow of narcotics. Not only were visitors free to pass items openly in the absence of supervision, but the visitors, almost always females, were almost never pat-searched prior to the visit as female ATF agents rarely, if ever, guarded the cooperating witnesses. See A490–92 (testimony of Special Agent Carl Jessen); A544 (testimony of Sergeant David J. O'Callaghan); A997–98 (testimony of Special Agent Thomas Murphy); A1002 (testimony of Special Agent Louis Wolfe); A1176 (testimony of Officer Daniel Brannigan). Notably, in January of 1991, Special Agents Jessen and Emmons echoed these security concerns in a memorandum directed to William R. Mueller, a supervisor at ATF. A474 (testimony of Special Agent Jessen); AE No. 8 ("El Rukin

---

43. In addition to Harris and Hunter's testimony on the matter, Jackie Clay testified that he too was allowed to visit behind closed doors at both federal buildings. A455. Clay, however, denied having sex with any of his visitors. A448–49.

[sic] Guard Duty Report"). The memorandum was written to point out "questionable practices" employed by ATF and Task Force officers while guarding and working with El Rukn witnesses. A474; AE No. 8, at 1. Respecting security during visits, the memorandum states: "El Rukin [sic] witnesses are allowed visits from wives on 39th floor of the 230 S. Dearborn Federal building. Wives are not checked for weapons and contraband prior to witness contact." AE No. 8, at 2. In light of the showing that Evans and Harris used illegal drugs, that they were allowed contact visits and that the security measures during these visits were inadequate to prevent the flow of contraband,[44] leads the court to conclude that Evans and Harris obtained illegal drugs from their visitors at the United States Attorney's Office and ATF offices on the 39th floor of the Kluczinski Building.

### 3. Harry Evans' Visitation Privileges

On April 10, 1989, at a time when inmates on the sixth floor were allowed contact with their visitors, Harry Evans was caught engaging in a sexual act with his common-law wife Beverly Wordlow. AE No. 37 (Memorandum of June 8, 1989, from MCC Discipline Hearing Officer L. Scott to Harry Evans); A1322–23 (testimony of Harry Evans). Evans appeared before the Discipline Hearing Officer on June 1, 1989, and was found to have committed prohibited act 205, engaging in a sexual act. AE No. 37. Evans received a sanction of 15 days disciplinary segregation and loss of visiting privileges with Beverly Wordlow for a period of six months. AE No. 37; A1323. With an effective date of April 10, 1989, Evans was not to receive a visit from Beverly Wordlow until after October 10, 1989. AE No. 37.

The ramifications of this incident are twofold. First, to the extent that the government allowed Evans to receive visits at the Dirksen and Kluczinski Buildings from April 10, 1989 to October 10, 1989, notwithstanding Evans' loss of visitation privileges at the MCC, the visits would constitute a benefit generally unavailable to other cooperating witnesses. Evans testified that he received a number of visits from Beverly Wordlow at both the United States Attorney's Office and the ATF offices on the 39th floor of the Kluczinski Building. A1325–27; H2183–85; see also A241–42 (testimony of William R. Hogan, Jr.). Evans further stated that these visit were all arranged through AUSA Hogan. A1334; see also A235, 246–47 (testimony of William R. Hogan, Jr.). According to Evans, Beverly would come to one of the federal buildings, as opposed to the MCC, because she was afraid that she may run into other El Rukn at the MCC. A1134; H2202. We observe, however, that prior to the incident on April 10, 1989, Wordlow visited Evans on a number of occasions at the MCC. See CGE No. 6 (MCC Visitor Log). Of the visits at the two federal buildings, Evans admits that one of them took place during the six month period that Wordlow was precluded from visiting Evans at the MCC. H2191, 2201. Evans stated that the visit occurred in the ATF offices, and that Hogan was present at the time. H2201–02. To the extent that Hogan permitted this visit with knowledge of the April 10, 1989 incident and Evans' subsequent loss of visitation privileges, the visit constitutes a benefit that should have disclosed to the defense. Hogan denies such knowledge, adding without solicitation that despite Warden Beeler's efforts

---

**44.** Further demonstrating the government's poor security precautions is the numerous incidents of theft from the United States Attorney's Office by El Rukn cooperating witnesses. Kees, Hawkins and Evans each testified that they obtained sensitive government documents from the United States Attorney's Office, bringing them back to the MCC. A708–13 (testimony of Derrick Kees); A644–47 (testimony of Earl Hawkins); A1330–33, 1338 (testimony of Harry Evans); see also A394–95 (testimony of Eugene Hunter); A885–86 (testimony of Henry Harris); AE Nos. 12, 13, 15. When the prosecutors later discovered the missing documents, they were immediately confiscated from the cooperating witnesses at the MCC.

A572–73 (testimony of Theodore Poulos); A885–86 (testimony of Henry Harris); A1331–32 (testimony of Harry Evans). Additionally, Eugene Hunter testified that he stole from Corinda Luchetta's "Rolodex" the home phone number of Paralegal Tanya Van Blake. A398. In that no security personnel witnessed these thefts, we can only conclude that Kees, Hawkins, Evans and Hunter were unguarded at the time. Further, in that these materials ended up back at the MCC, it is evident that no one at the United States Attorney's Office checked to determine what the cooperating witnesses possessed as they left the Dirksen Building.

"there was no policy implemented to inform Assistant United States Attorneys of disciplinary infractions at the MCC." A301–02.

Second, and more troubling, is the prospect that Evans obtained illegal drugs from Wordlow during these visits. As Lt. Simek noted, by allowing an inmate to embrace and kiss his visitor, even the securest institution exposes itself to the flow of illegal drugs. A966–67. Simek explained that one method to smuggle drugs into an institution is for the visitor to place the contraband in her mouth and transfer it to the prisoner during one of the permitted kisses. A967. There is a significant probability that such a transfer of drugs occurred during Evans' visit with Wordlow at the MCC on April 10, 1989. To be sure, just two days later, on April 12, 1989, Evans tested positive for illegal drugs. AE No. 5 (October 18, 1989 Memorandum from Charles Mildner to Warden Beeler). Likewise, in that AUSA Hogan afforded Evans similar unsupervised contact with Wordlow during visits at the Dirksen and Kluczinski Buildings, Hogan created an opportunity for the flow of illicit narcotics.

B. Telephone Privileges Conferred upon El Rukn Cooperating Witnesses by Members of the Prosecution Team

It is undisputed that the government provided El Rukn cooperating witnesses with telephone privileges not available to any other inmate housed in a federal correction institution. All of the cooperating witnesses testified that they had virtually unlimited access to telephones at the United States Attorney's Office and the ATF offices on the 39th floor of the Kluczinski Building for personal local and long distance calls. A395–96 (testimony of Eugene Hunter); A457 (testimony of Jackie Clay); A634, 642–44 (testimony of Earl Hawkins); A706–07 (testimony of Derrick Kees); A882–83 (testimony of Henry Harris); A1329–30 (testimony of Harry Evans). Additionally, while other inmates must call an outside party collect from the MCC, El Rukn cooperating witnesses were able to shift the cost from the outside party to the government. Various members of the prosecution team, with the permission of AUSA Hogan, routinely accepted collect calls from cooperating witnesses at the MCC and, at the request of the witness, forwarded the calls to outside numbers.[45] A304–05 (testimony of William R. Hogan, Jr.); A563–65 (testimony of Theodore Poulos); H2526–31 (testimony of Corinda Luchetta); H3816–17 (testimony of Tanya Van Blake). Over the objection of AUSA Poulos,[46] information regarding these telephone privileges was neither disclosed to the defense nor submitted to this court for an *in camera* review.

In addition to evincing a pattern of disparate treatment, the grant of unlimited and unsupervised phone privileges created substantial security concerns. As Special Agent Jessen noted, "unlimited access to telephone service in Task Force office[s] on [the] 39 floor ... [is] a dangerous practice for case security and officer safety." AE No. 8, at 1; *see also* A479–81 (testimony of Special Agent Carl Jessen). Jessen testified that in addition to making telephone calls approximately three times a day, cooperating witnesses were left to answer the phones at the ATF office. A480. These witnesses often answered the phone "ATF," giving the person calling the impression that they were speaking to an ATF agent. A480–81. In that other federal and state authorities routinely called the ATF offices, the practice jeopardized this case, other cases and officer safety. AE No. 8, at 1. Furthermore, evidence was introduced indicating that, while at the ATF offices, cooperating witnesses would accept phone calls from other inmates (including Harry Evans) and forward the calls to out-

---

45. As an indication of the frequency of these calls many of the cooperating witnesses stated that they took advantage of the government's forwarding service on a daily basis. Indeed, the cost to the government was so high that AUSA Gary Shapiro approached Poulos, and First AUSA Thomas Durkin approached Hogan, asking them to keep the volume down. A1356–57 (testimony of Theodore Poulos); A1366–67 (testimony of William R. Hogan, Jr.).

46. Poulos testified that, during the course of Trial I, he told Hogan that he, Poulos, believed the telephone privileges were a benefit that should be disclosed to the defense. A565–66. Hogan responded that the benefit was de minimis and, thus, need not be disclosed. A566.

**1328**

side parties. A397–98 (testimony of Eugene Hunter); A882–83 (testimony of Henry Harris); A1330 (testimony of Harry Evans).

Particularly troubling, these telephone privileges directly facilitated drug use on the part of El Rukn cooperating witnesses. In essence, by virtue of a call-forwarding program sponsored by the AUSA Hogan and other members of the prosecution team, El Rukn cooperating witnesses were permitted to order drugs over the phone at government expense. For instance, as discussed *supra* subsection 11(D)(4), Harry Evans placed a collect call from the MCC to the United States Attorney's Office on August 5, 1992. *See* AE No. 38. The call was accepted by AUSA Theodore Poulos, who, at the request of Evans, forward the call to Beverly Wordlow, Evans' common-law wife. AE No. 38, at 1–2. Evans then spoke to Wordlow about the quality of karachi heroin she had previously smuggled to him and requested that the next shipment be of a higher quality. AE No. 38, 3–7, 10. Given the frequency of calls forwarded on their behalf, and in light of the overwhelming evidence regarding the cooperating witnesses' continuing use of illegal drugs at the MCC, we can infer that the above described conversation is not the only instance in which a El Rukn cooperating witness utilized their phone privileges to order drugs at taxpayer expense.

### C. Personal Relations Between El Rukn Cooperating Witnesses and Paralegal Corinda Luchetta

The evidence adduced at these post-trial hearings clearly establishes that Corinda Luchetta, a member of the Illinois bar since November of 1990 and a paralegal in the United States Attorney's Office assigned to the El Rukn prosecutions, developed personal and unprofessional relationships with El Rukn cooperating witnesses. Through her improper conduct, Luchetta conferred upon these witnesses certain benefits.

Luchetta's improper relationship with Eugene Hunter is vividly and graphically displayed during a telephone conversation between the two, occurring on December 17, 1991 and tape recorded as a matter of course at the MCC. *See* CDE No. 39 (Transcript of Telephone Conversation Between Hunter and Luchetta). Without belaboring the point, various portions of the conversation can only be described as a sexual interlude with only the distance of the telephone lines preventing actual intercourse. *Id.;* H2554–57 (testimony of Corinda Luchetta). And, while Hunter may have instigated the conversation, it is fair to say that Luchetta responded in kind.[47] H2555–56. While there is no evidence that Luchetta actually engaged in any sexual contact with any cooperating witness, her in depth questioning of Hunter as to whether it was possible to have an intimate visit at the MCC suggests that it is possible. *See* H2561–65.

The recorded conversation between Luchetta and Hunter evinces more than poor judgment on the part of Luchetta. First, in response to Luchetta's inquiry regarding the possibility of engaging in sexual intercourse at the MCC, Hunter stated that you could have sex "even in the visiting room here [on the sixth floor]," and admitted to Luchetta that "[b]efore they put the glass up, Donna used to sit on my lap all the time." CDE No. 39, at 17. Luchetta, evidently did not follow up on this information to ensure that such conduct did not occur at either of the federal buildings. Second, in describing what visiting rooms look like in an average institution, Hunter responded, "Like your cafeteria." CDE No. 39, at 16. This response suggests that Hunter was brought to the cafeteria in either the Dirksen or Kluczinski Buildings, a substantial breach in security.[48]

After working extensively with Earl Hawkins from April to November of 1991, Luchetta's relationship with Hawkins also

---

47. We observe that during this conversation Hunter refers to Luchetta as "Rindy," further indicating the personal nature of their relationship. CDE No. 39, at 5, 15.

48. It appears that Luchetta not only was informed about Hunter's excursions into public areas, but also knowingly allowed such activity

to occur. Luchetta testified that, in the summer of 1992, Hunter told her that Special Agent O'Brien had agreed to take Hunter "out for some fresh air" if it were alright with Luchetta. C803. Luchetta told Hunter that she had no objection. C803.

crossed the line of professionalism. Astonishingly, Luchetta testified that, in 1991, she had certain feelings for Hawkins (who has been sentenced to death by the State of Illinois) over and above her professional relationship with him. H2600–04. More specifically, Luchetta stated that she was physically attracted to Hawkins. H2602. Hawkins testified that Luchetta gave him her home phone number and accepted collect calls placed by Hawkins to her home. A650. Further, in 1991, after Hawkins' testimony in Trial I, Luchetta purchased a coat and a radio for Hawkins at Hawkins' request and with his money. A651–52. Likewise in 1991, Hawkins ordered by mail a gold chain to give to Luchetta, but the chain was never sent. A652–53. Finally, Derrick Kees testified that he saw Luchetta place her feet in Hawkins' lap during a meal Hawkins and Luchetta shared on the eighth floor of the United States Attorney's Office. A721–22 (testimony of Derrick Kees). Hawkins recalled the incident, but denied touching Luchetta in a sexual manner. A654.

Lastly, Luchetta conferred upon Ervin Lee a more tangible benefit. One week prior to Luchetta's conversation with Hunter, Lee telephoned her from the MCC. *See* CDE No. 38 (Transcript of Telephone Conversation Between Luchetta and Lee). Lee asked Luchetta if she would get him a box of "Ex Lax." *Id.* at 1–2. Luchetta responded, "Sure, I can do that." *Id.* at 2. Lee instructed Luchetta to give the laxatives to Hunter, and to tell him to hide the laxatives in his legal papers in order to smuggle them back into the MCC. *Id.* Luchetta in fact bought Lee laxatives, and Hunter brought them back to the MCC in his legal papers. H2568–75 (testimony of Corinda Luchetta); A392–93 (testimony of Eugene Hunter). In addition to constituting a violation of federal law, *see* 18 U.S.C. § 1791, that Luchetta provided Lee with laxatives may have facilitated illegal drug use by El Rukn cooperating witnesses in the manner described *supra* subsection 11(D)(6) of this opinion.

D. Personal Relations Between El Rukn Cooperating Witnesses and AUSA William R. Hogan, Jr.

It appears that, as did Luchetta, AUSA Hogan cultivated relationships with various El Rukn cooperating witnesses extending beyond the bounds of professionalism. That Hogan treated these witnesses in a manner unlike the treatment afforded other cooperating witnesses, is initially evinced by the various gifts he received from the witnesses. It is undisputed that Henry Harris gave Hogan a copy of the Koran and a muslim prayer rug. A887 (testimony of Henry Harris); A1371 (testimony of William R. Hogan, Jr.). Likewise, Hogan received a ceramic work from Jackie Clay. A1371. Finally, as a testament to the importance of Harris' relationship with Hogan, Harris named Hogan as a beneficiary of his property, secondary only to Harris' mother. C609–10.

Further, there is evidence that Hogan called various officials at the MCC regarding the cooperating witnesses on numerous occasions. According to Charles Mildner, all of the cooperating witnesses constantly complained to AUSA Hogan about the conditions of confinement at the MCC, including but not limited to the food, the showers, phone privileges, and visitation privileges. C473–75; H352–56; *see also* H263–64 (testimony of William R. Hogan, Jr.). Hogan (and nobody else) routinely relayed these complaints to Mildner. C474–75; H352–56. Normally, Mildner would "handle" the problem himself, but if Hogan "tried to tell [Mildner] to do something that [he] shouldn't do," Mildner would forward the complaint to the Warden. H354; *see also* C475–76. Although the testimony quoted above suggests otherwise, Mildner acknowledged that Hogan never asked Mildner to disregard MCC regulations or policy, but rather was merely trying "to make sure that the inmates got what was coming to them." H428–30. Indeed, the stipulated testimony of all three wardens during the relevant time period is that Hogan did call to inquire about MCC policies which affected the cooperating witnesses, but that he never attempted to intervene in or interfere with MCC rules, regulations or disciplinary proceedings.[49] Stipulations as to

49. The evidence does indicate, however, that Hogan in fact called MCC Executive Assistant Robert Hafer and complained about the timing of the June 27, 1991 disciplinary hearing conducted

MCC Wardens Beeler, Henry and True. The propriety of the calls, however, is not the court's current concern. Rather, that Hogan took such an interest in the daily accommodations of his cooperating witnesses, whether proper or not, is indicative of Hogan's *modus operandi, i.e.,* to curry favor with the El Rukn cooperating witnesses in order to ensure continued and favorable cooperation.[50]

Finally, perhaps the length that Hogan would go to keep his witnesses happy is best exhibited by an incident reported by Ann C. Bissell, a financial litigation specialist who has worked in the United States Attorney's Office for over ten years, to the FBI on March 11, 1993.[51] Bissell stated that, one evening in the summer of 1991, Hogan approached her and began asking her questions about a female paralegal who worked in Bissell's division. AE No. 49, at 1 (March 11, 1993 FBI Interview of Ann C. Bissell). Hogan told Bissell that Henry Harris was attracted to the paralegal. *Id.* Hogan asked Bissell to talk to the paralegal and determine if she would accept phone calls from Harris. *Id.* Bissell was upset by Hogan's request, and responded "absolutely not." *Id.* Bissell interpreted Hogan's request as follows: "she [Bissell] thought that one of his [Hogan's] witnesses had taken a fancy to [the paralegal] and that he [Hogan] was trying to keep the witness happy." *Id.* Later that evening, Hogan attempted to introduce Harris to Bissell, stating "This is Ann Bissell, she works in the Financial Litigation Division with [the paralegal]." *Id.* Bissell immediately reported the incident to her supervisor, AUSA Carol Davilo. *Id.*

Hogan testified that he recalls a conversation with Bissell, but that the conversation did not take place as she described. A1397. According to Hogan, one evening Harris had returned from court to the United States Attorney's Office and had noticed the parale-

gal. A1397–98. Harris then informed Hogan about the paralegal, asking "Hey, can you find out who she is so I can write her a letter?" A1399. Hogan responded, "Sure, Henry. No problem." A1399. Hogan claims that both Harris' question and his response were in jest, much as if Harris would ask Hogan to let him out of jail. A1398–99. One of the Marshals, Marvin Reno, allegedly overheard the conversation and asked Hogan if he was kidding, to which Hogan responded, "Yeah, I'm kidding." A1399. Hogan stated that he approached Bissell only to inform her of the incident and to ask her to warn the paralegal not to encourage Harris. A1398.

While this court did not observe Bissell's demeanor and, thus, cannot make a complete credibility determination regarding her account, we can discern no motivation on her part to invent a such a story if it were not true. Further, given the wide gap between her version and that of Hogan, it seems unlikely that she may have misunderstood Hogan's intention. In any event, to the extent that Hogan's acquiescence to Harris' request was merely in jest and to the extent that Bissell did misinterpret Hogan's statements, his response nonetheless could have been interpreted by Harris (who may not possess Hogan's wit) as a benefit and was certainly beyond the bounds of professionalism.

E. Alcohol Use by El Rukn Cooperating Witnesses in the United States Attorney's Office and ATF Offices

Various El Rukn cooperating witnesses testified with respect to the availability of alcohol at the United States Attorney's Office and the ATF offices on the 39th floor of the Kluczinski Building. Eugene Hunter testified that he drank alcohol on two occasions. The first occurred in 1990, when he took a sip of an agent's beer without the agent's

---

against Harris in a jury room at the Dirksen Building. A285–87 (testimony of William R. Hogan, Jr.).

50. That Hogan acted on these numerous complaints is also indicative that he in fact listened to the witnesses as they voiced their concerns. This, in turn, makes it more likely that, if Clay and Kees told Hogan about post-incarceration drug use while complaining about the conditions

at the MCC, Hogan did hear the comments. *See supra* subsections III(D)(1)(a) & (4) of this opinion.

51. The parties have stipulated that, if called to testify, Bissell would testify as reported in her interview with the FBI on March 11, 1993. *See* AE No. 49.

knowledge. A401. Apparently, the agent had purchased the beer for consumption with his lunch. A401. Hunter also testified that, again in 1990, he took a beer out of AUSA Poulos' office refrigerator without his permission. A401. Poulos had authorized Hunter to go to the refrigerator and take a soda. A401. When Poulos discovered that Hunter was drinking a beer, Poulos took it away and scolded Hunter. A402.

Harry Evans testified that, on several occasions, he saw paralegal Corinda Luchetta give beer to Hunter and Lee in the United States Attorney's Office. A1329. According to Evans, these incidents occurred immediately after the government had obtained convictions in the various El Rukn trials. A1329. Evans stated that he asked for beer, but that Luchetta refused because of his medication. A1340.

Ervin Lee testified that Poulos and ATF agents Diamond and O'Toole allowed him to drink up to a dozen beers over a two-day period in 1991, after Lee had testified before Judge Conlon in Trial II. A1419–20. Lee further stated that, in 1992, he told Poulos that he, Lee, was going to write a letter to Judge Holderman and inform him about the beer. A1422, 1426. According to Lee, Poulos responded by threatening Lee. Poulos allegedly told Lee that, if he writes the letter, Poulos would revoke Lee's plea agreement and he would receive life imprisonment. A1422.

Lee was the final witness in this post-trial hearing and, as such, Poulos was not given an opportunity to respond to the charges. Further, government personnel who guarded the witnesses testified that no alcohol was permitted, and that they did not see any alcohol use by the witnesses. *See, e.g.,* A459 (testimony of Sergeant O'Callaghan). Based on this state of evidence, we cannot comfortably conclude that government personnel knowingly provided El Rukn cooperating witnesses with alcoholic beverages, a criminal offense in violation of 18 U.S.C. § 1791(a) as defined in 18 U.S.C. § 1791(d)(1)(D). How-ever, that Hunter and other witnesses may have consumed alcohol without the knowledge of government personnel is, at a minimum, evidence of the type of lax security characterizing the government's approach to these witnesses.

### F. Gifts, Clothing and Parties Conveyed to El Rukn Cooperating Witnesses by Members of the Prosecution Team

It is undisputed that various members of the prosecution team gave El Rukn cooperating witnesses gifts and, subsequently, did not disclose these gifts to the defense prior to the conclusion of Trial I. Government's Post–Hearing Brief at 23, 44–45. While of no particular significance standing alone, viewed in context of the totality of the evidence, these gifts further indicate the disparate treatment afforded to the cooperating witnesses by the government.

Henry Harris testified that he received the following items from paralegal Corinda Luchetta: one United States flag, one thesaurus, two world maps, one emphasis pointer, two pairs of pants, two shirts, one sweatshirt and a pair of gym shoes. A883–85 (testimony of Henry Harris); AE No. 18. Harris further testified that Officer Brannigan gave Harris' wife some baby clothes. A884–85. Additionally, Harris claims that Luchetta gave him two birthday parties, one in 1990 and one in 1991, in the United States Attorney's Office. A884. Hogan, Poulos and Brannigan testified that they recalled one impromptu gathering where one of the witnesses was celebrated by placing a candle in a cupcake. The only party they recalled was to celebrate Hogan's 40th in the summer of 1991. A1372 (testimony of William R. Hogan, Jr.); A1275–76 (testimony of Theodore Poulos); A1184–85 (testimony of Daniel Brannigan).

Earl Hawkins testified that he received from Hogan a $2 watch and a small notebook. A634. Hogan testified that he also provided both Hawkins and Evans with portable radios in January of 1991, paid for out of Evans' and Hawkins' commissary funds.[52]

52. In addition to constituting undisclosed benefits, the portable radios given to Evans and Hawkins likely facilitated post-incarceration drug use. Indeed, Evans told Nicholas Ahrens, a fellow inmate, that he, Evans, had passed to Harris heroin concealed in the battery compartment of a portable radio. C936–37; H2808.

A1368–69. Derrick Kees testified that he received a watch battery and probably a hairbrush from Hogan. A707. Hogan acknowledged purchasing the watch battery for Kees. A1373. For whatever reason, Evans, Clay and Hunter were not asked if they received any gifts from any member of the prosecution team.

## V. Government Disregard of Post–Incarceration Drug Use

The question of what the government did or did not do with the evidence it possessed regarding post-incarceration drug use by El Rukn cooperating witnesses necessarily entails an inquiry into AUSA William R. Hogan, Jr.'s conduct regarding such information. Hogan was not only the lead prosecutor in Trial I, but he navigated the entire El Rukn prosecution from pre-indictment investigation to indictment, trial and conviction. Hogan was assigned to lead the El Rukn investigation in approximately January of 1988. A157. AUSA Poulos was assigned to help with the investigation in November of 1988, and spent approximately 15–20% of his time on the El Rukn case from that time to roughly May of 1989. C262. Although Poulos served as lead prosecutor in the first trial before Judge Holderman and the trial before Judge Mills, he was clearly subordinate to Hogan. Five years Poulos' senior, Hogan made every major decision relating to these cases, including the decision of what information to disclose to the defense. *See* A565–66. The remaining assistants and paralegals were assigned to the prosecution post-indictment and were dealt with on a need to know basis. In other words, with the possible exception of Poulos, the only person in the United States Attorney's Office with a thoroughgoing knowledge respecting the entire El Rukn prosecution was AUSA Hogan.

### A. Failure to Disclose or Investigate

As described in detail in the preceding sections of this opinion, Hogan received at least fifteen pieces of information regarding Harris and Evans' post-incarceration drug use:

(1) May, 1989: Pursuant to Warden Beeler's policy, Hogan likely received notice of Harris and Evans' positive drug tests.

(2) Spring–Fall, 1989: Clay informed Hogan on three to four occasions that Evans and Harris were using illegal drugs at the MCC.

(3) October 17, 1989: First AUSA Raphaelson informed Hogan of "Warden Beeler's concerns of contraband coming to the El Rukns [on the sixth floor at the MCC]."

(4) October 18, 1989: After receiving a copy of a memorandum indicating that Harris and Evans had tested positive for an unauthorized narcotic, AUSA Rosenthal informed Hogan of the positive test results.

(5) October, 1989: Harris may have informed Hogan that he, Harris, tested positive for illegal drugs on May 11, 1989.

(6) Late 1989/Early 1990: Agent O'Brien and Officer Brannigan informed Hogan that El Rukn cooperating witnesses were bragging about receiving drugs at the federal buildings.

(7) 1989/1990: In the context of complaining about the conditions at the MCC, Kees may have asked Hogan, "What about [Harris] using drugs?"

(8) May or June, 1991: MCC Lt. Mildner informed Hogan of Kees' allegation that Evans had offered Kees illegal drugs.

(9) June 27, 1991: Hogan learned that Harris had been disciplined for his refusal to provide a urine sample on May 30, 1991.

(10) July, 1991: Hunter informed Hogan that Evans "may be getting high" at the MCC.

(11) August 15, 1991: Hogan received a copy of a second memorandum indicating Harris and Evans' positive drug test results, such memorandum produced by MCC officials pursuant to subpoena in Trial II.

(12) Summer/Early Fall 1991: Luchetta likely informed Hogan of Van Blake's suspicion that Evans had been under the influence of drugs.

(13) Early Fall, 1991: Martin informed Hogan that Evans was using drugs at the MCC.

(14) October, 1991: AUSAs Poulos and Hartmann informed Hogan that Evans

looked as if he were under the influence of drugs.

(15) October, 1991: Given a possibility that Evans may be using drugs, AUSA Poulos instructed Evans not to have contact with his mother during a visit. Poulos informed Hogan that, despite his explicit instruction, Evans and his mother passed a gym shoe back and forth between each other.

The vast majority of this information was available to Hogan prior to the conclusion of Trial I. Yet, in the face of conclusive evidence that his witnesses were using drugs at the MCC, Hogan remained silent.

Not only was Hogan orally apprised that Evans and Harris tested positive for drugs in April and May of 1989, but such information was conveyed to Hogan in writing at least twice prior to the conclusion of Trial I. One of the written memoranda, that dated October 18, 1989, clearly indicated that the positive tests of April 12 (Evans) and May 11, 1989 (Harris) were unauthorized, *i.e.*, not attributable to any prescribed medication. Armed with such direct evidence of illegal, post-incarceration drug use on the part of his two star witnesses, Hogan could have taken any number of steps, including disclosing the information to the defense and, to the extent that Hogan believed that Evans' positive test could have resulted from his medical condition, investigating the matter with the aid of the various government officials at his disposal. Hogan, however, took no action whatsoever. Had he, Hogan would have discovered various routine records relevant to Harris and Evans' drug usage (*i.e.*, the urinalysis logbook, the urine high risk list, the incident report logbook and the lieutenant's logbook), such records maintained at the MCC and available prior to and during the course of Trial I. These records, like the two memoranda dated October 18, 1989 and August 15, 1991, were not provided to the defense in Trial I.

Both Evans and Harris were transferred from the MCC in October of 1989. As Harris returned to the institution in March of 1990, so too did information regarding his drug use. This information was communicated to Hogan not only by Derrick Kees, but by the agents assigned to guard Harris. Likewise, when Evans returned to the MCC in March of 1991, information regarding his post-incarceration drug use followed and was communicated to Hogan. For instance, in May or June of 1991 (*i.e.*, during Trial I), MCC Lt. Charles Mildner informed Hogan of Kees' claim that Evans offered him, Kees, illegal drugs. Additionally, Eugene Hunter told Hogan in July of 1991 that Evans "may be getting high" at the MCC. Despite indicating that Evans and Harris likely continued to use drugs after May of 1989, and up to and during Trial I, Hogan did not disclose this information to the defense. Nor did he disclose this information to any other government official in an effort to ensure that Evans and Harris received proper discipline, whether by formal prosecution or by administrative hearing at the MCC. To the extent that Hogan may have believed that such information was not sufficiently specific to disclose, given Harris and Evans' previous positive tests, one would expect that Hogan would have at least investigated the new allegations to determine if his witnesses were continuing to use illegal drugs. He did not.

Finally, Hogan did not disclose to the defense in Trial I that Harris had refused to take a drug test on May 30, 1991. At that point in time, neither Harris nor Evans had been screened for illegal drugs since October 17, 1989. *See* HDE MCC Urine Surveillance Log. While Harris refused to provide a sample on May 30, 1991, no further efforts were made to test Harris from that date through the time he testified at the various El Rukn trials.

B. Deliberate Nature of the Failure to Disclose or Investigate

Relevant to our analysis under *Brady* and its progeny, the evidence establishes that Hogan's failure to disclose and investigate the information he possessed regarding Harris and Evans' post-incarceration drug use was a deliberate and calculated decision, as opposed to a product of neglect. First, and foremost, the sheer volume of the information that Hogan received over a considerable period of time negates the possibility that Hogan failed to act as a result of oversight. It is conceivable that, had Hogan been in-

formed of Harris and Evans' post-incarceration drug use on only one occasion, Hogan may have neglected the information given the stressful circumstance of preparation for trial in several difficult and complex cases. Hogan, however, in fact received information regarding Harris and Evans' drug use on no less than fifteen occasions over a two year period.

Second, as Hogan himself professed, the significance of such information would not have escaped him:

I'm saying that there's no way that if somebody had told me ... that the people who I was devoting my entire attention to had come up dirty at the MCC I would have failed to catch it, notice, it, bring it to the attention of [Former United States Attorney Anton] Valukas, Ira Raphaelson, and the individual defense lawyers who were involved. It would have been like a red flag in front of a bull, and I would have done something or looked into it.

H149–50. To be sure, former AUSA Rosenthal explicitly advised Hogan that Harris and Evans' unauthorized, positive drug test results were discoverable and should have been disclosed to the defense. A593–94; C65–67, 74; H48.

Third, when various persons, including Jackie Clay, informed Hogan of Harris and Evans' post-incarceration drug use, Hogan promised to "look into it." *See* A446–47; C971; H4728–30. Despite such an explicit promise and despite the ease in which Hogan could have investigated such information, he did not.

Fourth, *Hogan's failure to ensure that* Harris and Evans were screened for illegal drug use after October 17, 1989, is evidence of Hogan's bad faith. Had he desired to confirm whether either Evans or Harris had a serious and habitual drug problem, it could have done so through routine and continual drug testing.[53] The failure to secure such testing not only removed a significant deterrent, but evinces a callous, if not purposeful, disregard to drug use on the part of the cooperating witnesses.

Fifth, Hogan's reactions to the suspicions of other members of the prosecution team indicate an attempt to camouflage his prior knowledge that both Evans and Harris had tested positive for an unauthorized narcotic. For instance, when Luchetta informed Hogan of Van Blake's suspicions that Evans may be using drugs, instead seeking Van Blake out to investigate her concerns, Hogan instructed Luchetta to have Van Blake "leave it alone." C1031–37; H3819–22. Additionally, Hogan was less than forthright when approached by AUSAs Poulos and Hartmann with concerns over Evans' physical appearance and the possibility that such condition might be drug-related. Rather than informing Poulos and Hartmann of Harris and Evans' prior positive drug tests and having a frank discussion in context, Hogan persuaded Poulos and Hartmann that Evans' condition was attributable solely to his medical problems.[54] A215–16, 553–54.

Finally, Hogan's conduct in regard to the evidence of post-incarceration drug use is consistent with his overall treatment of these witnesses. As described in the preceding section of this opinion, Hogan and other government officials bestowed upon the El Rukn cooperating witnesses substantial, yet undisclosed, benefits. These clandestine benefits evince a motive on the part of Hogan to curry favor with the cooperating witnesses in order to ensure continued and favorable cooperation. Hogan's actions regarding the evidence of post-incarceration drug use can be explained by a similar motive. No doubt enticed by the prospect of convicting some of

---

53. That Evans' medical condition rendered him unable to urinate is of no consequence here. As Judge Holderman poignantly observed, the fluids obtained during one of Evans' frequent dialysis sessions could have been tested without any inconvenience to Evans.

54. That Hogan would not disclose Harris and Evans' prior positive tests to his trial partners is not inconsistent with his past dealings with them. For instance, Hogan testified that he learned that Harry Evans' half-brother was hired as a custodian in the Dirksen Building during the course of Trial I. A189–90, 249–50, 291–93. Despite the coincidence that Ronald Evans was hired in the midst of Trial I and the potential security concerns arising therefrom, Hogan did not share this information with any of his colleagues, not even Poulos. A578; *see also* A580–81 (testimony of Sergeant O'Callaghan).

the most notorious malefactors in Chicago history, Hogan faced a substantial dilemma upon learning of post-incarceration misconduct on the part of his star witnesses. Hogan recognized that the information he possessed, if disclosed, could seriously jeopardize his ability to return the indictment he had arduously labored to craft. *See* H151 ("[Such information] could have impacted on our ability to return the indictment at all. If somebody had said to me that the MCC had made a determination that two of your major witnesses have been using drugs or have used drugs, I would question whether or not those persons were reliable, whether I could return such a high indictment that was crafted in large part around their testimony, or their expected testimony."). Fully cognizant of the perils involved, Hogan chose to embrace Evans and Harris and, to avoid destroying the case he had struggled to develop, Hogan attempted to protect what little credibility they possessed going into the prosecution by ignoring their post-incarceration drug use.

Although Hogan assumed the decision not to disclose the various pieces of information that indicated the Evans and Harris continued to use illegal drugs post-incarceration, he is not the only blameworthy person in this affair. Other members of the United States Attorney's Office, including then First AUSA Raphaelson,[55] possessed similar information, yet did not disclose such information to any defense attorney associated with the various El Rukn trials. Additionally, Hogan's conduct was further exacerbated by the lack of supervision given to him.

Before turning to the legal issues surrounding Hogan's handling of this case, we are compelled to note that the transgressions detailed in this opinion are atypical of Hogan's career as a prosecutor. As manifested by his past accomplishments in over a decade of government service, Hogan is no doubt a bright, talented and dedicated individual. It is also evident that the course of conduct displayed throughout the El Rukn prosecu-

tion did not stem from malice, but rather arose from his well meant, but misguided, sense of justice. Of course, these factors cannot justify or excuse his present behavior. They do, however, add to the tragedy of this case and the anguish the court endures in making its findings.

## VI. Knowing Use of Perjured Testimony

Implicit in any dignified concept of due process, and well rooted in American jurisprudence, stands the principle that a conviction obtained through use of false evidence or testimony, known to be such by representatives of the prosecution, must be set aside in favor of a new trial. *See Miller v. Pate*, 386 U.S. 1, 6–7, 87 S.Ct. 785, 788, 17 L.Ed.2d 690 (1967); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *Mesarosh v. United States*, 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L.Ed.2d 1 (1956); *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935). Further, this fundamental tenet "does not cease to apply merely because the false testimony goes only to the credibility of a witness." *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177. Indeed, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Id.* To be entitled to a new trial, defendants shoulder the burden of establishing that: (1) the prosecution's case included perjured testimony; (2) the prosecution knew, or should have known, of the perjury; and (3) there is any likelihood that the false testimony could have affected the judgment of the jury. *See United States v. Adebayo*, 985 F.2d 1333, 1341 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2947, 124 L.Ed.2d 695 (1993); *United States v. Guadagno*, 970 F.2d 214, 220 (7th Cir.1992); *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir.1990); *United States v. Douglas*, 874 F.2d 1145, 1159 (7th Cir.), *cert. denied*, 493

---

**55.** During the course of the El Rukn investigation and pretrial proceedings, Raphaelson held the following supervisory positions: From July 30, 1989 to December 3, 1989, he served as First Assistant United States Attorney. From December 4, 1989 to August 26, 1990, Raphaelson was the appointed Interim United States Attorney. Finally, from August 27, 1990 to January 1, 1991, he again served as First Assistant United States Attorney.

**1336**

U.S. 841, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989); *United States v. Kaufmann,* 803 F.2d 289, 291 (7th Cir.1986).

While our initial focus centered upon Trial I testimony concerning post-incarceration drug use and government conferred benefits, a number of other areas of potential perjury were highlighted during the post-trial hearing. Accordingly, we address seriately the elements of a claim of knowing use of perjured testimony as they relate to all claims of false testimony addressed in the post-trial hearing before this court.

A. Identification of Perjured Testimony

 At the outset, defendants bear the burden of establishing that the prosecution's case included perjured testimony. We observe that not every testimonial inconsistency that goes uncorrected by the government establishes a constitutional violation. *Verser,* 916 F.2d at 1271; *Anderson v. United States,* 403 F.2d 451, 454 (7th Cir.1968), *cert. denied,* 394 U.S. 903, 89 S.Ct. 1009, 22 L.Ed.2d 215 (1969). Defendants must demonstrate more than mere inconsistencies, somewhat misleading testimony or testimony that is not necessarily true. *Guadagno,* 970 F.2d at 220; *Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir.1984). Rather, to be entitled to a new trial, defendants must show that the challenged testimony constituted "the willful assertion under oath of a false, material fact." *Verser,* 916 F.2d at 1271 (quoting *Carey,* 738 F.2d at 878); *see also United States v. Dunnigan,* —— U.S. ——, —— ——, 113 S.Ct. 1111, 1116–17, 122 L.Ed.2d 445 (1993).

The various defendants, *amicus curiae* and the court have identified the following potential instances of perjured testimony in Trial I: (1) testimony regarding post-incarceration drug use; (2) testimony regarding government conferred benefits; (3) allegations that William R. Hogan, Jr. coached Henry Harris and other witnesses to lie about their opportunity to collude with each other; (4) Henry Harris' testimony regarding the Robinson–Fort–Cooper heroin investment partnership; (5) Henry Harris' testimony that Noah Robinson introduced El Rukn buyers to narcotics suppliers to raise bond money for Jeff Fort in 1983; (6) Henry Harris' testimony regard-

ing the Howard Johnson Motel Receipt; (7) Jackie Clay's testimony concerning Robinson's solicitation of Derrick Porter to kill Henry Harris; (8) Henry Harris' account of the Ballistrieri Story; (9) Harry Evans' testimony concerning Louis Farrakhan; (10) Derrick Kees' testimony regarding Edgar Cooksey's role in the Charmane Nathan Murder; (11) allegations that William R. Hogan, Jr. coached Henry Harris to lie regarding the interpretation of Title III tapes; and (12) generalized allegations of false testimony.

### 1. Testimony Regarding Post– Incarceration Drug Use

A review of Henry Harris' testimony reveals that the only attempt to impeach Harris based on his drug use concerned questions limited to his activity in 1981. *See* R6745–46. Accordingly, it is self-evident, and defendants do not seriously contend otherwise, that Harris did not commit perjury regarding his post-incarceration drug use.

The same, however, cannot be said for Harry Evans. We have identified three passages extracted from Evans' Trial I testimony which in fact amount to willful assertions under oath of false facts concerning his post-incarceration narcotic activity. The first passage is as follows:

Q. Now, Mr. Evans, in addition to selling drugs, you used and abused drugs from the seventies until the time you went to jail in 1988, isn't that correct?

A. Yes, sir.

Q. You used marijuana, right?

A. Yes, I did.

Q. You used cocaine, right?

A. Yes, I did.

Q. You used—what other drugs did you use?

A. Cough syrup.

Q. Now, you used these drugs for a period—well, how many years would you say you have been using and abusing drugs?

A. You just said it.

Q. I didn't hear you answer, sir.

A. You just said it.

Q. From '74 to '88, or earlier?

A. That's a good figure.

R3015. The government contends that, while if taken out of context a case can be made that Evans affirmatively professed to have stopped using drugs once he was incarcerated in 1988, the fact that defense counsel began this line of inquiry by limiting Evans' attention from "the seventies until the time [he] went to jail in 1988" dispels the notion that Evans even considered post-incarceration drug use (as opposed to pre-custodial drug use) when answering counsel's questions. We disagree. True, defense counsel's first four questions were expressly limited to pre-custodial drug use. Nonetheless, counsel's fifth question withdrew the time limitation and, in fact, attempted to positively fix the time period in which Evans used drugs, including the point when his drug use ended. Indeed, precisely because defense counsel had previously distinguished pre-custodial drug use from post-incarceration drug use, Evans' referral back to the distinction indicates that he consciously excluded post-incarceration drug use from his answer. In other words, by referring counsel back to his questions regarding pre-custodial drug use, Evans willfully asserted that he used drugs only "from the seventies until the time [he] went to jail in 1988." To be sure, defense counsel then recounted Evans' answer by encircling the years 1974 or earlier up to 1988. Evans indicated that this was a good approximation of the years he had been using drugs. As detailed *supra* Section II of this opinion, there is overwhelming evidence that Evans possessed and used illicit narcotics while confined on the sixth floor of the MCC, such activity commencing in 1988 and continuing through and beyond the time he testified in Trial I. In the face of such evidence, it is clear that Evans' response to the above question regarding the date he stopped using drugs was perjured.

Immediately following the above exchange came the following colloquy:

Q. Now, let me ask you this. Since you were the one that was using and abusing the drugs, do you feel that the use of those drugs helped your mind operate?

A. Yeah, it helped me operate.

Q. Do you feel that the use of these drugs helped your memory and straightened your head out?

A. Yeah, it straightened my head out all right. It got me here today. That's what it did, them drugs you're talking about.

Q. Yes, that's what got you here, the drugs.

A. The drugs you were talking about that I abusing, that I was solicited to—

Q. Right.

A. —got me here today. But I'm not on drugs now. My mind is very clear. And now I see the light, oh, yeah.

R3015–16. As an extension of the previous dialogue, it is clear, as the government suggests, that the both Evans and defense counsel were cognizant of the distinction between post-incarceration drug use and pre-custodial drug use. In other words, when Evans refers to "them drugs you're talking about," he is referencing the drugs he used prior to his arrest in 1988, *i.e.*, the only drugs he has admitted to using. Thus, when he stated "But I'm not on drugs now," we can reasonably construe the word "now" not only to include that particular day on which he testified, but rather every day since his arrest. Of, course, as discussed above, Evans in fact used illegal drugs since his arrest, rendering this statement perjured. We observe, however, to the extent that the term "now" as used by Evans referenced only the particular day on which made the statement, there is enough evidence to suggest that he in fact either was under the influence while testifying or recovering from its last administration. A640–41 (testimony of Earl Hawkins); A27–28, 79–80 (testimony of Harry Martin); A726 (testimony of Derrick Kees); *see also supra* subsection II(D)(3) (detailing testimony regarding Evans' physical appearance).

Finally, in response to the question, "You are not dealing drugs anymore?," Evans stated "No, sir." R3354. Contrary to Evans' willful assertion, the evidence adduced during these post-trial hearings establishes that Evans in fact was selling drugs while incarcerated at the MCC. On August 5, 1992, Evans engaged in a tape-recorded telephone conversation with his girlfriend, Beverly Wordlow, clearly evincing that he was selling

drugs as of that date. *See* AE No. 38. Of course, Evans testified in Trial I roughly a year prior to this conversation. However, that Evans was selling drugs from the MCC after his testimony is probative of prior dealing when coupled with the substantial evidence indicating that he possessed both narcotics and unexplained quantities of cash at the MCC prior to his testimony in Trial I. Finding that Evans in fact sold some of the drugs he obtained while at the MCC prior to his testimony in Trial I, we conclude that Evans' response to this question constitutes perjury.

Before turning our attention to other allegations of perjury, we are compelled to comment on two additional passages regarding Evans' post-incarceration drug use raised by the parties. The first is as follows:

Q. You have been incarcerated continuously since January of 1988, is that right?

A. I've been incarcerated since '88, yes, sir.

Q. So you have been incarcerated the last three and a half years. You haven't been involved, obviously, in any criminal activity out in the street in those three and a half years, is that right?

A. No, I haven't.

R3167. Contrary to the impression that this question and answer created, Evans was in fact involved in criminal activity out on the street. To be sure, at his direction, his girlfriend, his half-brother Ronald Evans and, perhaps, his mother purchased narcotics "out in the street" and smuggled them into the MCC or the federal building for Evans' consumption. In that the phrase "out in the street" follows "criminal activity," we can interpret the question to include involvement other than his actual physical presence outside of prison. In other words, the question refers to "criminal conduct" out in the street and not Evans out in the street. Under such a literal interpretation of the question, Evans' answer is false. We recognize, however, that Evans most likely did not undertake such a task of deconstruction in answering the question. As such, it is more than reasonable that he believed his incarceration precluded a positive answer, since he was not "out in the street," but rather was in prison.

Accordingly, we cannot conclude that Evans' response to this question constituted perjury, *i.e.*, the willful assertion of a false fact under oath.

Finally, in support of the proposition that Evans perjured himself regarding his post-incarceration drug use, defendant Robinson points to Evans' statement that he "did nothing to worsen his [medical] condition intentionally." R3072. Presumably, Robinson's contention is that, to the extent that Evans was taking drugs while incarcerated, he intentionally worsened his medical condition. While illicit narcotic use is an intentional act that may worsen his medical condition, the question as phrased is too broad to consider Evans' response a willful assertion of a false, material fact. To be sure, the question calls for an opinion that Evans likely is unqualified to render, *i.e.*, whether certain conduct may worsen his medical condition. Evans' opinion, whether right or wrong, cannot form the basis of perjury.

### 2. Testimony Regarding Government Conferred Benefits

While all of the cooperating witnesses were asked about their respective plea agreements and the "money" they and their family received as result of their cooperation with the government, none were asked any follow-up questions to determine if the government had afforded the witnesses any other benefits (*i.e.*, free telephone service, otherwise unauthorized contact visits, alcohol, and various gifts such as portable radios). *See* R3000–04 (testimony of Harry Evans); R3659 (testimony of Earl Hawkins); R4343–45 (testimony of Derrick Kees); R5388–91 (testimony of Jackie Clay); R6092–95 (testimony of Eugene Hunter); R6931–33 (testimony of Henry Harris). In the absence of such questions, it is evident that none of the witnesses perjured themselves on this subject matter. Of course, the government can take no solace in the absence of false testimony regarding these other benefits. Indeed, had the defense known about these benefits prior to trial, it is certain that the cooperating witnesses would have been confronted with direct questions regarding these inducements to testify. To be sure, we will revisit the evidence of special benefits within the con-

text of the government's obligations under *Brady* and its progeny, *supra* Section VII of this opinion.

3. Allegations that William R. Hogan, Jr. Coached Henry Harris and Other Witnesses to Lie about their Opportunity to Collude with Each Other

All of the El Rukn cooperating witnesses except Henry Harris testified that their testimony in Trial I was truthful. A365–66 (testimony of Eugene Hunter); A436–37 (testimony of Jackie Clay); A624 (testimony of Earl Hawkins); A675–76 (testimony of Derrick Kees); A1312 (testimony of Harry Evans). Harris testified that the majority of his testimony was true, A800–01, but that he lied about being kept separate from other cooperating witnesses both at the time of his grand jury testimony and later. A828–33; AE No. 18, at 1, 3. Harris claims that in 1990, he reminded Hogan that "we [the cooperating witnesses] were together at the MCC, [and] I was with the guys in South Carolina [and] all this was before grand jury." A829. Hogan allegedly responded, "well, if you ever asked, you just say you wasn't together, you was in separate jails and we can prove it." A829. Harris was also housed together with the other witnesses on the sixth floor of the MCC during the trials, and had contact with the others while at the United States Attorney's Office. A832–33. According to Harris, Hogan likewise instructed him to testify that he was kept separated from the other witnesses at both the MCC and the United States Attorney's Office. A833.

Harris' claim is belied, at least in part, by the trial transcript. Contrary to his assertion, Harris did not testify during Trial I, either on direct or cross-examination, regarding his location in any jail relative to any other El Rukn cooperating witness at any time. *See* R6238–6973. Harris simply was not asked about this issue. Further, Hogan has denied that he ever coached Harris to lie about being housed with other El Rukn cooperating witnesses. A1382–91. The fortuitous absence of questions directed at Harris, however, does not end our inquiry. In that it takes more than one to collude, we are compelled to scrutinize the testimony of the other cooperating witnesses on this regard as well as any representations by the government during trial as to their efforts to exclude witnesses.

We observe that the representation made by the government at Trial I concerning the cooperating witnesses' ability to collude prior to their respective appearances before the grand jury was inaccurate. During closing argument the government stated:

> At that point it's important to remember that Harry Evans was kept separate from every other El Rukn general who has testified in this case. In other words, it was impossible for Harry Evans to get together with a single other government witness and collude, to collaborate, to come up with stories to make sure their stories matched. *Every single one of them testified that they were kept separate from each other until they testified in the grand jury,* and you know why that's done, ladies and gentlemen: To avoid collusion, to make sure that each individual is telling the truth. And the way you do that is you keep them separate and you don't give them any information you're getting from the others. And that is exactly what was done in this case and that is why these people are so believable.

R8585–86 (emphasis added). Not only was this statement contrary to the evidence adduced during the post-trial hearing, *see* AE No. 46A (inmate history reports indicating that cooperating witnesses were housed together prior to giving testimony before the grand jury), but it was contrary to the testimony adduced by the government at Trial I. For instance, Derrick Kees was asked on direct examination: "How about before you went to the grand jury, were you incarcerated with any of them [the other cooperating witnesses] at that time?" Kees responded: "I was—yes, I was in the MCC, but we were separated." R4341. Further, Hogan called Sergeant O'Callaghan to testify that, while they were housed together at the MCC prior to testifying before the grand jury, the witnesses had been kept separate during their initial interviews and debriefing. R3442–58. That the government's statement in closing was contrary to the testimony adduced at trial, however, does not in itself afford defen-

dants post-trial relief. As the court does in every jury trial, we instructed the jury that closing arguments are not evidence and "if something an attorney says is contrary to your recollection of the evidence, please disregard it." A8513. In the face of such an instruction, we must presume that the jury disregarded the inaccurate statement in favor of the testimony adduced at trial.

Although Harris was never asked about his housing arrangements and despite the fact that the government's inaccurate statement does not in itself indicate that any witness committed perjury, we believe that at least one witness perjured himself in regard to whether he colluded with other cooperating witnesses. While Harry Evans never testified at trial that he was kept separate prior to his appearance before the grand jury, he did state that he was housed with the other cooperating witnesses prior to the trial. Evans, however, denied discussing trial testimony with the others, and specifically with Hawkins. R3104–09, R3338–40. In a statement to AUSA Hartmann and ATF Special Agent Young, Hunter revealed that, every day during the trials, the cooperating witnesses including Evans discussed their trial testimony. CDE No. 75; *see also* A416. Hunter specifically remembered Evans and Hawkins discussing the drug transaction on Doty Road, and generally recalled that after one witness would testify the others would read about the testimony in the newspaper, thus sparking discussions. *Id.* In his post-trial testimony before this court, Evans acknowledged that he would in fact discuss his testimony with the other witnesses:

Q. Okay. What about the testimony you gave about talking to the other witnesses about what the testimony was?

A. We used to—we did that over there.

Q. You did discuss when you were at the MCC or over at the U.S. Attorney's Office or over at the ATF office what you were going to testify to?

A. Yeah.

Q. So you compared notes, so to say?

A. Yeah.

Q. Did you make efforts to coordinate or shape your testimony?

A. I mean, you couldn't help but—

Q. Put it in your own words. I don't want to put words in your mouth. How would you say?

A. It was like—

Q. Take your hand down.

A. It was like one of us was going on the stand or coming back, and the other one would be there. We would talk about what we just testified to, like that.

A1314–15. Notably, Evans did not deny trying to coordinate his testimony with others. It is evident from both Hunter's statement and Evans' testimony that although the discussions of testimony obviously occurred after at least one witness has testified, other witnesses participating in the conversation had yet to testify. Based on the above evidence, we conclude that Evans' assertions at Trial I that he did not discuss trial testimony with any other cooperating witness was perjured.

Other evidence has surfaced during the course of these post-trial proceedings suggesting that the El Rukn witnesses, including Evans, had shared information about their testimony prior to Trial I. First, in September of 1989, upon taking from Hogan's office a memorandum directed to the Indictment Committee, Derrick Kees immediately gave the memorandum to Eugene Hunter, who promptly made copies of the document. A708–13; A394–95. Second, paralegal Corinda Luchetta testified that she routinely asked El Rukn cooperating witnesses who happened to be in the United States Attorney's Office (including those who had yet to testify at Trial I) to deliver to other witnesses copies of their trial and grand jury testimony. C798–99. Hogan and Poulos testified that they gave to witnesses transcripts of their own trial testimony, but never that of another witness. A312–13 (testimony of William R. Hogan, Jr.); A575–76 (testimony of Theodore Poulos). Of course, as Poulos recognized: "I don't think there was any way of preventing that [*i.e.*, the sharing of prior testimony] once we decided to give them transcripts." A575. Finally, Luchetta testified that she worked with both Harris and Hunter together in translating the Title III tapes. C718–19. Hogan acknowledged that

there were occasions when other cooperating witnesses were present while Harris was working on translating the tapes and "observed the process," but that he would tell them, "I don't want your input about it because you're not going to be the witness. Harris has to be the one who testifies about it, it has to be his translation." A260. Of course, what is relevant is that they were exposed to a version of events other than their own, and not that Hogan did not want their input. These incidents not only bolster our conclusion that Evans committed perjury, but they call into question the independence of the testimony of all the cooperating witnesses.

4. Henry Harris' Testimony Regarding the Robinson–Fort–Cooper Heroin Investment Partnership

During Trial I, Harris testified that on his second trip to New York he purchased 6 ounces of heroin. Harris further stated that this quantity was mixed with approximately 4 pounds of quinine. R6409–10. From this mixture, Harris claimed to package 100,001 "dime" bags of narcotics (i.e., 0.1 grams per package). R6410–11. Harris testified that these "dime" bags were sold at $10 each, netting $1,000,000. R6410. Robinson's cut was allegedly $333,333. R6411–13.

As Noah Robinson has pointed out on numerous occasions, these numbers do not add up. The total mixture was 70 ounces, or 1984.4 grams (70 ounces × 28.349 grams/ounce). At 0.1 gram per package, Harris could only have produced 19,844 "dime" bags, a far cry from 100,001. Sold on the street for $10 each, Harris would have netted only $198,440, not $1,000,000.

Adding to the confusion, Harry Martin testified during these post-trial proceedings that, while the two were housed together at the MCC, he helped Harris adjust the amount of heroin and the number of people selling dime bags to realistically equal $1,000,000 in sales. A53–55. According to Martin, Harris approached Martin and began asking questions about how drugs were mixed and the accounting procedures surrounding drug sales. A53–54. Martin also testified that, in asking for help, Harris showed Martin some paperwork from the

United States Attorney's Office detailing drug quantities and dollar values. A54. From this testimony, defendants would have the court conclude that Harris, with Martin's help, perjured himself regarding the sale of the 100,000 dime bags.

During our post-trial hearing, Harris acknowledged that the figures did not add up. A806. Harris explained that, due to Hogan's questions on direct examination, he was unable to testify to a number of other ingredients making up the 100,000 dime bags. A806–07. Harris stated that in addition to the China white heroin and quinine, they added "black tar" heroin, "mexican mud" heroin, dormin and lactose. A807. Further, Harris stated that Martin did not help him with the above calculations to ensure he had enough heroin and mix to reach 100,000 dime bags. A808. Rather, Harris asserted that the papers he showed Martin concerned an attempt by AUSA Poulos to figure out the total amount of drug activity for sentencing purposes in connection with the first trial before Judge Holderman. A808–09.

Poulos testified that, in September of 1991, they were faced with a difficult task of quantifying how much narcotics the El Rukn enterprise sold from 1983 to 1987. A1266. While Harris and others had testified specifically as to the amount of raw heroin and cocaine they had purchased, that amount did not represent the amount sold because it was common practice to dilute the narcotic with a "mix" (i.e., quinine, dormin, lactose etc.). A1266–67. As not all of the drugs were mixed in the same proportion of purchased drug to mix, the United States Attorney's Office had to come up with a formula to approximate the total quantity mixed and sold. A1267. Poulos talked to Harris in arriving at the conversion formula. A1268. Indeed, Poulos felt that the government may have to call Harris as a witness during the various sentencings to explain the mixing process in more detail. A1270. Harris was given a computer printout of the conversion formula, but was concerned that he could not follow the math. A1270. Poulos told Harris not to worry about the math (because it was complicated), but rather to concentrate of the mixing ratio of purchased drugs to mix.

A1271. Harris, however, was concerned about the math, and this is likely what he discussed with Martin. To be sure, that Harris would approach Martin to explain merely how to mix drugs is absurd. Afterall, Harris was no novice; he had a virtual lifetime of drug dealing. *See* R6264–65, R6283–85, R6299–301, R6332, R6345–51, R6381–429, R6431–38, R6595–96, R6604, R6609–10, R6673–74, R6678–79, R6685–86, R6704, R6723, R6741–42, R6746, R6755–59, R6793, R6837, R6864–65, R6870, R6873–76, R6923–25.

Although there may have been a gaping hole in Harris' testimony at trial, that hole alone is insufficient to conclude that Harris perjured himself on this score. *See Guadagno,* 970 F.2d at 220.

5. Henry Harris' Testimony that Noah Robinson Introduced El Rukn Buyers to Narcotics Suppliers to Raise Bond Money for Jeff Fort in 1983

During his testimony at Trial I, Harris recounted a meeting with Noah Robinson at the Fort in which Robinson stated "that if we needed to raise money for Jeff's bond, that he got a guy from out of town, from the East Coast, that has plenty of cocaine. And he'd like to do some business if you're all willing to do some business." R6308.

This testimony stands in apparent contradiction to Harris' pretrial confession to William R. Hogan, Jr., memorialized in a stipulation between the government and defendant Thomas Burnside submitted during the post-trial hearings before Judge Holderman and signed by Hogan. That stipulation reads in relevant portion:

> if called ... Gene Wolfe would testify ... [h]e is a Special Agent of the Burean [sic] of Alcohol, Tobacco and Firearms, and was present at an interview of Henry Leon Harris by Assistant United States Attorney William R. Hogan, Jr. on October 5, 1988. At that interview Henry Leon Harris stated he had never heard the story about Noah Robinson offering to introduce the El Rukns to a cocaine source in order to raise money for Jeff Fort's bond in 1983.

In his recent post-trial testimony before this court, Harris denied that he ever told Hogan and Agent Wolfe that he, Harris, had never heard the story regarding Robinson offering to introduce the El Rukns to a cocaine source in order to raise Fort's bond money. A811. Harris reiterated that he did talk to Robinson regarding this subject, and that his testimony in Trial I was accurate in that regard. A811. For whatever reason, neither Hogan nor Agent Wolfe was asked about this stipulation, leaving only speculation as to whether Hogan recalled Harris' statement in accord with Wolfe. At best, Wolfe and Harris disagree over what Harris said during the course of his interview. This disagreement, however, is insufficient in itself for the court to conclude that Harris' testimony during Trial I was perjured. *See United States v. Brimberry,* 803 F.2d 908, 915 (7th Cir.1986), *cert. denied,* 481 U.S. 1039, 107 S.Ct. 1977, 95 L.Ed.2d 817 (1987); *United States v. Santiago,* 798 F.2d 246, 247 (7th Cir.1986).

6. Henry Harris' Testimony Regarding the Howard Johnson Motel Receipt

During Trial I, Harris testified that a receipt for a stay at Howard Johnson's dated October 16 and 17, 1985 corresponded to his third trip to New York to buy heroin for Noah Robinson. R6730–32, 6413–22. However, before the grand jury, Harris claimed that the third trip was in March of 1985. Defendant Robinson continues to contend that this discrepancy constitutes perjury. We have previously rejected this very contention, *United States v. Boyd,* 792 F.Supp. 1083, 1088 (N.D.Ill.1992), and nothing presented during the course of these post-trial proceedings warrants a different conclusion. *See* A811–12 (testimony of Henry Harris) (currently cannot recall which date is the correct one); *see also Santiago,* 798 F.2d at 247 ("that [the witness'] testimony at trial varied from her statement to the grand jury, or from other evidence in the record, does not in and of itself establish that she testified falsely at trial").

7. Jackie Clay's Testimony Regarding Noah Robinson's Solicitation of Derrick Porter to Kill Henry Harris

On May 18, 1989, Jackie Clay testified before the grand jury, stating that Derrick

Porter unequivocally refused Noah Robinson's offer of $5,000 to kill Henry Harris. However, on October 26, 1989, while again testifying before the grand jury, Clay stated that Porter was negotiating with Robinson for more money, using Clay as a middleman. On the same subject, Clay testified at Trial I that Porter flatly refused Robinson's offer and would not kill Harris for more money.

Against this backdrop, on July 9, 1991, Judge Conlon ruled that Jackie Clay's testimony before the grand jury on October 26, 1989 was perjurious. As such, Judge Conlon dismissed Count 16, paragraph 137 of Count 1 and Racketeering Act No. 28 of Count II against Porter. On July 15, 1991, Judge Conlon vacated the dismissal finding that, although Clay had perjured himself, the government did not know of such perjury.

We have previously held that Judge Conlon's finding of perjury does not require this court to disregard his testimony in Trial I. *Boyd*, 792 F.Supp. at 1088. While events subsequent to Trial I, *i.e.*, the possibility that Clay committed perjury during these post-trial hearings, further casts doubt on his credibility, there is no evidence that the position he took during Trial I regarding Robinson's solicitation of Porter was false. In any event, Robinson was found not guilty of soliciting either Porter or Clay to kill Harris (Count 16 & Racketeering Act No. 28 of Count II).

### 8. Henry Harris' Account of the Ballistrieri Incident

During the course of Trial I, Harris testified that Jeff Fort and some of the El Rukn Generals had gone to Milwaukee to visit Frank Ballistrieri in order to get a crate of machine guns back. R6288–89. Harris claimed that Fort made a statement to Ballistrieri that, if his group was selling drugs on the south side of Chicago, his family would hear his bones rattle in Italy. R6291. Further, Harris stated that Fort had taken Ballistrieri some fur coats and, after Fort had left, Ballistrieri threw the coats on the ground. R6292. Eugene Hunter, during the post-trial hearing before this court, testified that he believes that Harris made this story up, taking it from the plot of a book he had read. A427–28. Additionally, Harry Martin,

during our post-trial hearing on May 24, 1993, stated that Hawkins, Clay and Hunter told him that Harris' story was not true, that Harris got it from a book. A33, 49–50. Harris, however, has consistently maintained that the story is true. A818–19. With nothing more than a disagreement between the cooperating witnesses, we cannot conclude that Harris committed perjury regarding the Ballistrieri incident. *See Verser*, 916 F.2d at 1271.

### 9. Harry Evans' Testimony Regarding Louis Farrakhan

During the course of Trial I, one of the defense counsel elicited from Harry Evans on cross-examination that Louis Farrakhan had a secret drug operation. A3320. According to Evans, he used to give cocaine to Farrakhan's top lieutenants in exchange for fish. A3321. Evans further stated, on redirect examination, that the El Rukns and Farrakhan were going to open up fish markets and sell both fish and cocaine. A3357. A number of the cooperating witnesses and other inmates testified that they believed Evans' story about Farrakhan was totally false. *See* A31 (testimony of Harry Martin); A422 (testimony of Eugene Hunter); A439 (testimony of Jackie Clay); A818 (testimony of Henry Harris). Evans, however, steadfastly affirmed during these post-trial proceedings that the events happened as he testified in Trial I. A1310. Indeed, Evans has consistently told this story since 1985, when he told Officer Brannigan about Farrakhan's drug activities. *See* AE 44A, at 2. Once again, with nothing more than a disagreement between the cooperating witnesses, we cannot conclude that Evans committed perjury regarding the Farrakhan's purported involvement with the cocaine trade. *See Verser*, 916 F.2d at 1271.

### 10. Derrick Kees' Testimony Regarding Edgar Cooksey's Role in the Charmane Nathan Murder

During his testimony at Trial I and in our post-trial hearing, Derrick Kees has faithfully maintained that Edgar Cooksey was in one of the cars at the time Charmane Nathan was murdered. A715–16. Jackie Clay, however, has consistently claimed that Cooksey

was not present for the shooting, rather he, Kees, Alvin Toney and Billy Doyle borrowed Cooksey's car to do the deed. Clay testified to this fact both at trial, R5163–74, and during our recent post-trial hearing. A439–41. In that this disagreement between Kees and Clay was presented to the jury in Trial I, that they still disagree is insufficient to warrant post-trial relief. See Verser, 916 F.2d at 1271. This is true regardless of whether AUSA Hogan knew about the inconsistent statements prior to trial, as long as he did not attempt to coerce one witness to change his story to conform to the other (an allegation, if made, unsupported by the evidence).

11. Allegations that William R. Hogan, Jr. Coached Henry Harris to Lie Regarding the Interpretation of Title III Tapes

In an interview with the FBI on April 26, 1993, and during his testimony before this court on May 24, 1993, Harry Martin stated that various cooperating witnesses told Hogan that Harris' translation of the Title III tapes were inaccurate. A34, 57–58; AE No. 2, at 4–5. Martin implied that Hogan coached Harris to change various translations to help make the government's case stronger. A57–58; AE No. 2, at 4. Hogan denied ever coaching Harris. A1379–80. Rather Hogan claims he always insisted that Harris give his interpretation of the tapes regardless of whether Hogan or any cooperating witness may disagree with Harris' translation. A1380. Although Hogan would help Harris structure sentences and use proper grammar, he never changed the meaning of Harris' interpretation. A1380. Harris confirmed Hogan's account of his participation in the translation process. A812–14; see also R6480–89, R6958–62. To be sure, Hunter, for instance, had disputes with Hogan over the meaning of the tapes, but Hunter admits he testified in accordance with his own personal recollection, not Hogan's. A365–66. Further, Hunter concedes that at times when he, Harris and Hogan disagreed over the meaning of a colloquy, and such disagreement resulted in a change in translation, not all changes were favorable to the government. A404–06. The totality of the evidence suggests that Hogan never coached Harris to slant the meaning of the Title III tapes, and that Harris' testimony

during Trial I regarding the translation process was not perjured.

12. Generalized Allegations of False Testimony

Various witnesses during our post-trial hearing have stated in the most general terms that other cooperating witnesses had lied. Although unable to recall many specifics, Harry Martin testified as to the rumors he heard from cooperating witnesses regarding others who lied. See A30–33. Hunter testified that Harris, upon returning from testifying, stated that he had to bail out Hogan regarding Franklin. A424. Likewise, Clay claims that, upon questioning Harris at the MCC, Harris stated "O.K., I lied, but I'm straight now." A438. These statements, even if true, are too vague to warrant post-trial relief.

However, one of the many allegations Hunter made in passing deserves further comment. Hunter claimed that based on his own personal experience, Evans' testimony that he met Burnside on Doty Road was not possible. A366–67. Interestingly, Harris said he perjured himself in the trial before this court when he testified that Evans was present during a drug transaction on Doty Road. A814–15. Harris, however, did not testify at Trial I that Evans was present on Doty Road, R6308–22, and Evans did not claim to have been there. R2677–98.

B. Defining "Perjury within the Prosecution's Case"—Government Knowledge and Use of Perjured Testimony

As discussed above we have identified two areas of perjury in Harry Evans' testimony before this court in Trial I: (1) his testimony regarding post-incarceration drug use; and (2) his testimony that he had not discussed trial testimony with any other witness. The government, citing United States v. Adebayo, 985 F.2d 1333, 1341 (7th Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 2947, 124 L.Ed.2d 695 (1993), contends that these instances of perjury were not part of the "prosecution's case," and thus are inconsequential for purposes of defendants' motions for post-trial relief, because they were elicited by defense counsel on cross-examination. We

do not subscribe to the government's interpretation of the holding in *Adebayo*.

In *Adebayo*, the government's direct examination of the relevant witness elicited only that Adebayo purchased plane tickets to Chicago, that the witness did not know their precise destination in Chicago, and that Adebayo gave the witness the packets (later determined to contain heroin) that he was carrying when he was arrested. *Id.* at 1342. Prior to trial, the government expressly informed both the district court and Adebayo's attorney that its direct examination would be limited to the above topics to ensure that the witness would not commit perjury. *Id.* Specifically, the government feared that the witness would claim that he did not know the packets he was carrying contained heroin. *Id.* Predictably, on cross-examination, defense counsel elicited from the witness the perjured claim regarding his lack of knowledge. *Id.* Under these circumstances, the Seventh Circuit held that "not only did the Government present no perjured testimony in its own case, it did not know, nor did it have any reason to believe (the second requirement for a new trial), that [the witness] would perjure himself during cross-examination." *Id.*

■ To construe *Adebayo* as announcing as blanket rule that a defendant may be convicted upon perjured testimony so long as the government did not elicit such perjury on direct examination would be to ignore the well established principle that a conviction "must fall under the Fourteenth Amendment ... when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177; *see also United States v. Wallach*, 935 F.2d 445, 457 (2d Cir.1991) (ordering a new trial even though the perjured testimony was elicited by defense counsel on cross-examination and was collateral to the crimes charged against defendants); *United States v. Bontkowski*, 865 F.2d 129, 133 (7th Cir.1989) ("the government must correct false testimony of a government witness, whether the testimony is elicited upon direct examination by the prosecutor, or whether elicited upon cross-examination by defense counsel"). In other words, to the extent that the government allows such testimony to go uncorrected, perjured testimony will be considered a part of "the prosecution's case," even if elicited by defense counsel on cross-examination. To be sure, where defense counsel is unaware that he has elicited perjured testimony because the government has not corrected the statement it knew to be false, then in a very real sense the government is the party "using" the false testimony.

*Adebayo* does not abrogate this principle. Rather, the case is distinguishable on its unique facts from the circumstance described in *Napue*. Unlike the usual scenario where the government is aware of the perjured testimony and allows the defense to remain in ignorance, the prosecutor in *Adebayo* informed both the court and the defense that it suspected that its witness may lie regarding certain matters and, thus, the government would limit its testimony to other specified matters. Defense counsel exploited the situation by eliciting the perjured testimony. In that the defense either knew or should have know of the perjury, and given the government's affirmative action to prevent such false testimony, the court justifiably concluded that the defense, and not the prosecution, used the perjured testimony, *i.e.*, it was not offered as a part of "the prosecution's case."

The facts surrounding Evans' perjured testimony indicate that the instant case is more akin to the situation detailed in *Napue* than *Adebayo*. Here, as discussed *supra* Section III of this opinion, various members of the prosecution team, including lead prosecutor William R. Hogan, Jr., knew that Evans has tested positive for unauthorized illegal narcotics in 1989. Indeed, Hogan was not only informed of such misconduct on the part of Evans orally by various individuals including former AUSA Rosenthal, but Hogan received written documentation (in the form of the October 18, 1989 memorandum) well before Evans testified at Trial I. Likewise, both Hogan and Poulos either knew or should have known that Evans has discussed trial testimony with other El Rukn cooperating witnesses as they knew that the witnesses were given their prior grand jury and trial testimony to take and study at the MCC. As

Poulos stated: "I don't think there was any way of preventing that [*i.e.,* the sharing of prior testimony] once we decided to give them transcripts." A575. On the other hand, unlike defense counsel in *Adebayo,* the defense in Trial I neither knew nor had reason to know that Evans' testimony was false on either account. And, unlike the prosecution in *Adebayo,* the government in this case took no steps either prior to trial (by disclosing the information in its possession) nor during trial (*i.e.,* once it had ascertained that Evans in fact committed perjury) to correct the false statements. As such, we conclude that the false testimony in Trial I was in fact a part of "the prosecution's case."

C. Materiality of Perjured Testimony

■■■ Of course, the introduction of perjured testimony does not automatically entitle defendants to a new trial. Rather, the defense bears the burden of demonstrating that the evidence is material to guilt or punishment. However, under circumstance such as those present in the instant case where the government knew or should have known of the perjured testimony, this burden is light. In the presence of a knowing use of perjured testimony, such false testimony is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Napue,* 360 U.S. at 269–71, 79 S.Ct. at 1177–78; *Guadagno,* 970 F.2d at 220; *Kaufmann,* 803 F.2d at 291. "Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *Wallach,* 935 F.2d at 456 (citing *Napue,* 360 U.S. at 269, 79 S.Ct. at 1177; *United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir.1975), *cert. denied,* 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976)).

The Second Circuit's recent decision in *Wallach* is instructive on this point. In *Wallach,* three defendants were convicted of a variety of criminal offenses arising from their dealings with an entity know as Wedtech Corporation, such offenses including substantive violations of RICO and RICO conspiracy. *Id.* at 450, 454–55. The government's primary witnesses against defendants were

two men named Moreno and Guariglia. *Id.* at 455. These two witnesses "provided the foundation upon which the prosecution built its entire case." *Id.* During the course of trial, as the government conceded, Guariglia perjured himself. On direct examination, Guariglia claimed to have stopped his compulsive gambling in the summer of 1988, the trial taking place in June of 1989. *Id.* On cross-examination, Guariglia admitted that he had signed gambling markers totaling $65,000 in September and October of 1988, but continued to deny that he had gambled on those occasions. *Id.* at 455–56. During a post-trial hearing on defendants' motions for new trial, "the government acknowledged that information establishing that Guariglia had gambled in Puerto Rico in November of 1988 and that he had operated a stationary supply business illegally was obtained from an individual named Ira Cohen." *Id.* at 456. The government subsequently confirmed Cohen's information, and Guariglia was tried and convicted of two counts of perjury. *Id.* The court found that, if it were not aware of the perjury at the time of trial, it should have been. *Id.* at 457. In so finding, the court stated: "We fear that given the importance of Guariglia's testimony to the case, the prosecutors may have consciously avoided recognizing the obvious—that is, that Guariglia was not telling the truth." *Id.* Even though Guariglia's testimony as to defendants' crimes was not alleged to be false, the court reversed the convictions, reasoning:

> Guariglia was the centerpiece of the government's case. Had it been brought to the attention to the jury that Guariglia was lying after he had purportedly undergone a moral transformation and decided to change his ways, his entire testimony may have been rejected by the jury. It was one thing for the jury to learn that Guariglia had a history of improprieties; it would have been an entirely different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie.

*Id.*

1. Perjured Testimony Regarding Post–Incarceration Drug Use

Like Guariglia's lie in *Wallach,* Evans' false testimony concerning his post-incarcer-

ation drug use could have caused the jury to reject his entire testimony. Although acknowledging his substantial past wrongdoing, Evans repeatedly professed that he had decided to cooperate with the government and change his ways because he "had seen the light." To be sure, the government ended its direct by soliciting the following response to a question regarding Evans' motive for testifying:

> So when I left [the El Rukn enterprise], you know, my eyes was opened now. You know, I could see the light. I could see the light better, you know, and I'd seen like, hey—it was like, I can understand how the peoples, Jim Jones and Charles Manson and Hitler, you know—I can see who they was controlled and persecuted by, you know, one man, and you know—and just brainwashing you, you know, with the brain washing procedure that he used. It was so heavy that, man, it took 20 some years for me to get away from it, you know, 20 some years.

> It's more than just that happened to me, but I still couldn't see the light. You know, when I see the light, I said to myself, yo, you know, this has been going on for some decades. It's got to end and somebody got to end it. Because the way the man had everything situated, he knew we was going to get killed or be put in jail, so he had a lot of kids can take over.

> And this keep going on and on and on. Like he said, we will never die, you know. We Stones, we will multiply and all this, you know. And, you know, I don't want my kids to ever go through nothing like this, my kids or nobody else's kids. I mean, you know, I was robbed of my childhood.... And I don't want that to happen to my kids and nobody else's. Somebody had to come here and draw the line on this. If not, there's just going to be more and more killing, more and more drug selling, more and more manipulating, more and more young people getting destroyed out here in this world by Jeff Fort, the Jeff Fort syndrome.

R3406–07. Despite similarly claiming to "see the light" regarding his drug usage, Evans continued to use drugs post-incarceration and, in willful disregard of his oath before this court, he lied to cover it up. While Evans was subjected to substantial cross-examination on other matters, *see infra* subsection VII(D), we believe that such a conscious decision to lie while under oath is different in kind and, hence, not cumulative to any other impeachment at trial. Given the importance of Evans' credibility, and in light of the government's effort to bolster such credibility by eliciting testimony to the effect that Evans had "seen the light" (despite possessing knowledge that he had been continuously using drugs at the MCC), we conclude that the perjured testimony regarding his post-incarceration drug use was material. Based solely on the fact that the government did not correct such perjured testimony, we are compelled to reverse all convictions resting at least in part on Evans' testimony.

We observe that, contrary to the government's suggestion, the Seventh Circuit's ruling in *Jarrett v. United States*, 822 F.2d 1438 (7th Cir.1987), does not require a different conclusion. In *Jarrett*, the defendant moved to vacate his conviction for armed robbery on the basis of newly discovered evidence that a government witness, Lou Anne Walz, failed to testify truthfully at trial concerning her use of drugs on the date of the trial. *Id.* at 1445. Walz later admitted she had snorted a narcotic before testifying at trial against Jarrett. *Id.* Jarrett's pray for a new trial on the basis of perjured testimony required the court to determine if "the jury might have reached a different conclusion." *Id.* The Seventh Circuit ruled as follows:

> The fact that Walz testified falsely as to her use or ingestion of drugs on the day she appeared as a witness against Jarrett is of itself insufficient to entitle Jarrett to a new trial where Walz's prior history of drug use was presented to the jury and where no evidence exists in the record to establish that Walz did not testify truthfully concerning Jarrett's participation in the ... robbery. The evidence concerning Walz's history of drug use brought her credibility into question and the jury and the trial judge had ample opportunity to assess the credibility of her testimony in view of her demeanor and the responses she gave to the questions put to her by

respective counsel. . . . Since there is no evidence in the record to establish that Walz testified falsely concerning Jarrett's participation in the . . . robbery, Jarrett's "newly discovered" evidence that Walz testified untruthfully as to her use of drugs on the day she testified is a collateral attempt to impeach Walz's testimony and is therefore merely cumulative with respect to the question of Walz's credibility. . . .

*Id.* at 1445–46. Regardless of whether *Jarrett* represents a faithful application of the materiality standard in the face of perjured testimony, unlike the evidence before the court in *Jarrett,* the evidence adduced during these post-trial proceedings does suggest that Evans may have testified falsely regarding the substantive offenses in Trial I, rendering *Jarrett* inapposite.

### 2. Perjured Testimony Regarding Witness Collaboration

More troubling than his lie regarding post-incarceration drug use is Evans' false testimony that he never discussed trial testimony with any other cooperating witness. In that both sides recognized the importance of whether the cooperating witnesses were able to discuss trial testimony both before and after their respective appearances before the grand jury, the issue was given considerable attention during Trial I. Evans admitted that the cooperating witnesses were housed together on the sixth floor of the MCC for months prior to trial but, in order to maintain the independence of his testimony, denied that he had discussed trial testimony. Were the jury to learn that Evans in fact discussed trial testimony prior to, during, and after giving his testimony in Trial I, it could have reasonably concluded that Evans, whether consciously or subconsciously, tailored his testimony to that of others. In other words, Evans' lie in this regard casts considerable doubt over the veracity of his entire testimony. Furthermore, Evans' lie also calls into question the veracity of the testimony of the other cooperating witnesses. From the fact that Evans was engaging in conversations with other cooperating wit-

nesses regarding trial testimony, stems information that all of the cooperating witnesses engaged in such conversations and, thus, may have altered their respective testimony as well. Thus, in addition to that of Evans, the jury could have reasonably rejected the testimony of Harris, Hawkins, Clay, Hunter and Kees. In this sense, Evans' single lie is material not only to the convictions resting in part upon his testimony, but also to those resting in part on the testimony of Harris, Hawkins, Clay, Hunter and Kees. As discussed in the next subsection, this tainted testimony encompasses virtually every conviction obtained in Trial I, with the exception of Mayes' conviction for the intimidation of witness Henry Harris (Count 12) and Green's conviction for the possession of firearms as a convicted felon (Count 58).

### 3. Summary of Cooperating Witnesses' Testimony Relating to Each Count of Conviction

In the instant case, the centerpiece of the case against Jeff Boyd, Edgar Cooksey, Andrew Craig, Charles Green, Sammy Knox, Felix Mayes and Noah Robinson consisted of six former El Rukns who opted to cooperate with the government in exchange for leniency. Without the testimony of Harry Evans, Henry Harris and to a lesser extent, Eugene Hunter, Derrick Kees, Jackie Clay and Earl Hawkins, the government could not have proven the defendants guilty beyond a reasonable doubt of almost all of the charges of which they were convicted. As Harry Evans accurately observed: "Who else is going to testify in a case like this?" R8948.

Putting aside for the moment their convictions for racketeering conspiracy (Count 1) and racketeering (Count 2), defendants were each convicted of some combination of fourteen separate counts. The testimony of one or more of the above listed cooperating witnesses was critical to every conviction under all fourteen counts, save Mayes' conviction for the intimidation of Witness Henry Harris (Count 12) and Green's conviction for the unlawful possession of a firearm as a convicted felon (Count 58): [56]

**56.** By detailing only a portion of the cooperating witnesses' testimony as it relates to the counts

listed below, we in no way wish to suggest that no other evidence was set forth by other cooper-

• *Count 3:* All seven defendants were convicted of conspiracy to possess narcotics with the intent to distribute, as charged in Count 3 of the second superseding indictment. These convictions were based largely on the testimony of Evans and Harris, and to a lesser degree Kees, Clay, Hawkins and Hunter. The vast majority of Harris' testimony related to the El Rukn drug trade, during which he tied all seven defendants to narcotic related activity. *See* R6238–6973. Additionally, the numerous Title III tapes, almost all of which related to drug trafficking, were translated by Henry Harris and conveyed to the jury through his testimony. Evans explicitly linked Boyd (R2917–27, R2933–36), Cooksey (R2717–18, R2929–32), Craig (R2323, R2327–33, R2402–08, R2717–18), Green (R2609–16, R2634–36, R2706, R2711–14), Knox (R2327–30, R2609–16, R2698), Mayes (R2402–08, R2534–35, R2571, R2583–84, R2587–89, R2711–14) and Robinson (R2680–2714, R2928–29, R2936–39, R2952–53) to the El Rukn drug trade.

• *Count 4:* Boyd, Cooksey, Craig, and Knox were found guilt of conspiracy to murder and attempted murder of members of the King Cobras, as charged in Count 4 of the second superseding indictment. Both Evans and Harris testified regarding this incident. R2917–27, R3366 (testimony of Harry Evans); R6465–68 (testimony of Henry Harris).

• *Count 5:* Cooksey, Craig, and Green were convicted of the assault of Theotis Clark, as charged in Count 5 of the second superseding indictment. Both Evans and Harris testified regarding this incident. *See* R2726–28 (testimony of Harry Evans); R6443–57 (testimony of Henry Harris).

• *Count 6:* Charles Green was convicted of the murder of Robert "Dog" Jackson, as charged in Count 6 of the second superseding indictment. The government has conceded that this conviction "was based in large part upon the testimony of Harry Evans" and, thus, cannot be supported with independent evidence. Government's Brief in Opposition to Defendants' Motions for Post–Trial Relief at 50 (Feb. 24, 1993); *see also* R2731–36 (testimony of Harry Evans).

• *Count 7:* Jeff Boyd was convicted of the triple murder of Rico Chalmers, Vicki Nolden and Glendon McKinley, and the attempted murder of Andre Chalmers, as charged in Count 7 of the second superseding indictment. Evans, Harris, Kees, and Hawkins provided significant evidence regarding this incident. *See* R2916–27 (testimony of Harry Evans); R6464–68 (testimony of Henry Harris); R4274–75 (testimony of Derrick Kees); R3558–80 (testimony of Earl Hawkins).

• *Count 8:* Noah Robinson was convicted of the interstate attempted murder-for-hire of Robert Aulston, as charged in Count 8 of the second superseding indictment. While Evans was not involved in this incident, Harris provided substantial testimony regarding both his and Robinson's participation. *See* R6508–25, R6536–45, R6553–59, R6566–69 (testimony of Henry Harris). Further, the prosecution relied on approximately twenty taped telephone conversations between Jeff Fort in prison in Bastrop, Texas, and various El Rukn Generals in Chicago, each of which translated by Harris. Finally, Hunter and Kees, who travelled with Harris to Texas to stalk and kill Aulston, provided significant corroborating evidence regarding the incident. *See* R4876–93 (testimony of Eugene Hunter); R4297–4304 (testimony of Derrick Kees).

• *Count 9:* Robinson was also convicted of the interstate murder-for-hire of Leroy "Hambone" Barber, as charged in Count 9 of the second superseding indictment. Both Evans and Harris testified regarding this incident. *See* R2946–50, R2995–96 (testimony of Harry Evans); R6516, R6577–94, R6633–34 (testimony of Henry Harris). Further, both Jackie Clay and Eugene Hunter, who travelled to Greenville, South Carolina on two occasions with other El Rukns including Henry Harris and Edgar Cooksey to kill Barber, testified that Robinson had hired the El Rukns to do the deed for $10,000. *See* R4898–99, R4902–23 (testimony of Eugene

ating witnesses concerning the particular incident. Indeed, for those events to which both Evans and Harris testified, we will not set forth

in detail the relevant testimony adduced from Clay, Hunter, Hawkins and Kees.

Hunter); R5246–62 (testimony of Jackie Clay).

• *Count 10:* Boyd and Knox were convicted of the kidnapping of Patricia McKinley, as charged in Count 10 of the second superseding indictment. McKinley testified that Boyd and Knox kidnapped her to prevent her from testifying against Knox in his upcoming trial for the murder of Maurice Coleman. R2775–88, R2810–26. While her testimony was substantial in itself, it was nonetheless corroborated by both Harry Evans and Earl Hawkins who testified respecting the Coleman beating in retaliation for the attempted burglary of McKinley's apartment. *See* R2668–77 (testimony of Harry Evans); R3504–10 (testimony of Earl Hawkins). Hawkins also testified to a conversation he had with Knox, wherein Knox admitted that he and Boyd had kidnapped McKinley. R3509–10.

• *Count 12:* Felix Mayes was convicted of the intimidation of witness Henry Harris, as charged in Count 12 of the second superseding indictment. Specifically, Mayes was charged with invading and shooting up Hank's Fun House Tap, which was owned by Harris' parents, in order to prevent Harris from cooperating with the government in this and a related case. The government's evidence on this count consisted entirely of the testimony of Luther Wright and Mark Baker. Wright testified that, on October 9, 1987, he was at Hank's Fun House Tap when two men wearing all black and carrying a semi-automatic rifle and a sawed-off shotgun began "shooting up the place." In that the men were wearing ski masks, Wright could not identify them. R7364–81. Baker testified that Luther Wright is his uncle, that when Wright came home he told Baker about the events at the Fun House, that Baker subsequently went to the Fun House to observe the commotion, that after he left the scene he went to a restaurant nextdoor, that defendant Mayes and two other individuals were at that restaurant, that Baker overheard Mayes brag about shooting up the Fun House. Baker identified Mayes in open court. R7381–7411. Although conceding that no other witnesses testified to this event, defendant Mayes contends that "the

underlying foundation of the charge, that Harris was testifying and stood to be intimidated, necessarily came from Harris. Without Harris the charge had no substance." Defendant Felix Mayes' Brief in Support of Post–Trial Motion for New Trial at 17 (July 28, 1993). This contention, however, fails in that the jury need not have believed a word uttered by any of the cooperating witnesses in order to find that Harris was a witness at Trial I and that Mayes' actions were aimed to intimidate Harris. As Mayes' conviction on this count is bolstered entirely by evidence from witnesses other than Evans, Harris, Clay, Hawkins, Hunter, and Kees, the perjured testimony discussed herein is immaterial to this conviction.

• *Counts 13, 14 & 15:* Noah Robinson was convicted of the interstate attempted murder-for-hire of Janice Denise Rosemond, retaliation against witness Janice Denise Rosemond and tampering with Janice Denise Rosemond, as charged in Counts 13, 14 and 15 of the second superseding indictment. All three of these charges stem from Robinson's hiring of Freddie Sweeney to kill Rosemond after she had testified about the Leroy "Hambone" Barber murder before the grand jury in this case. In that Sweeny was the individual who actually stabbed Rosemond at the request of Robinson, Sweeny's testimony regarding the incident was substantial. *See* R7159–7216. Nonetheless, Jackie Clay, who was travelling with Robinson at the time, provided significant evidence to corroborate Sweeney's account, including that Robinson was going to have his brother George talk to Rosemond to see if she would change her testimony regarding the Barber murder and, if not, Robinson would have Sweeney "do something to her," that Clay saw and spoke to Sweeney, that Sweeney spoke with Robinson, and that Robinson told Clay that George had no luck so Sweeney stabbed Rosemond but she did not die. R5340–52; *see also* R5572–76, R5673, R5679 (testimony of Eugene Hunter).

• *Count 17:* Robinson was also convicted of tampering with witness Henry Harris, as charged in Count 17 of the second superseding indictment. This conviction rests in large part on the testimony of Henry Harris,

*see* R6691–93, and, as such, the government does not argue that it can be maintained by independent testimony. *See also* R5631–32 (testimony of Eugene Hunter).

• *Count 58:* Charles Green was convicted of unlawfully possessing firearms as a convicted felon, as charged in Count 58 of the second superseding indictment. Green's conviction on this count rested almost exclusively on the testimony of Officer Brannigan, who stated that, on May 1, 1985, he searched Green's third-floor apartment in the El Rukn's Morrocco building and found five weapons, including two nine millimeter semi-automatic pistols, a .45 caliber semi-automatic blue steel pistol, an uzi, a military carbine and a shotgun. R2450–59. To tie up the loose ends, the government submitted Green's prior conviction and the testimony of a fingerprint expert to establish that he was in fact the individual previously convicted. None of the El Rukn cooperating witnesses testified to the details of the raid on the Morrocco building and, as such, the perjured testimony discussed herein is immaterial to this conviction.

Given that the only counts discussed above that may be maintained independent of the testimony of the El Rukn cooperating witnesses is Counts 12 (Mayes) and 58 (Green), it is evident that the perjured testimony also taints Counts 1 (racketeering conspiracy) and 2 (racketeering). First, without the testimony of Evans, Harris, Hunter, Kees, Clay and Hawkins, there would be insufficient evidence from which the jury could determine the existence of the requisite "enterprise." Further, the jury could not determine that any of the defendants either committed or agreed to commit two of the 31 racketeering acts charged in the superseding indictment.

In sum, we conclude that Evans' perjured testimony regarding both post-incarceration drug use and collaboration with other witnesses mandates post-trial relief respecting every conviction but Mayes' under Count 12 and Green's under Count 58. We now turn to the legal issues surrounding the government's failure to disclose evidence.

## VII. Government Obligations under *Brady v. Maryland*

That the prosecution, as the representative of the sovereign, holds a responsibility above that of a private advocate should be of no surprise to any Assistant United States Attorney. His responsibility in a criminal prosecution is not merely to obtain a conviction, but rather to ensure that justice is served. As stated by Justice Sutherland:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

*Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); *see also United States v. Bell,* 901 F.2d 574, 578 (7th Cir.1990) ("As an officer of the court, the [Assistant United States Attorney] has some responsibility to ensure, as far as may be reasonably possible, the integrity of the proceedings."); ABA Standards for Criminal Justice § 3–1.1(c) (1980) ("The duty of the prosecutor is to seek justice, not merely to convict."). The nature of this obligation entails more than the "duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger,* 295 U.S. at 88, 55 S.Ct. at 633:

> [The United States Attorney] may prosecute with earnest and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Rather, as a unique servant of the law, the prosecutor's mandate compels affirmative action to safeguard the criminal defendant's right to a fair trial. Anything less would necessarily transform the dictates of the United States Constitution into mere yield signs on the road to conviction.

From the above principle arises the second rudimentary issue presently confronting the court: Did the government's failure to dis-

close information regarding (1) Henry Harris and Harry Evans' post-incarceration drug use, and (2) government supplied benefits deny defendants of a fair trial? This question, of course, is a matter of due process, governed by standards set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny.

In *Brady*, the United States Supreme Court upheld the reversal of a death sentence because the prosecution, despite the defendant's pretrial request to produce statements, withheld a codefendant's statement that he, not the defendant, had actually killed the victim. *Id.* at 91, 83 S.Ct. at 1198. In so doing, the Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. Since its holding in *Brady*, the Court has expanded the scope of the government's duty of disclosure. Recognizing that "there are situations in which evidence is obviously of such substantial value to the defense," the Court has since held that "elemental fairness requires [such evidence] be disclosed even without a specific request [by the accused]." *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976); *see also United States v. Bagley*, 473 U.S. 667, 680–81, 105 S.Ct. 3375, 3382–83, 87 L.Ed.2d 481 (1985); *United States v. Jackson*, 780 F.2d 1305, 1308 (7th Cir.1986). Thus, to prevail under *Brady* and its progeny, a defendant must demonstrate: (1) that the prosecution suppressed evidence within its possession; (2) that such evidence was favorable to the defense; and (3) that the suppressed evidence was material. *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992); *United States v. Hartmann*, 958 F.2d 774, 790 (7th Cir.1992); *Jackson*, 780 F.2d at 1308.

Before we apply these standards to the instant case, however, a word concerning the context in which we encounter this issue of nondisclosure is in order. As explained in *Agurs*, 427 U.S. at 107–08, 96 S.Ct. at 2399, the issue of nondisclosure arises in two principle contexts:

First, in advance of trial, and perhaps during the course of trial as well, the prosecutor must decide what, if anything he should voluntarily submit to defense counsel. Second, after trial a judge may be required to decide whether a nondisclosure deprived the defendant of his right to a fair trial.

Of course, in both situations the standard of constitutionality remains the same. *Id.* at 108, 96 S.Ct. at 2399. Nonetheless, in practical terms, the pretrial decision of a prosecutor is, and rightfully should be, different. "Because we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Id.* at 108, 96 S.Ct. at 2399–400. In the instant case, unlike the prudent prosecutor, AUSA William R. Hogan, Jr. resolved the pretrial question in favor of nondisclosure. As the government now concedes, information regarding Harris and Evans' post-incarceration drug use and government conferred benefits should have been either turned over to the defense or submitted to this court for an *in camera* inspection. Hindsight, of course, is a vantage point unavailable prior to trial. And, practical notions of what the prosecutor should have disclosed based on such hindsight does not guide this court's post-trial determination of whether there was a breach of the prosecutor's constitutional duty to disclose. *See id.* at 108, 96 S.Ct. at 2400.

### A. Evidence within the Possession of the Government

At the threshold, we are faced with the question of who is to be considered as a part of the "government" or "prosecution team" for *Brady* purposes. The issue is relevant in that a number of witnesses testified to knowledge of undisclosed evidence by persons employed by the federal government, but who were not Assistant United States Attorneys assigned to the El Rukn prosecution. These individuals include ATF agents, Chicago Police officers, United States Attorney's Office paralegals, MCC personnel and

employees of the United States Marshal's Service.

It is well settled that information possessed by any member of the United States Attorney's Office will be attributed, for these purposes, to the "prosecution." *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766. This rule encompasses not only Assistant United States Attorneys not working on the case, but also other United States Attorney's Office personnel, such as paralegals. Likewise, it is also clear that the "prosecution" includes police officers, federal agents and other investigatory personnel who participated in the investigation and prosecution of the case. *See United States v. Brooks*, 966 F.2d 1500, 1503 (D.C.Cir.1992) (finding *Brady* violation for failure to disclose homicide files in the possession of the D.C. police, given the "close working relationship" between that body and the United States Attorney's Office for the District of Columbia); *United States ex rel. Smith v. Fairman*, 769 F.2d 386, 391 (7th Cir.1985) (state's failure to produce police ballistics report unknown to prosecutors but in police files violated *Brady* because "the withheld evidence [was] under the control of a state instrumentality closely aligned with the prosecution, such as the police"); *Carey v. Duckworth*, 738 F.2d 875, 878–79 (7th Cir. 1984) (stating in dicta that "a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case ... [prosecutors] should not simply assume that they have no responsibility for keeping abreast of decisions made by other members of the team"); *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964) (failure to disclose police ballistics and fingerprint tests violated *Brady* because "the police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure"). Indeed, the government does not dispute that the "prosecution team" in this case includes all of the employees of the United States Attorney's Office and the various investigative agents assigned to the case, including those from ATF and the Chicago Police Department. Government's Post–Hearing Brief at 1, 5 (July 26, 1993).

There has been considerable debate amongst the parties as to whether information in the possession of MCC officials may be attributed to the "prosecution." *See United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir.1992) (suggesting that, to the extent that the prosecutor "had authority" over MCC officials, evidence in the possession of the MCC may be attributed to the "prosecution"). In the context of the instant case, however, we need not resolve the issue. To be sure, there is overwhelming evidence that, apart from information in the hands of MCC officials, various members of the prosecution team were aware of the post-incarceration drug use and government conferred benefits.

1. Post–Incarceration Drug Use

The government does not dispute that it possessed and failed to disclose information regarding Harris and Evans' post-incarceration drug use. Indeed, the government admits that, at the very least, (1) Cynthia Ward (Raphaelson's secretary) and AUSA Rosenthal received and reviewed the October 18, 1989 memorandum detailing Harris and Evans' positive drug test results, (2) on August 15, 1991, during the trial before Judge Conlon, AUSA Hogan and other members of the prosecution team received and reviewed a second memorandum indicating that Evans and Harris had tested positive for illegal drugs at the MCC, and (3) paralegal Corinda Luchetta was in fact informed of Harris' refusal to provide a urine sample on May 30, 1991. Government's Post–Hearing Brief at 13 (July 26, 1993). To supplement the government's concession, we add, without belaboring the point, that AUSA William R. Hogan, Jr. possessed, prior to the conclusion of Trial I, a considerable amount of information regarding Harris and Evans' post-incarceration drug use. *See supra* subsection V(A) of this opinion. Further, the same and other information was possessed by other members of the United States Attorney's Office, including then First AUSA Ira Raphaelson, as well as by various other government personnel who, through their involvement in the El Rukn prosecutions, had substantial contact with these witnesses. *See supra* Section III of this opinion.

**1354**

**2. Government Conferred Benefits**

In that the undisclosed benefits described in Section IV of this opinion were bestowed upon the El Rukn cooperating witnesses by members of the prosecution team, including AUSAs Hogan and Poulos, paralegals Luchetta and Van Blake, and various members of the investigative task force, it is axiomatic that the "prosecution" possessed information concerning these benefits. The government does not contend otherwise.

**B. Evidence Possessed by the Government was Suppressed**

██ Although conceding that the evidence of undisclosed government benefits was "suppressed" within the meaning of *Brady*, the government contends that such is not the case respecting the information of Harris and Evans' post-incarceration drug use. At first blush, the contention seems nonsensical in that the evidence was both within the possession of the government and not disclosed to the defense. Nonetheless, it is apparent that the term "suppressed" cannot be defined solely with reference to the prosecution's action. Rather, the concept excludes information that the defense either (i) had actually obtained prior to trial through some independent means, *see Tate v. Wood*, 963 F.2d 20, 25–26 (2d Cir.1992); *United States v. Newman*, 849 F.2d 156, 161 (5th Cir.1988); *United States v. McMahon*, 715 F.2d 498, 501 (11th Cir.), *cert. denied*, 464 U.S. 1001, 104 S.Ct. 507, 78 L.Ed.2d 697 (1983), or (ii) could have discovered through the exercise of reasonable diligence. *See United States v. Dimas*, 3 F.3d 1015, 1018–19 (7th Cir.1993); *White*, 970 F.2d at 337; *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir.), *cert. denied*, 498 U.S. 1000, 111 S.Ct. 561, 112 L.Ed.2d 567 (1990); *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir.1990); *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir.), *cert. denied*, 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989); *Lugo v. Munoz*, 682 F.2d 7, 9–10 (1st Cir.1982). With an eye toward defendants' conduct in this case, the government contends that they did not, and could not, "suppress" the drug test results, since: (1) defendant Robinson already possessed information that the government's cooperating witnesses were using narcotics in the MCC; (2) Robinson abandoned his effort to obtain such information pursuant to subpoena; (3) the other defendants had access to the results through the exercise of reasonable diligence via a subpoena; and (4) all defendants had access to the drug test results through the exercise of reasonable diligence when those results became a matter of public record on August 15, 1991, in proceedings before Judge Conlon. As explained below, we reject each of these contentions.

**1. Actual Knowledge of Post–Incarceration Drug Use**

██ The government's assertion that defendants possessed information relating to Harris and Evans' post-incarceration drug use stems exclusively from a statement of defendant Robinson contained in one of numerous *pro se* filings. In his "Renewed Motion for Reconsideration of Independent Threshold Jury Tampering Inquiry," filed on December 9, 1992, Robinson states:

> During the spring of 1991 the defendant [Robinson] had been apprised by MCC personnel in confidence, and by non-custodial associates of El Rukn government witnesses held in segregated MCC protective custody housing, the government's "Els" were being provided *hard* narcotics (heroin and cocaine) and allowed conjugal visits in the MCC and in the U.S. Attorney's office.

*Id.* at 2. In explanation of this statement, Robinson maintains that, until the revelations during the post-trial hearings before Judges Conlon and Holderman, he knew only of rumors of post-incarceration drug use on the part of the government's cooperating witnesses. Such knowledge, according to Robinson, is insufficient to defeat his *Brady* claim. We agree. *Brady* does not require disclosure for the mere sake of disclosure. Rather, the requirement is a means to ensure that the defendant is afforded the opportunity to effectively present evidence in his or her defense. Thus, the exception for information already known to the defense must necessarily assume the possession of a sufficient factual basis to present the evidence at trial. With only rumors to support his assertion, Robinson would have been precluded at trial from asking Evans and Harris

about their post-incarceration drug use. *See* Michael H. Graham, *Federal Practice and Procedure* § 6504, at 22 (Interim Edition 1992) (cross-examiner must possess a good-faith basis to inquiry into specific acts of misconduct; rumors, innuendo, etc. are insufficient); *see also Oostendorp v. Khanna*, 937 F.2d 1177, 1181 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 951, 117 L.Ed.2d 119 (1992); *United States v. Elizondo*, 920 F.2d 1308, 1313 (7th Cir.1990); *United States v. DeGeratto*, 876 F.2d 576, 584 (7th Cir.1989); *United States v. McBride*, 862 F.2d 1316, 1320 (8th Cir.1988); *United States v. Davenport*, 753 F.2d 1460, 1463–64 (9th Cir.1985). Accordingly, we will not forfeit Robinson's *Brady* claim on the basis that he had obtained such information prior to trial.[57]

2. Waiver by Defendant Noah Robinson

■ In the absence of specific pretrial knowledge of Harris and Evans' post-incarceration drug use, our focus shifts to the reasonableness of Robinson's efforts to obtain such information. Certainly, the unsubstantiated allegations gratuitously conferred to Robinson conveyed a duty upon him to corroborate his suspicions. Indeed, Robinson undertook such a process by issuing subpoenas upon the "U.S. Department of Justice, Federal Bureau of Prisons," seeking for all government witnesses (1) "[a]ny and all Movement Logs to and from the Metropolitan Correctional Center," and (2) "[a]ny and all records of chemical analysis." The government, however, objected to at least that portion of the subpoenas which requested records relating to the movement of government witnesses to and from the MCC and, accordingly, moved to quash the subpoenas.

On May 6, 1991, the following colloquy transpired:

> Mr. Hogan: There was a matter with respect to certain subpoenas that were issued by Ms. Carothers, Rivkin–Carothers, on behalf of Noah Robinson with respect to some travel records, the marshals' records regarding the travel to and from the MCC by government's witnesses. We strongly oppose that, your Honor. I don't think that's at all appropriate, why and how and when they were brought over.
>
> The Court: You say there is a motion pending?
>
> Mr. Hogan: No, there are subpoenas issued.
>
> Ms. Rivkin–Carothers: No, I sent the subpoenas that were returnable to this Court for today's date for the movement records of government's witnesses. I think it is relevant to show their movement.
>
> The Court: Have you filed a motion to quash that subpoena, is that it?
>
> Mr. Hogan: I am doing it orally now. I don't have anything in writing, but I'll be happy to put something together on that.
>
> The Court: Okay. I am not going to—the subpoena requests what again?
>
> Ms. Rivkin–Carothers: It requests their movement from the MCC to any place else during their time in custody as well as any chemical analysis.
>
> Mr. Simone: For the purpose, Judge, of determining how many times and how many hours they were interviewed.
>
> The Court: I am going to quash that subpoena. If you want to get the informa-

---

**57.** Additionally, we are troubled that the government's only evidence that Robinson knew of post-incarceration drug use on the part of its cooperating witnesses comes from one of his *pro se* motions. We have stated repeatedly that, given Robinson's status as a represented party, any motion filed *pro se* is null. *See, e.g., United States v. Robinson*, No. 89 CR 908 (N.D.Ill. July 29, 1992) (Robinson is to submit all filings through his attorney); *United States v. Robinson*, No. 89 CR 908 (N.D.Ill. Aug. 21, 1992) (adopting Magistrate Judge's Report and Recommendation and fining Robinson $43,000 for *pro se* filings). Robinson's "Renewed Motion for Reconsideration of Independent Threshold Jury Tampering Inquiry" is no exception. As such, whether permitted by

law or not, fundamental fairness compels the court to refrain from scouring Robinson's *pro se* filings in search for detrimental admissions while, at the same time, ignoring their merits. Even if this court ruled that Robinson could not pursue his *Brady* claim on the basis of the information he had obtained prior to trial, the government has cited no authority to attribute Robinson's knowledge to his codefendants. Robinson's revelation of pretrial information concerning drug use at the MCC was disclosed in a post-trial motion. Further, counsel for Robinson's codefendants have each denied that they had learned of Harris and Evans' post-incarceration drug use prior to trial.

tion as to how many times and the length of time that they were being interviewed, I am going to ask the government to prepare a log to that effect and give it to them at the appropriate time. You are going to have to give it to them at cross-examination anyway, so you might as well do it now.

Transcript of Proceedings at 3–4 (May 6, 1991). The government, initially under the belief that only two subpoenas were issued (one asking for movement records and the other seeking any chemical analysis), contends that this court quashed the subpoena for the movement records and left standing a separate subpoena for the chemical analysis, which certainly would include the drug test results in question. As such, citing *United States v. Taglia*, 922 F.2d 413, 416 (7th Cir. 1991), the government asserts that Robinson's failure to act on the subpoena in the face of noncompliance by the MCC constitutes a waiver of his *Brady* claim.

As we learned later during the course of these post-trial proceedings, the government's initial assumption regarding the number of subpoenas issued and the information requested in each was mistaken. In fact, Robinson's attorney issued eight subpoenas, each requesting both movement records and any chemical analysis for eight different government witnesses. Accordingly, when this court quashed "the subpoena," we did not leave an independent subpoena seeking chemical analysis unresolved. Rather, by quashing the request for movement logs, we effectively quashed a portion of eight individual subpoenas. Unfortunately, the transcript of proceedings reveals that our ruling was subject to more than one reasonable interpretation. Robinson reasonably believed that the court's statement, "I am going to quash the subpoena" referred to each of the eight subpoenas in their entirety. While he may have been mistaken, the reasonableness of his interpretation distinguishes his effort from that of the defendant in *Taglia*.

In *Taglia*, the defendant filed a pretrial motion for severance, arguing that his codefendant's counsel, who had previously been defendant's lawyer, might use knowledge obtained through the previous representation while cross-examining defendant in the upcoming trial. *Id.* at 416. The motion to severe was apparently "lost in the shuffle before trial," and was never ruled upon. *Id.* Taglia did not renew the motion. *Id.* Instead, he proceeded to trial along with his codefendant and former attorney, from which we can infer that he "became content with or even came to prefer a joint trial." *Id.* at 417. In holding that Taglia waived the severance issue, the Seventh Circuit explained: "If a motion is not acted upon, a litigant had better renew it. He may not lull the judge into thinking that it has been abandoned and then, after he has lost, pull a rabbit out of his pocket in the form of the forgotten motion." *Id.* at 416.

 Here, there is no doubt that Robinson did not lull this court into thinking that the subpoenas had been abandoned. Rather, after the court addressed the matter on May 6, 1991, Robinson reasonably believed that they had been quashed in total. Thus, unlike the defendant in *Taglia*, Robinson does not seek to disrupt an unfavorable verdict with a deliberately displaced motion. Moreover, in *Taglia* and the cases cited therein, the issue of waiver arose within the context of a motion for severance. The rationale for requiring a defendant to renew his motion for severance at the close of evidence is that "it is then that any prejudice which may have resulted from the joint trial would be ascertainable." *United States v. Brown*, 870 F.2d 1354, 1360 (7th Cir.1989) (cited in *Taglia*). If the defendant fails to renew the motion for severance at the close of evidence, the court can infer that the defendant no longer objects to the joint trial. *See Taglia*, 922 F.2d at 417. With the issuance of a subpoena, however, there is no equivalent defining moment from which we can infer that a defendant has waived his right to obtain the information sought. If the opposition moves to quash the subpoena and the court so rules, the proponent of the subpoena is under no obligation to seek reinstatement in order to perfect a *Brady* claim.

### 3. The Power of Subpoena

 Apart from the issue of waiver, the question arises: Could any of the defen-

dants have discovered evidence of Harris and Evans' post-incarceration drug use from an independent source through the exercise of due diligence? It is well settled that defendants cannot base a *Brady* claim on information that could have been obtained from other sources via subpoena. *See United States v. Tormos-Vega,* 959 F.2d 1103, 1109 (1st Cir.) (claim that government withheld bank statements and other similar financial documents), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 135 (1992); *United States v. Ellender,* 947 F.2d 748, 757 (5th Cir.1991) (claim that government withheld defendant's state prison record); *United States v. Romo,* 914 F.2d 889, 898–99 (7th Cir.1990) (claim the government withheld records maintained by local police), *cert. denied,* 498 U.S. 1122, 111 S.Ct. 1078, 112 L.Ed.2d 1183 (1991); *United States v. Williams,* 902 F.2d 678, 682 (8th Cir.1990) (claim that government withheld telephone bill); *see also United States v. Lockhart,* 956 F.2d 1418, 1426 (7th Cir.1992) ("[W]here counsel is on notice that a witness may have exculpatory information, and has an opportunity to subpoena that witness, there is no obligation for a prosecutor to seek out and provide information."). Likewise, the government is under no obligation to disclose information of public record. *Newman,* 849 F.2d at 161 (claim that government withheld a probation worksheet of public record); *McMahon,* 715 F.2d at 501 (claim that government withheld psychiatric reports concerning the government's main witness previously revealed in the trial of a codefendant); *Lugo,* 682 F.2d at 9–10 (claim that government withheld information that a court in another case had ordered a psychiatric evaluation of the prosecution's main witness).

Unlike the material sought in the cases cited by the government, however, information of Harris and Evans' post-incarceration drug use was neither available from a neutral source nor a matter of public record prior to the close of evidence in Trial I. Rather, the information was generated and maintained by the Federal Bureau of Prisons which, as of May 14, 1930, is controlled by and within the Department of Justice. To be sure, when presented with a subpoena in connection with the trial before Judge Conlon, MCC officials called upon Hogan to determine whether they should comply. H81–82 (testimony of William R. Hogan, Jr.). Hogan, in turn, referred the matter to another assistant within the United States Attorney's Office. H81–82; *see also* H406–08 (testimony of Charles Mildner) (as a matter of policy, United States Attorney's Office given first chance to review all defense subpoenas upon the MCC before compliance efforts are initiated). Given the incestuous relationship between the two entities, we cannot conclude that the Trial I defendants could have obtained the information sought prior to trial from an independent source. Thus, their failure to compel the information from the MCC does not remove the material from the reach of *Brady. See Agurs,* 427 U.S. at 111, 96 S.Ct. at 2401:

> [T]he fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial.... If the standard applied to the usual motion for new trial based on newly discovered evidence were the same when the evidence was in the [government's] possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice.

*See also Lugo,* 682 F.2d at 9 (distinguishing between evidence within the prosecution's control and knowledge and that which is not).

4. Impact of Production in Trial II

■ The fact that the defendants in Judge Conlon's trial were ultimately successful in obtaining the information from the MCC is inconsequential. First, the information became public on August 15, 1991, eight days after the close of evidence in Trial I. Due process requires disclosure at a time when the evidence would be of value to the accused. *United States v. Beverly,* 913 F.2d 337, 349–50 (7th Cir.1990) (citing *United States v. Allain,* 671 F.2d 248, 254–55 (7th Cir.1982)), *cert. denied,* 498 U.S. 1052, 111 S.Ct. 766, 112 L.Ed.2d 786 (1991); *see also United States v. Weaver,* 882 F.2d 1128, 1141 (7th Cir.) (collecting cases), *cert. denied,* 493 U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380

(1989). To learn of the potentially impeaching evidence on August 15, 1991 surely would have been of no use to defendants, as cross examination of the relevant witnesses was complete.

Second, to the extent that the defense could have made use of the evidence of post-incarceration drug use after August 15, 1991, the information disclosed during the trial before Judge Conlon was misleading to the point that defendants likely would have abandoned the issue. The facts revealed by the memorandum itself were minimal when compared to the information already in the possession of the government. Most importantly, unlike the memorandum Mildner sent to Warden Beeler on October 18, 1989, the August 15, 1991 memorandum, also authored by Mildner, does not indicated that the positive tests of April 12, 1989 (Evans) and May 11, 1989 (Harris) were unauthorized, *i.e.*, not attributable to any prescribed medication. To the extent that AUSA Hogan did not direct Mildner to omit this crucial information, he certainly knew of its existence and, by not volunteering it, contributed to the public distortion of the record before Judge Conlon.

Hogan not only failed to disclose information in his possession which would have supplemented that in the August 15, 1989 memorandum, he affirmatively mislead the court, the jury and defense counsel as to the import of the revealed information. As a part of the government's rebuttal, Hogan called MCC Executive Assistant Robert Hafer to testify. Hafer testified that at the time of the positive tests, he was a MCC unit manager and his responsibilities included administering drug tests and reviewing incident reports relating to inmate drug violations. C Tr. 5759–60. According to Hafer, when an inmate tested positive, Hafer would check the inmate's file to determine whether the result could be attributed to prescribed medication and, if not, he would conduct a disciplinary hearing. C Tr. 5761, 5765. After examining the August 15, 1991 memorandum, Hafer testified that he did not recall conducting any disciplinary hearings with respect to either Harris or Evans. C Tr. 5762–66. Finally, Hafer testified that Evans had considerable

medical problems at the time he provided his urine samples, and that the Tylenol administered by the MCC contains codeine. C Tr. 5761, 5765.

The impression created by Hafer's testimony was that, since neither Harris nor Evans had been disciplined by Hafer, their positive tests must have been authorized by prescribed medication. To reinforce this false impression, in closing argument Hogan stated:

> Then [defense counsel] talk about the fact Henry Harris tested positive for morphine while he was at the MCC in witness protection. You heard Bob Hafer get on here, and he told you that there was never a disciplinary hearing.... [Defense counsel] didn't even bother to cross examine Bob Hafer about that, because they knew that the testimony that he had given was that there was [sic] no disciplinary proceedings because there wasn't anything wrong with the fact that he had drugs in his system, because he was taking it for medication, just like Harry Evans was.

C Tr. 6170–71. Of course, both Hafer and Hogan knew that this was not the case. Hafer admitted during the course of these post-trial proceedings that, contrary to the impression created by his testimony in Trial II, he was not a unit manager for the sixth floor of the MCC, where Evans and Harris were housed, and, as such, would not be informed if an inmate on that floor had tested positive for drugs and was disciplined. C123–25, 137–38. Moreover, on July 6, 1989, in his capacity as acting warden, Hafer received and initialed a memorandum indicating that Henry Harris had tested positive for illegal drugs and had been disciplined as a result. C139–40; CDE Hafer No. 5. Hafer's misleading testimony provided Hogan with the opportunity to further conceal his knowledge regarding Harris and Evans' continued drug use and allowed him to fraudulently dismiss the positive test results as medically authorized. Under these circumstance, the government may not point to the disclosure in Trial II and claim that defense counsel in Trial I lacked diligence in obtaining information regarding Harris and Evans' post-incarceration drug use. *See United*

*States v. Shaffer,* 789 F.2d 682, 690 (9th Cir.1986) ("[W]hile the government did apprise [defendant's] counsel of [exculpatory evidence], such disclosure was inadequate because the government also told [defendant's] counsel that [the evidence] would be of no value to [the] defense. This later statement negates any disclosure made in the earlier statement."); *Freeman v. Georgia,* 599 F.2d 65, 71–72 (5th Cir.1979) ("When a police statement misleads the defense into believing that evidence will not be favorable, the state cannot thereafter argue that it was a waiver not to request it."), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed.2d 641 (1980).

At root, defendants were dependant upon the prosecution for production of the test results. Rather than disclose the information in its possession, the government represented that it had complied with its *Brady* obligations. Defendants took the government at its word, hardly a failure to exercise due diligence. The conduct of the government coupled with defendants' excusable oversight compels a conclusion that information of Harris and Evans' post-incarceration drug use was "suppressed" within the meaning of *Brady.*

### C. Evidence Suppressed by the Government was Favorable to the Defense

 It is now settled that "favorable" evidence extends beyond that which is exculpatory, as seen in *Brady* and *Agurs,* to include any evidence that the defense might have used to impeach government witnesses. *See Bagley,* 473 U.S. at 676–77, 105 S.Ct. at 3380–81; *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Douglas,* 874 F.2d at 1163; *United States v. Phillips,* 854 F.2d 273, 277 (7th

Cir.1988). The evidence suppressed from the defense in this case, including substantial evidence of Henry Harris and Harry Evans' continued drug use and their receipt of benefits such as contact and conjugal visits normally prohibited at the MCC, free telephone service, alcohol, clothing and other gifts, most certainly was "valuable for impeachment purposes," *Douglas,* 874 F.2d at 1163–64, and, as such, was favorable to the defense.

#### 1. Post–Incarceration Drug Use

Bearing on the issue of favorability,[58] the government has argued that evidence of Harris and Evans' post-incarceration drug use would have had no value for impeachment purposes as it would have been inadmissible at trial. We disagree.

 As a general rule, a witness' past drug use is not probative of veracity and, thus, is not a proper subject for cross examination. *United States v. Sellers,* 906 F.2d 597, 602 (11th Cir.1990); *United States v. McDonald,* 905 F.2d 871, 875 (5th Cir.), *cert. denied,* 498 U.S. 1002, 111 S.Ct. 566, 112 L.Ed.2d 572 (1990); *United States v. Williams,* 822 F.2d 512, 516–17 (5th Cir. 1987). Nonetheless, the instant evidence of post-incarceration drug use properly could have been offered for a purpose other than to attack Harris and Evans' general character for truthfulness. First, in cases where a witness' memory or mental capacity is legitimately at issue, a district court may admit evidence of a witness' drug use as it relates to his or her "inability to recollect and relate." *United States v. Robinson,* 956 F.2d 1388, 1397 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 654, 121 L.Ed.2d 581 (1992); *United States v. Cameron,* 814 F.2d 403, 405

---

**58.** We observe that the government raises this issue within the context of the materiality determination. And, many courts have approached the question within that framework. *See Dimas,* 3 F.3d 1015, 1017–18; *United States v. Phillip,* 948 F.2d 241, 249 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992); *United States v. Kennedy,* 890 F.2d 1056, 1059 (9th Cir.1989), *cert. denied,* 494 U.S. 1008, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990). The reason is evident, for if the evidence would have been inadmissible at trial then it could have no impact on the result. Equally apparent, howev-

er, the admissibility of the suppressed material is also germane to the issue of favorability. To be sure, to the extent that potentially impeaching evidence in fact would have been admissible at trial, such evidence is undisputedly favorable to the defense. We address the issue in this section only because "[a] trial judge should rule first on the question of whether the evidence is favorable—is it exculpatory or valuable for impeachment purposes.... If the evidence *is* favorable, only then must the judge rule on the question of materiality." *Douglas,* 874 F.2d at 1163–64 (emphasis in original).

**1360**

(7th Cir.1987); *see also Wilson v. United States,* 232 U.S. 563, 568, 34 S.Ct. 347, 349, 58 L.Ed. 728 (1914) (trial court did not error in allowing inquiry of witness' drug use on cross examination as it related to "whether, at the moment of testifying, she was under the influence, or had recovered from the effects of its last administration"). Both Harris and Evans testified to matters spanning over twenty years, placing their respective memories at issue. Further, both asserted that at the time of Trial I, they were clear-headed and could vividly remember the events as they transpired. *See* R3016 (testimony of Harry Evans) ("[Drugs] got me here today. But I'm not on drugs now. My mind is very clear."); R6746 (testimony of Henry Harris) (stating in response to the question "What did [cocaine] do to your head?", "I'm still complete, and I'm functional. My mind is sharp."). In light of these statements, defendants would have been well within their right to question whether the continuing nature of Harris and Evans' drug use affected their ability to recollect and relate. *See Robinson,* 956 F.2d at 1397; *United States v. Sampol,* 636 F.2d 621, 667 (D.C.Cir.1980).[59]

▮ Further, the suppressed evidence relating to Harris and Evans' post-incarceration drug use would have been admissible to establish bias. Evidence that a government witness has a bias in favor of the government is always permissible cross-examination and, if not admitted by the witness, may be proven by extrinsic evidence. *United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984); *United States v. Atherton,* 936 F.2d 728, 733 (2d Cir.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 1187, 117 L.Ed.2d 429 (1992); *United States v. Frank-*

*enthal,* 582 F.2d 1102, 1106 (7th Cir.1978). Drug use alone is normally not probative of bias. Rather, courts usually require some showing that the government was aware of the witnesses' drug use yet refrained from prosecution or other discipline. *See, e.g., Atherton,* 936 F.2d at 733 (holding admission of evidence establishing that informant used and distributed drugs during his service to the government conditioned on "some showing that the government was contemplating prosecution, or at least was aware, of the illegality"); *accord United States v. Noti,* 731 F.2d 610, 613 (9th Cir.1984) (evidence that government witness used drugs not probative of bias where no showing that witness cooperated to receive lenient treatment from government). The evidence adduced at the these post-trial hearings clearly establishes that the government not only knew of both Harris and Evans' continued drug use at the MCC, but deliberately overlooked such misconduct. Certainly, the government would have preferred that its witnesses were not habitual drug users but, as the evidence indicates, to the extent that it could not stop the problem discretely, it chose to ignore the issue. Such government tolerance enabled Harris and Evans to continue using drugs at the MCC without significant risk of detection or punishment. When coupled with evidence of undisclosed benefits conferred upon the El Rukn cooperating witnesses by the government, some of which directly facilitated the post-incarceration drug use, a reasonable jury could infer that the government's failure to stop such drug use and to ensure its witnesses were disciplined for the same was motivated by a desire to both curry favor with these witnesses and preserve their cred-

**59.** Notably, prior to any of the post-trial hearings conducted in connection with this cause, AUSA Hogan filed a responsive pleading advocating disposition of defendants' motions for new trial without an evidentiary hearing. Government's Response to Defendants' Motion to Vacate Judgments of Conviction or Move for New Trial (June 2, 1992). In support of his position, Hogan cited *Sampol* and argued: "And even if long term drug use may impact on a witness' ability to recollect, one or two instances does not advance that inquiry. Therefore, even if true, isolated drug use while at the MCC, well after the events about which the witnesses testified but over two years prior to their testimony, was irrelevant." *Id.* at

20–21. Of course, at the time he filed this pleading, Hogan not only knew that Harris and Evans had tested positive for illegal drugs in April and May of 1989, but he also possessed information that these witnesses were routinely using drugs during their entire stay at the MCC, including the time of Trial I. To be sure, as discussed *infra* Section II of this opinion, Harris and Evans' continued drug use could be reasonably construed as habitual. *See also* A679 (testimony of Derrick Kees) (Evans has been a drug addict since 1986 and, by the time Harris had reached the MCC in Chicago, he was a drug addict, *i.e.,* he had a "habit" and needed drugs "to keep [himself] together").

ibility. With such a foundation, the suppressed evidence could have been used to subject Harris and Evans' credibility to serious question. *See United States v. Ray*, 731 F.2d 1361, 1365 (9th Cir.1984).

### 2. Government Conferred Benefits

Evidence that the El Rukn cooperating witnesses received clandestine benefits from the government, such as free telephone service, contact and conjugal visits ordinarily prohibited at the MCC, alcohol, clothing and other gifts, not only is admissible to show bias under the Federal Rules of Evidence, but were this court to prohibit defendants from inquiring about these benefits, we likely would have violated defendants' rights secured under the confrontation clause of the Sixth Amendment. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Accordingly, there is no question, and the government does not dispute, that the suppressed evidence of government conferred benefits was favorable to the defense.

### D. Evidence Suppressed by Government was Material

■ That the government suppressed evidence favorable to the defense does not automatically entitle defendants to a new trial. Rather, the defense bears the burden of demonstrating that the evidence is material to guilt or punishment. In *Agurs*, the Supreme Court distinguished three situations involving post-trial discovery of evidence favorable to the accused that, during the course of trial, had been known to the prosecution but unknown to the defense. For each of these situations, the Court appeared to define a separate standard of materiality. First, in cases where the prosecutor knowingly used false information or failed to disclose that testimony used to convict the defendant was perjured, the standard of materiality was whether there was "any reasonable likelihood that the false evidence could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397

(citing *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935)). Second, where the defense made a specific request for material that the prosecution had suppressed, the standard was "whether the suppressed evidence might have affected the outcome of the case." *Id.* 427 U.S. at 104, 96 S.Ct. at 2398 (citing *Brady* as an example). Finally, where the defense made either a general request or no request for the information in the possession of the government and favorable to the accused, the standard of materiality was whether "the omitted evidence create[d] a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2402.

■ In *Bagley*, however, the Supreme Court reformulated the standard of materiality for all cases in the absence of perjured testimony. Under such circumstances, "[t]he evidence [withheld by the government] is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383; *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987); *United States v. Dweck*, 913 F.2d 365, 371 (7th Cir.1990); *Jackson*, 780 F.2d at 1309–10. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. While recognizing that "the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption," the Court found that "[t]his possibility of impairment does not necessitate a different standard of materiality." *Bagley*, 473 U.S. at 682–83, 105 S.Ct. at 3384. Rather, the Court found the *Strickland*[60] formulation of the *Agurs* test for materiality "sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to

60. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court held that a new trial must be granted when evidence is not introduced because of the incompetence of counsel only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

the accused." *Id.* at 682, 105 S.Ct. at 3383. Thus, we are left with a choice between two standards of materiality, such decision turning on the presence or absence of perjured testimony.

In the instant case, the decision is not critical. While the government did not rely on perjured testimony respecting the special benefits conferred on its witnesses nor regarding Henry Harris' post-incarceration drug use, it failed to correct Harry Evans' false assertion that he had not used drugs since 1988. Under this circumstance, we could apply reasonably the less restrictive standard: whether there was "any reasonable likelihood that the false evidence could have affected the judgment of the jury." Nonetheless, we are convinced that the nature and magnitude of the suppressed evidence in this case is material even under the *Bagley* formulation: whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

### 1. Suppressed Evidence was not Merely Cumulative Impeachment

Seventh Circuit case law instructs that "[g]enerally, where impeachment evidence is merely cumulative and thereby has no reasonable probability of affecting the result of trial, it does not violate the *Brady* requirement." *Dweck*, 913 F.2d at 371 (citing *Jackson*, 780 F.2d at 1311; *United States v. Polizzi*, 801 F.2d 1543, 1553 (9th Cir.1986); *United States v. Mackey*, 571 F.2d 376, 389 (7th Cir.1978)); *see also United States v. Sweeney*, 688 F.2d 1131, 1141–42 (7th Cir. 1982). For instance, in *Dweck*, the defendant was found guilty of violations of 21 U.S.C. § 841(a)(1) (possession with the intent to distribute cocaine) and 18 U.S.C. § 2 (aiding and abetting in the commission of the substantive offense charged) largely upon the testimony of Dennis McCarthy, a government witness who testified pursuant to a plea agreement. *Id.* at 366–67. On the day of trial, Dweck's counsel moved for sanctions pursuant to Rule 16(d)(2) of the Federal Rules of Criminal Procedure and *Brady*, claiming that certain material relating to drug trafficking and drug use by McCarthy prior to 1986 had not been disclosed by the

prosecution. *Id.* at 370. After an *in camera* inspection, the district judge stated:

> I reviewed all the material last night and in my opinion there is no *Brady* material here that's been withheld by the government.
>
> The fact of the matter is that Mr. McCarthy has admitted up and down that he is up to his eyeballs in the drug business and has been dealing, selling, doing everything that a drug dealer does, false names and what have you, and the long reports of the DEA here are simply McCarthy's statements about other people that he's done long and big time drug dealing with. There is nothing here that goes to the charges against Mr. Dweck. There is no fodder for even attacking his credibility beyond what has already been noted. For instance, he says on page 13 that he was freebasing cocaine. That's already in the record. The jury has heard that he has done that. Mr. Dweck's name is mentioned a few times in these reports and he has testified consistent with that. So I find no *Brady* violation, and not even the smell of one that would require further analysis and review of this point by me.

*Id.* at 370–71. The Seventh Circuit affirmed, reasoning that "the jury had a clear picture of McCarthy as a government informant and his history as a major drug dealer and user." *Id.* at 372.

Unlike the evidence suppressed in *Dweck*, we do not believe that the information regarding Harris and Evans' post-incarceration drug use would have been merely cumulative impeachment. To be sure, both Harris and Evans were subjected to an inordinate amount of cross-examination designed to attack their credibility. For instance, Harris was asked about and acknowledged: (1) past criminal conduct, including his involvement in efforts to murder a rival gang member, R6452–56, R6491–93, R6886, his participation in efforts to carry out two contract murders, R6447, R6508–25, R6543–45, R6552–63, R6579–85, R6791, R6795–96, and his assisting a fellow drug dealer in fleeing the scene of a double shooting, R6710–12, R6831; (2) extensive drug abuse, including using cocaine and marijuana in 1981, R6745–46, regularly

snorting cocaine to test its quality in the mid–1980's, R6345–46, using cocaine with a female companion in New York City in 1985, R6415–16, and sampling cocaine he picked up from South Carolina in 1985 and 1986, R6439; (3) a virtual lifetime of drug dealing, *see* R6264–65, R6283–85, R6299–301, R6332, R6345–51, R6381–429, R6431–38, R6595–96, R6604, R6609–10, R6673–74, R6678–79, R6685–86, R6704, R6723, R6741–42, R6746, R6755–59, R6793, R6837, R6864–65, R6870, R6873–76, R6923–25; (4) numerous lies and acts of falsehood, including stealing money and drugs from the El Rukns, R6409, R6596, R6871–72, attempting to deceive the FBI into believing he was cooperating and providing the agency with false and selective information, R6680–84, R6829, R6906–16, making false statements in a television interview, R6701–03, R6864, and, for a promised fee of $15,000, lying in a sworn statement to an attorney, R6692–93, R6831–32; (5) omissions from and inconsistencies with his handwritten notes, R6765–78, R6806, R6848, R6928, statements given to federal agents, R6873, and testimony in a previous trial, R6810–23; (6) an interest in testifying favorably for the government to "save [his] own hide," R6778, admitting he feared the "electric chair" and life imprisonment, R6819, R6921, adding that he did not "know a man in the world that wouldn't lie to save his life," R6827; (7) the benefit he was to receive for his testimony, including an agreement with South Carolina prosecutors whereby a state heroin charge was dropped and he would not be subject to the death penalty, R6843, R6922, the details of his federal plea agreement, R6734, R6777, R6807, R6926, R6932–33, and his understanding of the substantial penalties attached to the charges he faced and could have faced, R6735, R6819, R6838, R6921, R6927; and (8) his extensive efforts in assisting the government, including his testimony in other trials, R6713–14, R6718, R6925, the countless hours spent listening to, and translating hundreds of recorded conversations, R6480–90, R6840, R6934, R6958–60, and numerous meetings with policemen, agents and prosecutors, R6282, R6483–84, R6713, R6727, R6961. Likewise, the record is littered with serious attacks on Evans' credibility, including evidence of: (1) his involvement in nearly a dozen murders, murder attempts and shootings, including (i) the "tit-for-tat" murders of Bert Conner and Gregory Freeman, R2357–82, (ii) the murders of two "disloyal" gang officers, R2405–07, R30099, R3346–47, (iii) the shooting of a Waukegan pimp/drug dealer in a territorial dispute, R2416–18, R2538–39, (iv) the attempted murder of Barnett Hall, a rival gang member, R2617–19, R3099–3100, R3347–48, (v) the attempted murder of Bruce Davis, a rival gang member, and his girlfriend, R2623–27, R3100, R3177, R3303, R3348, (vi) the attempted murder of Duke Thomas, a rival gang member, R2644–45, R3101, R3358, (vii) the attempted murder of the Ewing brothers, R2653–57, R3100, R3358–59, (viii) attempts to locate and kill Theotis Clark, a former El Rukn who joined a rival gang, R2726–29, R3102, (ix) an incident in which Evans and several others took a number of unarmed hostages, robbed them, and forced them to jump out a five-story window, after which Evans and his gang shoot at the rest (killing one) when they tried to flee, R2391–93, R3025, and (x) the so-called "Sengali massacre," in which Evans and fellow gang members tried to kill 17 or 18 rival gang members in a yard and then had a shoot-out with security guards, R2386–88, R3099; (2) his involvement in numerous beatings, extortions, intimidations, home invasions and robberies, including a robbery that ended in a shoot-out with police, R2343–44, R2349–52, R2389, R2396, R2591, R2608, R3024, R3026, R3064–65, R3102–03, R3111, R3121; (3) the use of cocaine, marijuana, pills and cough syrup from the early 1970s, and the admission that Evans was under the influence of drugs during the events he testified about, R3015–16; (4) twenty years of drug dealing, R3374, during which time he sold cocaine, heroin, marijuana, cough syrup and pills, R2309–19, R2579, R2602–04, R2627–28, R2699, R2912–13, R2933, R3013, R3065, R3312, R3425; (5) numerous instances of falsehood, including falsely pretending to cooperate with law enforcement authorities in order to get close to, and if necessary kill, and El Rukn thought to be cooperating, R2956, R3008–09; (6) omissions from and inconsistencies with his grand jury testimony, R3040, R3098, R3145, R3149–52, R3155–56, and testimony from a prior trial, R3004,

R3063, R3174, R3306–07, R3315–16, R3318–19; (7) his interest in testifying favorably for the government, and even lying, to help himself, R3008; (8) Evans' cooperative efforts with the government and the terms of his federal plea agreement, R2958, R2967–70, R2987–88, which included a promise by the State of Illinois not to charge him with any crime mentioned in his proffer, including ten murders, R2967–68; and (9) payments received by virtue of his cooperation with the government, including (i) $90 per month to his family, (ii) $60 per month paid directly to Evans' commissary account, and (iii) payment for his extensive medical treatment, R3001, R3003, R3438–39. Nonetheless, the suppressed information regarding Harris and Evans' post-incarceration drug use stands apart from the above attacks on their respective credibility. The vast majority of the above cross-examination focused on Harris and Evans' conduct prior to the time they "saw the light" and began cooperating with the government. The terms of their plea agreements and the financial assistance Evans and Harris acknowledged receiving, while accruing after their cooperation, do not bear on their conduct subsequent to becoming cooperating witnesses. As such, were the jury to learn that both Harris and Evans were engaging in criminal conduct (i.e., using illicit narcotics) after they had begun providing information and were otherwise assisting the government, it is reasonably probable that the jury would reject some or all of Harris and Evans' testimony. In making this determination, we place great emphasis on (1) the duration of these witnesses' drug use, and (2) that the government knowingly allowed such conduct to occur.

Likewise, the evidence of government supplied benefits, including free telephone service, contact and conjugal visits otherwise prohibited at the MCC, alcohol, clothing and other gifts, gives rise to a reasonable probability that the outcome of Trial I would have been different. While standing alone, any one of these benefits may appear trivial, taken together, they evince a pattern of preferential treatment afforded no other government cooperating witnesses. Unlike the details of their respective plea agreements and the financial support to which each cooperat-

ing witness acknowledged during Trial I, these benefits evince a motive on the part of the government to curry favor with all of their cooperating witnesses in order to ensure continuing and favorable cooperation. As such, a jury could reasonably reject some or all of the testimony given by Jackie Clay, Harry Evans, Henry Harris, Earl Hawkins, Eugene Hunter and Derrick Kees. As discussed supra subsection VI(C)(3), were the jury to reject the testimony of all six cooperating witnesses, only Felix Mayes' conviction for the intimidation of witness Henry Harris (Count 12) and Charles Green's conviction for the unlawful possession of firearms as a convicted felon (Count 58) could be maintained without taint.

2. Lead Prosecutor William R. Hogan, Jr.'s Conduct Respecting the Suppressed Evidence Compels a Finding of Materiality

The Supreme Court has repeatedly stated that, within the context of a Brady claim, the focus remains upon the fairness of the trial, not the culpability of the prosecutor. See Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 947–48, 71 L.Ed.2d 78 (1982); Agurs, 427 U.S. at 110, 96 S.Ct. at 2400–01; Brady, 373 U.S. at 87, 83 S.Ct. at 1197. At the same time, we are cognizant of the Seventh Circuit's decision in United States v. Esposito, 523 F.2d 242, 248–49 (7th Cir.1975), cert. denied, 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 768 (1976), which states that "a court should be less inclined to hold unproduced evidence immaterial … if the prosecutor's failure to reveal the evidence was not in good faith." See also United States v. Disston, 612 F.2d 1035, 1038 (7th Cir.1980) ("Since the information was not withheld in bad faith, we are less inclined to hold the unproduced evidence material"). Although the court in Disston recognized that "[t]he good or bad faith of the prosecuting attorney may no longer be a factor in determining whether nondisclosure of information requires reversal of conviction," id. at 1038 n.*, later panels of the Seventh Circuit have attempted to reconcile Esposito and Disston with Agurs:

We do not believe that our decisions in Esposito and Disston are inconsistent with Agurs. The decisions of this court merely

point out that in cases where the materiality of the evidence has not been conclusively determined, we will look to the bad faith of the government, if it exists, to assist our judgment. In actuality, this process involves nothing more than plain common sense. The fact that the government seeks in bad faith to suppress certain evidence indicates that such evidence may indeed be material. We are doubtful that any prosecutor would in bad faith act to suppress evidence unless he or she believed it could affect the outcome of the trial. In short, the existence of bad faith is merely a factor a court may consider in making its materiality determination.

*Jackson,* 780 F.2d at 1311 n. 4; *see also United States ex rel. Smith v. Fairman,* 769 F.2d 386, 391 (7th Cir.1985) (citing *Esposito* for the proposition that "good faith of prosecutor relevant only insofar as special benefit of the doubt on the question of materiality should be given to a defendant when the prosecutor's failure to reveal evidence is *not* in good faith) (emphasis in original). The Seventh Circuit has recently reaffirmed the proposition that: "Another factor the court ought to look into is whether the prosecution acted in bad faith. Though bad faith alone is not enough to require a new trial, it could shed some light on whether the prosecution thought the evidence was valuable to the defendants." *Dimas,* 3 F.3d 1015, 1020.

While the government may not have disclosed information of the special benefits afforded to the El Rukn cooperating witnesses out of a mistaken belief that they were of de minimis value to the defense, there is no question respecting the government's belief concerning the value of the Harris and Evans' post-incarceration drug use. As discussed *supra* subsection V(B), the evidence adduced during these post-trial hearings overwhelmingly indicates that lead prosecutor William R. Hogan, Jr. deliberately concealed substantial information regarding his two star witnesses' continued drug use at the MCC. From such a calculated decision stems the inference that Hogan believed disclosure of this information would have destroyed his case. As the Seventh Circuit recognized in *Jackson:* "We are doubtful that any prosecutor would in bad faith act to

suppress evidence unless he or she believed it could affect the outcome of the case." *Id.* at 1311 n. 4. Hogan admitted as much, opining that the undisclosed drug test results:

> could have impacted on our ability to return the indictment at all. If somebody had said to me that the MCC has made a determination that two of your major witnesses have been using drugs or have used drugs, I would question whether or not those persons were reliable, whether I could return such a huge indictment that was crafted in large part around their testimony, or their expected testimony.

H151. Just as Hogan would have questioned these witnesses credibility, so too would have the jury, which is precisely why Hogan did not disclose such information in his possession to the defense.

In sum, considering the totality of the post-trial evidence, the court's "confidence in the outcome" has been undermined, *see Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383, and, accordingly, we hold that defendants' due process rights were violated by the government's failure to disclose the information in question. As discussed above, such undisclosed information touches every conviction, save Felix Mayes' conviction for the intimidation of witness Henry Harris (Count 12) and Charles Green's conviction for the unlawful possession of firearms as a convicted felon (Count 58).

## VIII. Conclusion

Jeff Boyd, Edgar Cooksey, Andrew Craig, Charles Green, Sammy Knox, Felix Mayes and Noah Robinson, as the government has insinuated, may be the most infamous of organized criminals that Chicago has seen since the days of Al Capone. As such, however, they are precisely the type of individuals that our founding fathers envisioned when guaranteeing each and every member of our society the right to a fair trial. Were the court to condone the abrogation of constitutional protection in this case based on the notoriety of the defendants, injustice would afflict not only these defendants, but society as a whole. Such is the paradox of justice: to ensure a free and just society for every

law-abiding soul, the individual protections afforded by law must apply with equal force to the most hardened criminals preying on our community. Finding that the actions of a few individual members of the United States Attorney's Office [61] have deprived defendants of due process of law, we grant their respective motions for new trial on all convictions, save Felix Mayes' conviction for the intimidation of witness Henry Harris (Count 12) and Charles Green's conviction for the unlawful possession of firearms as a convicted felon (Count 58).

It is so ordered.

---

61. We emphasize that, although this opinion has criticized the actions of a few identified individuals in the United States Attorney's Office and other Northern District of Illinois law enforcement and penal agencies in these El Rukn prosecutions, these actions are atypical of the traditional modus operandi of these offices and agencies. This court has observed and has the highest respect for the professionalism of the hardworking and principled men and women in the Office of the United States Attorney for the Northern District of Illinois and the other federal agencies involved in the El Rukn prosecutions. We hope that the transgressions of an overly zealous and poorly supervised Assistant United States Attorney, and those few who followed his lead, do not unfairly reflect on the reputations of the dedicated law enforcement professionals to whom we all owe so much.